David Aronoff (SBN 125694)
daronoff@foxrothschild.com
Joshua Bornstein (SBN 311658)
jbornstein@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
Telephone:  310-598-4150
Facsimile:   310-556-9828

Gavin W. Skok (*pro hac vice*)
gskok@foxrothschild.com
**FOX ROTHSCHILD LLP**
1001 Fourth Ave., Suite 4500
Seattle, WA 98154
Tel.:  206-624-3600
Fax:  206-389-1708

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISPOT.TV, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>NADEZHDA TEYFUKOVA a/k/a NADYA TEYFUKOVA, an individual, and ENTERTAINMENT DATA ORACLE, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 2:21-CV-06815-MEMF-MAR<br><br>Hon. Judge Maame Ewusi-Mensah Frimpong<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**(1) VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836);**<br><br>**(2) MISAPPROPRIATION OF TRADE SECRETS (Cal. Civ. Code § 3426.1 *et seq.*);**<br><br>**(3) VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT; AND**<br><br>**(4) BREACH OF CONTRACT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff iSpot.tv, Inc. ("iSpot"), by and through its attorneys of record, alleges as follows:

## I.      NATURE OF THE ACTION

1.      This is a case about unfair and illegal competition in the TV advertising analytics industry.

2.      iSpot is an industry leader in real-time television advertising data and analytics.  At the core of iSpot's business is its proprietary, trade secret ad database, which provides extensive advertising data organized by industry, accessible to iSpot's customers through a user-friendly dashboard and iSpot's proprietary APIs.[1]  iSpot has spent considerable time, money, and effort developing and maintaining its database, services, dashboard and APIs, which, unlike legacy and ad hoc solutions, are purpose-built to measure the performance of every ad on television with digital-like precision and granularity in real time.  iSpot's customers license the use of iSpot's database and services, typically for a specific industry or segment, and pay a subscription fee.  One of the primary products offered is a real-time competitive intelligence. All other iSpot solutions, including media measurement, unified measurement, TV conversions, user level data, creative assessment and more are built on top of iSpot's proprietary and trade secret ad database.  iSpot and its customers enter subscription agreements governing the use of iSpot's database and services, which bind all users of such services, along with iSpot's terms of use.  All iSpot users must use unique account login and security credentials associated with a specific customer and that customer's subscription.

3.      Entertainment Data Oracle, Inc. ("EDO") is a newcomer to the advertising data and analytics industry.  In December 2014, EDO (originally called "Big Data Box Office") persuaded iSpot to allow EDO to become an iSpot customer by representing that EDO's business was movie box office sales analysis, and

---

[1] An API, or "application programming interface," is a software interface that allows computers to communicate directly. The iSpot APIs are valuable to iSpot's customers because they allow automation and greater efficiency in data retrieval and review.

SECOND AMENDED COMPLAINT

143037730.1

claiming it wanted to use iSpot's TV ad analytics data and services related to the movie industry as one of several data points in analyzing movie box office sales. Based on those representations, iSpot granted EDO a limited license to use certain iSpot data and services in iSpot's "Life & Entertainment: Movies" category in exchange for promises by EDO that it would use the iSpot services and information only for internal research related to tracking theatrical advertising and for the sole purpose of providing predictive analytics for box office sales sold to movie studios. EDO expressly and in writing agreed that it would not "use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service," or reverse engineer or copy any iSpot materials or services.

4.    EDO repeated those promises in a second agreement in March 2016 when its original agreement expired.  EDO persuaded iSpot to enter the March 2016 agreement by again representing that EDO's business was limited to predicting and analyzing movie box office sales, and claiming it sought iSpot's data and services solely for such purposes.

5.    The parties entered a third contract in March 2017 when the March 2016 agreement expired.  iSpot again raised questions regarding EDO's intended use of iSpot's data and services after industry rumors began circulating that EDO may be developing TV analytics products that would compete with iSpot.  EDO again assured iSpot that its business was only a "predictive movie analytics service" and that it intended to use iSpot's data and services solely to provide one datapoint to be used in that analysis.  Based on those representations, iSpot agreed to enter a new one-year contract limited to providing access to certain iSpot data and services for the "Life & Entertainment: Movies" industry segment.

6.    To protect its valuable intellectual property (and the substantial investment made in developing and maintaining it), iSpot insisted that EDO agree in the March 2017 contract that EDO "may not use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service."  At EDO's

SECOND AMENDED COMPLAINT

request and, on information and belief, in a further effort to persuade iSpot that EDO would not misuse iSpot's data or services, the March 2017 contract added language specifying this provision was not violated by "using the iSpot Service to support [EDO's] own predictive movie analytics service."  The parties did not agree to any carve outs or exceptions for any other uses.

7.    Unbeknownst to iSpot—and in blatant breach of its promises and representations—EDO was developing its own competing products and TV monitoring and analytics service while an iSpot customer, and was using iSpot's intellectual property, data, and designs to do so.  Among other things, EDO exploited iSpot's APIs and circumvented restrictions on its allowed access to gain access to a massive amount of ads and data for numerous industries that EDO was not licensed or permitted to access.  EDO took tens of thousands of digital ads, including their proprietary metadata structures and elements, and made millions of automated calls to iSpot's APIs to scrape extensive metadata, ad airing schedules and other information collected by iSpot for ads in nearly every industry in iSpot's database.  EDO also carefully studied the appearance and function of iSpot's dashboard and APIs, replicating their form and function in large part in products that EDO publicly released shortly after it ceased being an iSpot customer.

8.    In 2018, just months after the iSpot contract expired, EDO publicly unveiled two competing products, which it called the "TV Ad Database" and the "TV Ad Engagement" platform.  EDO used these products—which were built on the back of iSpot's data and products—to take customers and market share from iSpot.

9.    In 2019, in a further effort to compete unfairly and take iSpot's valuable trade secrets, EDO and its Media Analytics Manager, Nadya Teyfukova, begin illegally accessing iSpot's database and services by making unauthorized use of login credentials that had previously been issued to Ms. Teyfukova for her work on behalf of an iSpot customer while working at a former employer and falsely representing that she still was employed by that former employer—which was an authorized iSpot user.

143037730.1

Ms. Teyfukova and EDO were not authorized to access iSpot's database, use its services, or use these login credentials.  Investigation of iSpot's logs and IP access information show that over the course of 21 months, EDO and Ms. Teyfukova illegally accessed iSpot's database by way of such misrepresentations and misuse of access credentials numerous times, viewing thousands of pages of iSpot's data, running thousands of queries against iSpot's database on topics valuable to EDO, and accessing and downloading hundreds of custom reports, all of which was done to gain a competitive advantage and generate profit from sales to EDO customers without the need or expense of EDO doing its own work or paying subscription fees to iSpot.

10.    More simply, EDO tricked iSpot into taking EDO on as a customer with limited access to a single narrow industry segment, claiming that EDO intended to use iSpot's database and services as one of many data points to help with EDO's purported core business of predicting box office sales.  Over the next three and a half years, EDO studied iSpot's highly successful TV ad analytics business, learned how to build the dashboard and APIs it needed to compete by copying iSpot's work, and took tens of thousands of digital assets and millions of pieces of data to build its own competing database and products.  Still not confident in its own work—or its ability to compete fairly—EDO and Ms. Teyfukova then illegally accessed iSpot's database hundreds of times and continued taking information that EDO then used to compete with iSpot and steal market share.

11.    This brazen theft is the antithesis of fair competition.  It also breaches the parties' contract and violates the law in numerous ways.  Accordingly, iSpot brings this action to protect its valuable intellectual property, prevent EDO and Ms. Teyfukova from further unfair competition, theft, and or unauthorized access to its database, and to recover monetary damages.

## II.    PARTIES

12.    Plaintiff iSpot.tv, Inc. is a Delaware corporation with its principal place of business in Bellevue, Washington.

143037730.1

13.     Defendant Entertainment Data Oracle, Inc. is a Delaware corporation with its principal place of business in Culver City, California.

14.     Defendant Nadya Teyfukova is an individual who resides in Los Angeles, California.

### III.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Ms. Teyfukova because Ms. Teyfukova resides in this District and committed acts in this District that are directly related to the claims at issue in this action.  This Court has personal jurisdiction over EDO because EDO's headquarters and principal place of business are in Culver City, California, and because EDO transacts business in this District that is directly related to the claims at issue in this action.

17.     Venue is proper in this District with respect to Ms. Teyfukova pursuant to 28 U.S.C. § 1391(b)(1) because Ms. Teyfukova resides in this District, and pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.  Venue is proper in this District with respect to EDO pursuant to 28 U.S.C. § 1391(b), (c) and (d) because, during the relevant period, EDO resided and transacted business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District.

### IV.     FACTS

**A.      iSpot Invests Significant Time and Resources to Develop and Maintain Its Proprietary Ad Database, Products, and Services, Which Are Recognized Industry Leaders.**

18.     iSpot offers real-time television advertising measurement and attribution services that enable advertisers, agencies and TV networks to plan, optimize, and

143037730.1

measure the effectiveness of their television advertising investments based on impact across business-outcomes, brand impact, search and other key performance indicators.

19.    As part of its business, iSpot has developed an extensive proprietary and trade secret database of TV and video advertising data.  Such data includes both digital assets (digital copies of ads) and extensive data about each ad and airing that can be used to analyze numerous factors important to advertisers, such as reach, audience engagement, and ad effectiveness.  iSpot collects, analyzes, and aggregates advertising data, and then organizes that data by industry into a user-friendly and graphical interface (the iSpot dashboard).  iSpot spent considerable time and resources creating and maintaining its dashboard and tools for its customers to interact with its database, including application programming interfaces (APIs) that facilitate customer use of iSpot's services.

20.    iSpot has also spent considerable time and resources developing and maintaining its intellectual property and its trade secret database over many years, which is a critical foundation of its business.  The database is built by automatically "watching" TV feeds using Automated Content Recognition (ACR) technologies, determining each airing of an advertisement, and extracting new television advertisements or new variations of an advertisement that have not been seen before. The advertisements are then layered with extensive metadata that tracks products, pricing, promotions, actors, songs, mood, URL, phone numbers and many other dimensions.  It took nearly nine years to build accuracy, speed, and the scale inherent in the database, which today covers over 1.5 million advertisements and millions of ad airings.  The data and analytics in iSpot's database are not publicly available in one compilation, and it would take considerable time, money, and effort to replicate, if replication were even possible.  As a result, iSpot's database gives iSpot a significant competitive advantage in the TV advertising analytics industry, which is maintained and furthered by the secrecy of the database.

143037730.1

21.     iSpot licenses access to its database to approved customers for a monthly subscription fee, which can total hundreds of thousands of dollars.  iSpot requires its customers to obtain secure account login credentials for each user who will be accessing the database.  To control access to its proprietary database, iSpot prohibits its customers from sharing a single login among multiple users, and restricts access to employees or contractors, with all users subject to confidentiality obligations.[2]

22.     iSpot has taken reasonable steps to secure and protect its proprietary database and the trade secret information it contains.  For example, iSpot carefully screens its customers, then limits access to its database to customers who sign a subscription agreement and agree to iSpot's Terms of Service, which include confidentiality obligations binding on the customer and their users.  iSpot's customers may only access the specific portion of the database they are licensed to access, agree to keep all information from iSpot's database and services confidential, and are barred from sharing data from iSpot's database outside of their respective organizations or use that data for any unlicensed purpose.  iSpot's database is also password protected and every user must have secure login credentials to gain access.

**B.     EDO Gains Access to the iSpot Service By Holding Itself Out As a Movie Box Office Sales Analytics Company, And Agrees to Not Use That Access to Develop Competing Products.**

23.     EDO was an iSpot customer from December 19, 2014 through March 29, 2018, pursuant to three separate contracts with iSpot covering different time periods.

24.     EDO describes itself as "a data, measurement, and analytics company that advances the success of marketing, research, and creative professionals."[3]  A

---

[2] For example, while EDO was an iSpot customer, its contract with iSpot granted EDO a limited number of licensed user seats and provided that EDO "may provision user seats to its advertising agency, including its agency of record and its media and/or creative agencies. Any agency users accessing the iSpot Service are bound by the terms of this Agreement."  iSpot.TV Subscription Agreement between iSpot and EDO, dated as of March 29, 2017, at § 1.1(b).

[3] https://www.edo.com/company (last viewed March 3, 2022).

143037730.1

press release by EDO in 2018 a few months after it ended its relationship with iSpot described EDO's business as focused—like iSpot—on TV ad analytics:

> The company focuses on delivering innovative and accurate insights into the effectiveness of TV ads in driving the types of consumer engagement most closely tied to purchase activity. By measuring each national linear TV ad airing's granular impact on consumer intent and amassing a database of over 47 million precisely measured TV ad airings over the past 3.5+ years, EDO offers marketers real-time clarity about their TV campaign's creative and media performance as well as competitive intelligence.

https://www.prnewswire.com/news-releases/edo-closes-12-million-series-a-financing-led-by-breyer-capital-300740237.html (November 1, 2018 EDO press release) (last viewed March 3, 2022).

25.    EDO became an iSpot customer in December 2014 shortly before EDO was formally incorporated, while it was still operating as "Big Data Box Office."  At the time, EDO represented to iSpot that its business was limited to analyzing movie box office sales, and that it was seeking access to iSpot's data and services to provide one data point to be used in that analysis for EDO's customers.  In reliance on those representations, iSpot agreed to take EDO on as a customer.  The parties entered an "iSpot Analytics Subscription Order Form" dated as of December 19, 2014 ("Order Form"), which gave EDO 10 user licenses to access iSpot's TV Metrics, Audience Metrics, and APIs for the "Life & Entertainment: Movies" industry segment.  EDO's use of iSpot's data and services was subject to the Terms of Service attached as Exhibit A to the Order Form.  Among other things, the Order Form:

- Specified that EDO "may only use the iSpot Service for internal research purposes" (Order Form § 1.4(b)), "to track [EDO's] own and competitor's advertising activities" (*id.* § 1.3(a)), or to create and share work product with EDO's own customers (who EDO claimed it was advising about movie box

143037730.1

office sales) that "includes only a limited subset of or your summary or consolidation of the iSpot Data." *Id.* § 1.3(b).

- Provided that EDO "may not resell [or] redistribute . . . the iSpot Materials or any element thereof" (*id.* § 1.4(d)) and "may not modify, create derivative works of, reverse engineer, disassemble, decompile, or otherwise attempt to derive the source code or underlying trade secrets of the iSpot Service." *Id.* § 1.4(e)

- Barred EDO from using its access to the iSpot Service to build any competing product, expressly stating that EDO "may not use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service." *Id.* § 1.4(g).

26.    Subsequent public statements by EDO show that, contrary to the representations it made to persuade iSpot to give EDO access to iSpot's services and database in late 2014, EDO in fact was *from its inception* intending to build advertising analytics services and products to compete with iSpot.  For example, public statements by EDO shortly after ending its relationship with iSpot revealed that TV advertising analytics was a core part of EDO's mission from its founding:

> EDO's Founding Story
>
> Founded in 2015 by Daniel Nadler and Edward Norton, EDO got its start after Norton met Nadler and invested in Nadler's first company . . .Norton convinced Nadler that there was an opportunity **to apply advanced data science and machine learning in the media and advertising space and bring unprecedented sophistication to the measurement of advertising efficacy in ways that incumbent measurement players lacked** the technological capabilities to address.  They recruited an initial team of top engineers and data scientists from Nadler's Harvard network and media veterans from Nielsen and NBCU, including EDO's CEO Kevin Krim, the former head of CNBC Digital . . .

https://www.prnewswire.com/news-releases/edo-closes-12-million-series-a-financing-led-by-breyer-capital-300740237.html (last viewed March 3, 2022) (emphasis added).

143037730.1

27.    EDO and iSpot subsequently entered an iSpot.tv Subscription Agreement dated as of March 31, 2016, with a one-year term.  This agreement was intended to continue EDO's prior access to iSpot's services and database and similarly granted EDO user licenses to access iSpot's "Life & Entertainment: Movies" industry segment, allowed use of TV Metrics and Audience Metrics data and services, and gave EDO access to iSpot's dashboard and APIs for the licensed industry segment. The parties agreed to remain bound by all terms and conditions in the December 19, 2014 Order Form.

28.    Prior to entering the March 31, 2016 Subscription Agreement, iSpot again asked EDO about its intended use of iSpot's data and services.  EDO again represented that it merely intended to use the iSpot data and services to assist in EDO's predictive box office sales analytics.  EDO did not disclose its plans to develop competing TV monitoring products, and in fact led iSpot to believe that it was not doing so.  The March 31, 2016 Subscription Agreement kept in place the December 19, 2014 Order Form's prohibition on EDO's development of competing products. However, consistent with EDO's representations that it was creating only a non-competing movie box office sales analytics service, the March 31, 2016 Subscription Agreement added a carve-out clarifying that the agreed prohibition against using iSpot Services and data to develop competing products "shall not apply to any [EDO] services relating to its own analytics services unrelated to TV monitoring."

29.    When the March 31, 2016 Subscription Agreement ended, EDO and iSpot entered a new iSpot.tv Subscription Agreement dated as of March 29, 2017 (the "iSpot Contract"), which again granted EDO access to certain iSpot services and its ad database within the single industry segment, "Life & Entertainment: Movies."  iSpot Contract, Order Form at 1.  Within that industry segment, EDO was licensed to use the "iSpot Service", which the iSpot Contract defined as including the iSpot Dashboard, the iSpot Data, the iSpot Digital Assets, the iSpot APIs, and other services.  *Id.* § 1.1.  EDO was licensed under the iSpot Contract to use the iSpot

Service for 1 year and agreed that upon termination EDO "will promptly cease use of the iSpot Service."  iSpot Contract § 2.3.

30.   EDO agreed in the iSpot Contract that only certain uses of the iSpot Service were permitted, including (1) viewing, downloading and analyzing iSpot's data and the iSpot Digital Assets only "in the licensed industries" and for tracking advertising activities; (2) "[f]or internal research"; and (3) to "create insights from the iSpot Data and share such work product with its customers," so long as iSpot's own data or reports were combined into EDO's own insights.  iSpot Contract § 1.2. EDO further agreed that "[a]ny other use not explicitly granted in Section 1.2 or under this Agreement" was prohibited (*id.* § 1.3(j)), and that it would not "make use of any iSpot Materials other than in accordance with the terms of this Agreement."  *Id.* § 1.3(g). EDO also agreed in the iSpot Contract that it would not share any information from the iSpot Service outside of the company except as specifically permitted (*id.* § 1.3(b)) and would not copy or resell "the iSpot Service or any element thereof" (*id.* § 1.3(c)). In addition, EDO agreed that it would only access the iSpot Service in certain ways, agreeing that it would not "access (or attempt to access) the iSpot Service by any means other than through the iSpot Dashboard or iSpot APIs."  *Id.* § 1.3(g).

31.   EDO specifically agreed in the iSpot Contract to not use its access to the iSpot Service to inspire or enable creation of a competing service or product, agreeing among other things that (1) EDO would not "modify, create derivative works of, reverse engineer, disassemble, decompile, or otherwise attempt to derive the source code or underlying trade secrets of the iSpot Service" (*id.* § 1.3(d)) and (2) EDO would not "use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service" (*id.* § 1.3(e)).  With respect to iSpot's data, EDO also expressly agreed that it "may not utilize data to build any services that complete [sic] with iSpot.tv Inc. or gives the impression that they compete with iSpot.tv, Inc."  *Id.* § 1.3(i).

143037730.1

32.    The parties in the iSpot Contract recognized the highly confidential and proprietary nature of iSpot's data, database, intellectual property and services.  EDO acknowledged that iSpot was granting EDO access to a myriad of valuable, non-public information, including "information pertaining to such party's business strategy, activities and operations . . . reports, ideas, concepts, know-how, techniques, technology, designs . . . data . . . pricing information . . . trade secrets, and other technical or business information and any information, data or reports prepared or compiled under this Agreement."  iSpot Contract § 3.1.  EDO agreed that while the iSpot Contract was in effect, and for three years afterward, it would not disclose any such confidential information but instead would "take all reasonable measures to maintain the confidentiality of all Confidential Information of the other party in its possession or control, which will in no event be less than the measures it uses to maintain the confidentiality of its own information of similar importance."  *Id*. § 3.2.

33.    The parties also agreed in the iSpot Contract that Washington law governs the iSpot Contract and its interpretation.  *Id.* § 4.8.

## C.    EDO Undertakes a Massive Campaign to Take iSpot's Data, Steal the Design and Function of its Products, and Use its Intellectual Property to Build Competing Products and Services.

34.    The iSpot Contract gave EDO access to various iSpot application programming interfaces (APIs), which in simple terms are software interfaces that allow computers to communicate directly.  For example, an iSpot customer looking for specific data from iSpot's database could use an iSpot API to allow the customer's computer to directly interface with iSpot's servers and query the database without the need for a user to make individual queries through the iSpot dashboard.  The iSpot APIs are available for use only by iSpot customers pursuant to a written subscription agreement with iSpot, and are limited to use in the industry segment that a customer is licensed to access.  EDO licensed access solely to iSpot's "Life & Entertainment: Movies" industry segment.  Accordingly, insofar as EDO chose to use any iSpot APIs,

143037730.1

such use was authorized only for data in the "Life & Entertainment: Movies" category.

35.     The iSpot APIs are valuable to customers because they allow automation and greater efficiency in data retrieval and review.  iSpot offers numerous APIs for customer use, including among others a "metadata" API that allows an iSpot customer to access all metadata for any ad (the core information needed for analytics), "airings" APIs that allow access to airing information, and "impressions" APIs that help retrieve information about impressions per ad.

36.     Although use patterns vary among customers based upon their needs, in general most iSpot customers make API calls a few hundred to a few thousand times per month.  In contrast, between early 2016 and March 2018, EDO used iSpot's APIs nearly *5 million times* to repeatedly access and scrape iSpot's highly valuable and trade secret data for numerous industries and segments.   Despite agreeing in the iSpot Contract that it would use the iSpot APIs only for the "Life & Entertainment: Movies" category, and not being given access to any other category by iSpot, EDO developed an exploit or workaround to use iSpot's APIs to access all other industry segments and data categories, far exceeding the scope of its license and breaching the iSpot Contract.

37.     EDO's use patterns make it obvious EDO's use was neither innocent nor permitted.  In early 2016, EDO called iSpot's APIs as few as 40 times per month (in line with typical use patterns of other iSpot customers).  By mid-2016, EDO had increased its calls to iSpot's APIs to the mid-ten thousands per month.  EDO then dramatically scaled up its access to iSpot's access in early 2017 as it approached the expiration of its one-year March 2016 Subscription Agreement, increasing its API calls six-fold in January 2017, then nearly doubling again its use in February and March 2017, consistent with taking as much information as possible before losing access to iSpot's database.  To put EDO's massive scale-up in context, EDO accessed iSpot's APIs just over 113,000 times *total* in all of 2016.  In just the first month of

2017, it accessed iSpot's APIs nearly *170,000* times—more than the entire prior year. Once iSpot and EDO signed the iSpot Contract in late March 2017, EDO reduced its API calls dramatically.

38.    However, EDO's exploitation of iSpot's APIs then suddenly exploded in October 2017, shooting up approximately 500% from September 2017 to October 2017. EDO made over 750,000 API calls in December 2017, averaging more in a *single day* in December 2017 than for the *entire month* of December 2016. This shockingly high use continued until late March 2018, when the iSpot Contract ended. The millions of API calls that EDO made far exceeded those of any other iSpot customer at the time. They were also completely out of keeping with the size of EDO's then-existing business, the use it represented to iSpot it was making of iSpot's services, and any legitimate use of data for the narrow "Life & Entertainment: Movies" industry category, e.g., EDO averaged *over 1000 API calls per hour*, 24 hours per day and 7 days per week, through December 2017, consistent with a large-scale data "scraping" operation and entirely inconsistent with EDO's representations and promises to iSpot that it would use the iSpot services only to obtain some data points for use in EDO's movie box office sales analysis.

39.    The largest number of EDO's API calls were to iSpot's metadata and airings APIs, which allowed EDO to gain access to the metadata associated with each of the ads and their airing schedules—essentially the "rosetta stone" that provides key information about the ad and the airing for a company operating an advertising analytics platform to analyze the ad. For example, the metadata collected by iSpot and accessible using this iSpot API includes the ad title, advertiser name, duration of the ad, its total airings and last airing, last network and show the ad was shown on, industry of the ad, products featured in the ad, any social media logos and related social media sites, taglines, parent information, promotions in the ad, industry specific classifications (e.g., "Luxury SUVs" for auto), actors, related events, and extensive other information collected by iSpot that is highly valuable to iSpot and its customers.

143037730.1

EDO made over *4.5 million* calls to iSpot's metadata API, allowing EDO to capture all information regarding the ads and airings returned in those millions of API calls. Many of those API calls were repeated over time for the same ad or group of ads, allowing EDO to not only capture extensive information about the ad itself but to repeatedly update that information with all newly-gathered information whenever the ad aired again.

40. In addition, the iSpot Contract governs EDO's allowable access to and use of the "iSpot Digital Assets," which are digital files containing the TV ads tracked by the iSpot services and database and which are part of the "iSpot Service" provided to EDO under the iSpot Contract. *See* iSpot Contract § 1.1(e). The iSpot Contract granted EDO the right to view and download copies of the iSpot Digital Assets for limited purposes (*see* iSpot Contract § 1.2(a)), and to keep a local copy of the ads as needed on EDO's computers "during the term of this Agreement." As with other aspects of the iSpot Service, EDO agreed it would not use these digital ad files to "build or contribute to any other third party TV monitoring or analytics service" (iSpot Contract § 1.3(e)), to build any services that compete with iSpot "or give[] the impression that they compete with iSpot.tv, Inc." (*id.*, § 1.3(i)), or share any of them outside of EDO or with a third party (*id.* §§ 1.3(b), (c)). And, as with all other aspects of the iSpot Service, EDO's use of the iSpot Digital Assets was limited to the licensed industry segment of "Life & Entertainment: Movies."

41. EDO blew right through the contractual limitations on EDO's use of the iSpot Digital Assets. Instead of downloading and using limited local copies of digital ads for specific permitted uses when needed "to track advertising activities in the licensed Industries" (iSpot Contract § 1.2(a)), EDO exploited its access to iSpot's database to—without prior notice or request to iSpot—download *en masse* approximately *28,000* ads from the "Life & Entertainment: Movies" segment, which represented the vast majority of iSpot's Digital Assets in that industry segment. EDO also exploited a flaw in iSpot's APIs to access and take digital assets and massive

143037730.1

amounts of data from other industry segments that EDO had no right to access, use, or take.  In total, EDO accessed and took nearly *30,000* digital ad files and related metadata (and other information) for industries other than the "Life & Entertainment: Movies" segment it was authorized to access.

42.    EDO access and downloading of iSpot's Digital Assets, and its millions of API calls to take metadata and other information from iSpot, had no legitimate purpose, and instead was part of EDO's efforts to build a competing TV advertising metrics business and take iSpot's market share and customers.  For example, EDO lists several large TV networks as clients on its website.[4]  iSpot tracks ad activity for TV network customers under iSpot's "Life & Entertainment: TV Networks" industry segment.  EDO was not licensed to access or use that segment while it was an iSpot customer, and in fact the iSpot Contract expressly barred EDO from using the iSpot Service "to build or contribute to any other third party TV monitoring or analytics service" (§ 1.3(e)) or building any services that competed with iSpot or gave the impression that they competed with it.  *Id.* § 1.3(i).  Yet EDO improperly and illegally accessed and took over 14,000 ads and related metadata from the "Life & Entertainment: TV Networks" segment of iSpot's database.  EDO publicly admitted selling its own competing TV advertising analytics products and services to TV network clients within a few months of ending its relationship with iSpot.[5]

43.    iSpot's investigation has revealed numerous other instances in which EDO, while an iSpot customer, impermissibly and illegally accessed and took iSpot's digital assets and valuable proprietary and trade secret information that had no use to EDO other than building its own competing products.  For example:

---

[4] https://www.edo.com/ (last viewed March 2, 2022).

[5] https://www.prnewswire.com/news-releases/edo-closes-12-million-series-a-financing-led-by-breyer-capital-300740237.html (last viewed March 3, 2022) (EDO Nov. 1, 2018 press release: "The upstart data, measurement and analytics company, which *already counts major TV networks*, movie studios and other media leaders *among clients who rely on its measurement of TV advertising efficacy*, is coming out of stealth mode and expanding its real-time EKG for TV ads to all national brand advertising categories.") (emphasis added).

143037730.1

- EDO's website prominently features several car makers as EDO's clients.[6]  EDO improperly accessed and took nearly 1600 ads and related information and metadata from iSpot's "Vehicles" industry data while it was an iSpot customer, including hundreds of ads and related information and metadata specific to car makers.

- EDO's website advertises two large wireless companies as customers of its services that compete with iSpot.[7]  While an iSpot customer, EDO impermissibly accessed and took approximately 230 ads and related metadata and information from iSpot's "Electronics & Communication: Wireless" industry segment.

- EDO accessed and took digital assets and related metadata from industry segments it had no right to access or use (i.e., segments other than Life & Entertainment: Movies) that several other EDO clients operate in, including: (i) the for-profit education industry (EDO holds out University of Phoenix as a current client); (ii) cruise and travel industry (Royal Caribbean is listed as a client on EDO's website); and (iii) multiple ads in the "Cleaning Supplies" category (EDO lists Shark vacuums as a client).[8]

- EDO accessed and took ads and related metadata and information for numerous other industry segments that had nothing to do with the "box office sales analytics" business EDO represented it was developing, and which had no use to EDO other than developing its competing TV monitoring and analytics products.  Examples of such segments include: (i) weight loss, (ii) tax filing services, (iii) soda & snack foods, (iv) insurance, (v) medical supplies, and even (vi) psychics & chat services.

**D.    EDO Unveils Its Own Competing Products Shortly After Ending Its Relationship With iSpot.**

44.    EDO publicly announced two competing TV ad monitoring and analytics products in 2018 shortly after the iSpot Contract ended and around the time EDO closed a new funding round.  EDO referred to this as "coming out of stealth mode,"

---

[6] https://www.edo.com/ (last viewed March 2, 2022).

[7] *Id.*

[8] https://www.edo.com/ (last viewed March 3, 2022).

143037730.1

explaining in a November 1, 2018 press release that it was now going public with its then-ongoing TV ad analytics business, bolstered by its new investment:

> The upstart data, measurement and analytics company, which already counts major TV networks, movie studios and other media leaders among clients who rely on its measurement of TV advertising efficacy, is coming out of stealth mode and expanding its real-time EKG for TV ads to all national brand advertising categories.[9]

On information and belief, EDO was privately visiting investors and potential customers—including iSpot's own customers—prior to November 2018 to market its competing products and solicit additional investment to further development and bolster EDO's efforts to compete with iSpot.

45.    One competing product EDO unveiled in 2018 was its "TV Ad Database," which offers many of the same services, features and functionality as the iSpot TV ad database.  Indeed, it even appears to use the *same data*, which is unsurprising, given the substantial amount of data that EDO took from iSpot. Tellingly, EDO's website advertised in 2018 that its TV Ad Database included "high-quality ad logs" that included "the details of national linear TV advertising *going back for several years*,"[10] and a separate public statement by EDO in late 2018 similarly described EDO as "amassing a database of over 47 million precisely measured TV ad airings over the past 3.5+ years."[11]  EDO had been an iSpot customer until just a few months before those statements and was contractually barred from developing exactly such a database during that time—it could not have legitimately developed that database on its own.

---

[9] https://www.prnewswire.com/news-releases/edo-closes-12-million-series-a-financing-led-by-breyer-capital-300740237.html (last viewed March 3, 2022) (EDO Nov. 1, 2018 press release, accessed by hyperlink at https://www.edo.com/company/press).

[10] https://web.archive.org/web/20181209080042/http://www.edo.com:80/products/tv_ad_database/ (last viewed March 2, 2022) (emphasis added).

[11] https://www.prnewswire.com/news-releases/edo-closes-12-million-series-a-financing-led-by-breyer-capital-300740237.html (last viewed March 3, 2022).

143037730.1

46.    EDO also pushed features in the TV Ad Database that mirrored those available in the iSpot database that EDO had been using while an iSpot customer from December 2014 through March 2018, touting EDO's "easy-to-use dashboard" and the ability for customers to "[i]ngest our data through our API"[12]—both of which were features that iSpot spent several years developing for the iSpot service, and which EDO used extensively while an iSpot customer.  EDO even not-so-subtly suggested to customers that EDO could deliver the same services and information they were receiving from iSpot, advertising on EDO's website that EDO's TV Ad Database allows customers to "verify your media strategy *on the spot*."[13]

47.    EDO later re-branded its "TV Ad Database" as the "Ad Engage Convergent database," but continues to claim on its website that the database contains TV ad airing information "collected 24/7, 365 *since 2015*."[14]  iSpot, not EDO, was collecting that data in 2015, 2016, 2017 and the first part of 2018 while EDO was an iSpot customer—EDO was contractually barred from collecting this data at all times while it was an iSpot customer from December 2014 through March 2018.  Tellingly, the vast majority of the ads (and related information and metadata) that EDO accessed and took from iSpot while an iSpot customer had first airing dates from January 1, 2015 forward—just as EDO advertised was in the EDO database.

48.    A second competing product that EDO unveiled in 2018 shortly after the iSpot Contract ended was called "TV Ad Engagement."  This product looks and functions substantially similar to the iSpot service.  EDO's website explained that its TV Ad Engagement product relied on the data in EDO's TV Ad Database.[15]  Again trying to lure customers away from iSpot with the same functionality iSpot offered,

---

[12] *Id.*

[13] *Id.* (emphasis added).

[14] https://www.edo.com/products (last viewed March 2, 2022) (emphasis added).

[15] https://web.archive.org/web/20190110054954/http://www.edo.com/products/tv_ad_database/ (last viewed Feb. 22, 2022) ("TV Ad Database serves as the base of ad airings for our TV Ad Engagement platform, providing clients with a powerful, seamless solution.").

143037730.1

EDO advertised its TV Ad Engagement product on its website using an "Always On" banner over a statement that "[w]e collect data 24/7,"[16] which is a nearly verbatim copy of the description of iSpot's competing service on iSpot's own website that describes iSpot's "always-on, unified dashboard" and iSpot's "always-on, holistic measurement of linear and streaming ads."[17]

49.    EDO later re-branded its TV Ad Engagement product into "Ad EnGage Convergent," which EDO's website now describes as "EDO's platform for comprehensive TV ad occurrence and effectiveness data"[18]—more simply, a TV ad monitoring and analytics service.  EDO claims to have created its Ad EnGage Convergent product "[o]ver 5 years ago."[19]  EDO, of course, was an iSpot customer until less than four years ago.  EDO agreed in the iSpot Contract that it would *not* build a competitive product while an iSpot customer, yet now boldly advertises on its website that it did exactly that.  Ironically, EDO's advertisements for Ad EnGage Convergent even encourage customers to "learn from your competitors strategies" and touts that "[t]he experience of all your competitors is embedded in EDO's models."[20]

50.    Importantly, EDO recognizes the economic and competitive value of historical advertising data, holding out the historical data used in its services—data that, on information and belief, came at least in part from iSpot—as a selling point to persuade customers to hire EDO:

> Forget year-long waits to resolve IT, privacy, or technology headaches. EDO enables instant benchmarking with history. Measure your campaigns using our historical data set of 100M+ ad

---

[16] https://web.archive.org/web/20190110091348/http://www.edo.com:80/products/tv_ad_engagement (last viewed Feb. 22, 2022) (Internet archive of EDO's product page for TV Ad Engagement as of January 10, 2019).

[17] https://www.ispot.tv/products (last viewed Feb. 22, 2022).

[18] https://www.edo.com/ (last viewed March 2, 2022).

[19] https://www.edo.com/products/ad_engage_convergent/ (last viewed March 2, 2022).

[20] https://www.edo.com/products/ad_engage_convergent/ (last viewed March 2, 2022).

143037730.1

airings and customizable view sets to compare different groups of peers.[21]

**E.      EDO Continues to Illegally Access and Exploit iSpot's Database and Misappropriate iSpot's Trade Secrets and Valuable Proprietary Information During 2019–2021**

51.      Until September 2019, Defendant Nadya Teyfukova worked for Horizon Media ("Horizon"), a media services agency that was providing services to an iSpot customer in the movie industry.  At the request of iSpot's customer, iSpot agreed to allow Horizon to access the iSpot service on its customer's behalf and solely for the purpose of providing services to that iSpot customer.  Horizon and its employees accessing the iSpot service remained subject to iSpot's rules and restrictions on access as if they worked directly for iSpot's customer, including iSpot's confidentiality protections and the iSpot Terms of Service that apply to every user (https://www.ispot.tv/agreements/terms).[22]

52.      Through her employment with Horizon, Ms. Teyfukova was provided confidential password and account login credentials allowing her to access iSpot's secure database.  Ms. Teyfukova's user ID for access to iSpot's database was "nteyfukova@horizonmedia.com", an email address reflecting that she was employed at Horizon and was conducting work on behalf of Horizon's specific iSpot customer. Ms. Teyfukova knew that she was only permitted to use these confidential login credentials and access iSpot's database in the course and furtherance of her work at Horizon on behalf of that single iSpot customer.

53.      In her last year at Horizon, Ms. Teyfukova logged in to iSpot's database approximately 56 times, almost entirely from IP addresses in Los Angeles associated with Horizon Media.

---

[21] https://www.edo.com/products/ad_engage_convergent/ (last viewed March 2, 2022).

[22] The iSpot Contract with EDO used a substantially similar structure, allowing EDO to provision some or all of its licensed user seats "to its advertising agency, including its agency of record and its media and/or creative agencies" and providing that "[a]ny agency users accessing the iSpot Service are bound by the terms of this Agreement."  iSpot Contract § 1.1(b).

143037730.1

54.     In September 2019, Ms. Teyfukova left Horizon and began working for EDO as a Media Analytics Manager servicing EDO's movie studio clients.  At the time, EDO had over 100 employees.  Ms. Teyfukova reported to a direct supervisor at EDO and was also under the direction and control of other EDO employees and officers during her employment.

55.     Even though she was only authorized to use the iSpot services while at Horizon and in the course of her work on behalf of the single iSpot client Horizon was assisting, Ms. Teyfukova took her confidential iSpot access credentials with her when she left Horizon and joined EDO in early September 2019.  She then used those stolen credentials for the benefit of EDO, and at the knowing direction and control of EDO, with the purpose of evading and bypassing the technological security barriers that restricted access to the iSpot database and services to only authorized users in order to continue logging into the iSpot database and using the iSpot services after leaving Horizon when she was no longer authorized to do so.  Ms. Teyfukova was aware of these technological security barriers from her prior work at Horizon and knew they were intended to prevent unauthorized access to the iSpot database and services, but she intentionally used the stolen Horizon credentials at EDO's knowing direction and control to benefit EDO in violation of her duty of loyalty to Horizon and with the primary purpose of evading those barriers in order to gain access to iSpot's system.  Each time that Ms. Teyfukova logged into the iSpot database, she committed at least two separate wrongful acts.  First, she intentionally and falsely misrepresented that she was still an employee of Horizon, acting within the course of scope of such employment and on the behalf of iSpot's customer that Horizon was assisting, by entering the username nteyfukova@horizonmedia.com.  Second, with knowledge that she was not authorized to do so, she utilized the password that had been authorized for her use solely for work in the course and scope of her employment at Horizon on behalf of the iSpot customer that Horizon was assisting.  Ms. Teyfukova repeated these separate wrongful acts over 150 times to access iSpot's database after joining

23
SECOND AMENDED COMPLAINT

143037730.1

1    EDO, viewing thousands of pages of information in iSpot's database and generating

2    and downloading hundreds of reports that contained proprietary information from

3    iSpot's database.

4        56.    Ms. Teyfukova accessed iSpot's database and stole its data in the course

5    of her employment with EDO, at the knowing direction and control of her direct

6    supervisor and others at EDO, and for EDO's benefit, using the confidential login

7    credentials provided to her by Horizon and in violation of her duty of loyalty to

8    Horizon.  Once Ms. Teyfukova joined EDO, the IP addresses used to login to iSpot's

9    database with her credentials almost immediately shifted to Culver City, where EDO

10   is headquartered.  When COVID shelter-in-place orders were issued and Ms.

11   Teyfukova began working from home full time for EDO, the IP addresses used for

12   many logins with her credentials shifted to the zip code where she resides.  For

13   example, during a two-day stretch in November 2019, the Teyfukova credentials were

14   used to access the iSpot database multiple times from both Culver City and from Ms.

15   Teyfukova's home zip code, and nearly 40 detailed data reports generated and

16   downloaded related to the movie industry (EDO's and Ms. Teyfukova's focus) taken

17   during those logins. The majority of logins using the Teyfukova credentials also

18   occurred during normal business hours on weekdays, at times when Ms. Teyfukova

19   would be at work for EDO.

20       57.    Additionally, iSpot is informed and believes, and based on such

21   information and belief alleges, that EDO knowingly and intentionally induced Ms.

22   Teyfukova, as a condition of her employment at EDO, to further violate her duty of

23   loyalty to Horizon, her former employer, by also turning over to EDO the sensitive

24   and confidential iSpot password and username given to her solely for her use as an

25   employee of Horizon to enable other employees of EDO, including Ms. Teyfukova's

26   direct supervisor at EDO and other additional employees of EDO, as well as

27   automated software and information technology systems of EDO under EDO's

28   control, to access iSpot's proprietary database by bypassing its password protection

gating system to view and download valuable information under the knowingly false pretext of supposedly being "nteyfukova@horizonmedia.com" – an employee of Horizon. The primary purpose of the actions of Ms. Teyfukova, EDO, and other EDO employees, including Ms. Teyfukova's supervisor, was to knowingly evade iSpot's technological database protections and break into its database by bypassing the iSpot's credential gating system restricting access to the database to only properly authorized users, including certain employees of Horizon.

58.     The iSpot data and assets accessed by EDO through Ms. Teyfukova or directly through misrepresentations and use of login credentials obtained from her were the type of proprietary and trade secret information that had significant economic and competitive value to EDO and its efforts to serve its customers, grow its market share, and take customers from iSpot. For example, EDO's web page at relevant times advertised a "Box Office" product that EDO claims can help customers "[p]redict your movie's opening weekend performance based on a data-driven analysis of consumers' interest and engagement."[23] EDO, through Ms. Teyfukova or directly using credentials she supplied, took that type of information from iSpot. As one example, the movie "A Quiet Place 2" was released on May 28, 2021 by Paramount Pictures, which EDO identifies on its website as an EDO client. *See, e.g.,* https://www.edo.com/about-us/. The Teyfukova login was used in May 2021 to access the iSpot database, generate custom reports, and gather information regarding A Quiet Place 2. As a second example, EDO's website identifies Warner Bros. as an EDO client (https://www.edo.com/about-us/). Warner Bros. produced the movie "Tenet," which was released in early September 2020. During that movie's opening week in September 2020, the Teyfukova login was used to login into iSpot's database and access at least 17 different datasets about "Tenet."

59.     The information Ms. Teyfukova and EDO accessed and took has significant economic and competitive value to Ms. Teyfukova and EDO. EDO offers

---

[23] https://www.edo.com/ (last viewed March 2, 2022).

products and services that directly compete with iSpot in the industry areas that the information relates to, and Ms. Teyfukova was at relevant times and employee at EDO working on some of those products.  The information has further economic value to Ms. Teyfukova and EDO because it allowed viewing and downloading of valuable proprietary and secret information without the cost to Ms. Teyfukova or EDO of paying the licensing fees charged by iSpot for authorized access to such information—indeed, iSpot likely would have been unwilling to license use of the accessed information to EDO at all, or would have charged significant licensing fees and impose significant restrictions on use if it had been willing to grant a license.

## FIRST CLAIM FOR RELIEF

### Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836)

### (Against All Defendants)

60.    iSpot incorporates the allegations in all preceding paragraphs as if fully set forth herein.

61.    iSpot's proprietary ad database and the information contained therein constitute an original and highly valuable compilation, selection and arrangement of business information and other material, which iSpot has spent substantial time, resources, and money developing and maintaining.

62.    iSpot's ad database and the information contained therein derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, those who could obtain economic value from the disclosure or use of the information.

63.    The information contained in iSpot's ad database is used in interstate commerce.

64.    iSpot has taken reasonable measures to keep the information contained in its proprietary ad database secret and confidential.  These measures include, but are not limited to, (i) limiting access to iSpot's database to customers who agree to iSpot's Terms of Service, which include confidentiality obligations, and whose authorized

users are subject to such obligations (ii) imposing password protections on the database, and (iii) requiring all users to use unique account logins to access the database.

65.    Ms. Teyfukova and EDO used improper means (including but not limited to misrepresentation, theft, breach or inducement of a duty to maintain secrecy, and unauthorized access) to access iSpot's ad database and acquire information contained therein.  Ms. Teyfukova and EDO knew or had reason to know that they were using improper means to access iSpot's database and acquire the information contained therein.

66.    Ms. Teyfukova's and EDO's misappropriation of iSpot's trade secrets was willful and malicious.

67.    As a result of Ms. Teyfukova's and EDO's actions, iSpot has suffered and will continue to suffer competitive harm, irreparable injury, and damages in an amount to be proven at trial.

68.    Under 18 U.S.C. § 1836(b)(3)(B)(i), iSpot is entitled to damages for iSpot's actual losses and Ms. Teyfukova's unjust enrichment, in amounts to be proven at trial.  Alternatively, iSpot is entitled to damages measured by a reasonable royalty under 18 U.S.C. § 1836(b)(3)(B)(ii).

69.    iSpot is also entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and its attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CLAIM FOR RELIEF

### Misappropriation of Trade Secrets (Cal. Civ. Code § 3426.1 *et seq.*)

### (Against All Defendants)

70.    iSpot incorporates the allegations in all preceding paragraphs as if fully set forth herein.

71.    As alleged above, iSpot's ad database and the information contained therein constitute trade secrets under the California Uniform Trade Secrets Act.

72.     As alleged above, iSpot has made reasonable efforts to maintain the secrecy of the information contained in iSpot's ad database.

73.     Ms. Teyfukova and EDO used improper means (including but not limited to misrepresentation, theft, breach or inducement of a duty to maintain secrecy, and unauthorized access) to access iSpot's ad database and acquire information contained therein.  Ms. Teyfukova and EDO knew or had reason to know that they were using improper means to access iSpot's database and acquire the information contained therein.

74.     As a result of Ms. Teyfukova's and EDO's actions, iSpot has suffered and will continue to suffer competitive harm, irreparable injury, and damages in an amount to be proven at trial.

75.     Under California Civil Code§ 3426.3(a), iSpot is entitled to damages for iSpot's actual losses and Ms. Teyfukova's and EDO's unjust enrichment, in an amount to be proven at trial.  Alternatively, iSpot is entitled to damages measured by a reasonable royalty under California Civil Code § 3426.3(b).

76.     iSpot is also entitled to exemplary damages under California Civil Code § 3426.3(c) and its attorneys' fees under California Civil Code § 3426.4.

### THIRD CLAIM FOR RELIEF

**Violation of the Digital Millennium Copyright Act (17 U.S.C. § 1201, *et seq*.)**

**(Against All Defendants)**

77.     iSpot incorporates the allegations in all preceding paragraphs as if fully set forth herein.

78.     iSpot's ad database is an original work of authorship that is fully protected by the Copyright Act, 17 U.S.C. 101 *et seq*., including, without limitation, as to the selection, coordination and arrangement of the data, information, and other material that iSpot has selectively chosen to include and correlate in its database.

143037730.1

79.    As alleged above, iSpot uses technological measures, including password protection and unique login credentials, to protect and control access to its copyright-protected ad database.

80.    Ms. Teyfukova and EDO have circumvented iSpot's technological measures to gain access to iSpot's ad database as alleged herein.

81.    As a result of EDO's and Ms. Teyfukova's actions, iSpot has suffered and will continue to suffer irreparable injury and damages in an amount to be proven at trial.

82.    iSpot is entitled to its actual damages under 17 U.S.C. § 1203(c)(2), including any and all of Ms. Teyfukova's and EDO's profits, in an amount to be proven at trial.  Alternatively, iSpot is entitled to statutory damages under 17 U.S.C. § 1203(c)(3).

83.    iSpot is also entitled to its attorneys' fees and costs under 17 U.S.C. § 1203(b)(4)–(5).

84.    iSpot is also entitled to injunctive relief under 17 U.S.C. § 1203(b)(1).

### FOURTH CLAIM FOR RELIEF

### Breach of Written Contract

### (Against EDO, Inc.)

85.    iSpot incorporates the allegations in all preceding paragraphs as if fully set forth herein.

86.    iSpot and EDO are parties to the iSpot Contract (the iSpot.tv Subscription Agreement, dated as of March 29, 2017).

87.    iSpot fully performed its obligations under the iSpot Contract.

88.    EDO materially breached the iSpot Contract, as set forth herein.

89.    iSpot suffered damage as a result of EDO's material breaches of the iSpot Contract, in an amount to be proven at trial.

90.    Washington law governs the parties' rights, obligations, and remedies with respect to the iSpot Contract, which specifies that the iSpot Contract "will be

governed and interpreted in accordance with the laws of the State of Washington without regard to principles of conflict of laws." iSpot Contract § 4.8.

## PRAYER FOR RELIEF

WHEREFORE, iSpot prays for judgment and the following relief against EDO and Ms. Teyfukova:

1. For an award of iSpot's actual damages and restitution for EDO's and Ms. Teyfukova's unjust enrichment under 18 U.S.C. § 1836(b)(3)(B)(i) or, in the alternative, for an award of damages measured by a reasonable royalty under 18 U.S.C. § 1836(b)(3)(B)(ii).

2. For an award of iSpot's actual damages and restitution for EDO's and Ms. Teyfukova's unjust enrichment under California Civil Code § 3426.3(a) or, in the alternative, for an award of damages measured by a reasonable royalty under California Civil Code§ 3426.3(b).

3. For an award of iSpot's actual damages and EDO's and Ms. Teyfukova's profits under 17 U.S.C. § 1203(c)(2), or, in the alternative, for an award of statutory damages under 17 U.S.C. § 1203(c)(3).

4. For an award of compensatory damages.

5. For an award of exemplary damages as permitted by law, including under 18 U.S.C. § 1836(b)(3)(C) and California Civil Code § 3426.3(c).

6. For an award of all damages caused by EDO's breach of the iSpot Contract, to the maximum extent permitted by law.

7. For an award of iSpot's reasonable attorneys' fees and costs as permitted by law, including under 18 U.S.C. § 1836(b)(3)(D), California Civil Code § 3426.4, and 17 U.S.C. § 1203(b)(4)-(5).

8. For an order (including, without limitation, a temporary, preliminary, and/or permanent injunction):

    a. enjoining EDO's and Ms. Teyfukova's unauthorized access to iSpot's database;

SECOND AMENDED COMPLAINT

143037730.1

b.    enjoining EDO and Ms. Teyfukova from sharing or distributing any information acquired from iSpot's database without iSpot's authorization with any other organization or individual;

c.    enjoining EDO from making any further use of any intellectual property, information, data or digital assets obtained from iSpot, or derived from any intellectual property, information, data or digital assets obtained from iSpot; and

d.    ordering EDO and Ms. Teyfukova to return or destroy all intellectual property, information, data or digital assets obtained from iSpot, or derived from any intellectual property, information, data or digital assets obtained from iSpot.

9.    For an award of pre- and post-judgment interest.

10.    For such other relief as the Court deems equitable and just.


Dated:  February 24, 2023              FOX ROTHSCHILD LLP

                                      By    s/ David Aronoff
                                            David Aronoff
                                            Gavin Skok (*Pro Hac Vice*)
                                            Joshua Bornstein
                                            Attorneys for Plaintiff

SECOND AMENDED COMPLAINT

143037730.1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 24, 2023

**FOX ROTHSCHILD LLP**

By:/s/ *David Aronoff*
David Aronoff
Gavin Skok (*Pro Hac Vice*)
Joshua Bornstein
*Attorneys for Plaintiff*

143037730.1