UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                    Date:  February 27, 2025

Title:   *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

Present:  The Honorable:   MARGO A. ROCCONI, UNITED STATES MAGISTRATE JUDGE

| Valerie Velasco | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**        **(In Chambers) ORDER RE:  PARTIES' CROSS MOTIONS TO COMPEL AND DEFENDANTS' REQUEST FOR A PROTECTIVE ORDER, DKTS. 105, 111; DISTRICT JUDGE'S ORDER GRANTING DEFENDANTS' MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S ORDER, DKT. 169**

## I.
## BACKGROUND

On August 24, 2021, Plaintiff iSpot.TV ("Plaintiff") filed the original complaint against Defendant Nadya Teyfukova ("Teyfukova").  ECF Docket No. ("Dkt.") 1. On February 24, 2023, Plaintiff filed the operative second amended complaint naming Teyfukova and Entertainment Data Oracle ("EDO") (collectively "Defendants") as Defendants.  Dkt. 73.

The district judge previously explained the relationship between the parties:

> Plaintiff iSpot is a data and analytics company which provides its clients with extensive and proprietary advertising data concerning various industries.  FAC ¶¶ 23–24.  Defendant EDO is a "data, measurement, and analytics company that advances the success of marketing, research, and creative professionals."  Id.  iSpot entered into a contract with EDO to provide access to iSpot's TV ad analytics data and services related to the movie industry.  Id. ¶ 2.

Dkt. 71 at 2–3.[1]

In a previous order, this Court provided further details regarding the parties'

---

[1] All citations to electronically filed documents refer to the CM/ECF pagination.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                                    Date:  February 27, 2025

Title:   *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

relationship and the discovery disputes at issue here:

…"[f]rom March 2016–March 2018, under the terms of two one-year licensing agreements, EDO licensed linear TV airings data from iSpot to analyze marketing strategies for movie studios."  These agreements allowed EDO access to a portion of iSpot's data relating to movie advertisements.  The agreements also gave EDO access to iSpot's dashboard, "which allowed EDO to manually query iSpot's database, as well as its [Application Programming Interface ("API")], which "allow[ed] [EDO] to directly interface with iSpot's servers in order to automatically download data."  The agreements provided that "[w]ith respect to iSpot's data, EDO could not 'utilize data to build any services that complete [sic] with iSpot.tv Inc or gives the impression that they compete with iSpot.tv, Inc.'"

In March of 2018, EDO ended its subscription with iSpot.  Around the same time Defendants hired Nadya Teyfukova, who previously worked for Horizon Media (a company who had been providing services to an iSpot customer).  Plaintiff alleges that Teyfukova used her credentials from her former employer to access the iSpot service for Defendants.  Then in November 2018, Defendants announced they were launching a new product that would contain Defendants' own TV ad database.  Plaintiff contends that the only way Defendants could have developed this database with the speed that they did was if they used Plaintiff's data to build their competing database.

At the outset of discovery the parties exchanged discovery requests.  On June 16, 2023, Plaintiff responded to Defendants' discovery requests.  Subsequently, on October 25, 2023, Plaintiff produced documents to supplement their responses to the interrogatories requesting that the alleged trade secrets be described with particularity ("particularity interrogatories").  On December 5 and 7, 2023, Plaintiff served supplemental responses on the particularity interrogatories and provided documents.  On January 9, 2024, Plaintiff provided more supporting documents.  On February 15 and 16, 2024, Plaintiff provided second

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                              Date:  February 27, 2025

Title:     *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

> supplemental responses to the particularity interrogatories.  Defendants have objected to more than fifty (50) discovery requests on the basis that Plaintiff has not identified its proprietary information with specific particularity.
>
> On April 15, 2024, Plaintiff and Defendants filed cross motions to compel.  In the same motion, Defendants requested a protective order. On April 24, 2024, both parties filed a supplemental memo.

Dkt. 122 at 1–2 (citations omitted).

On May 23, 2024, this Court issued an order granting Plaintiff's motion to compel, while denying Defendants' motion to compel and motion for a protective order.  Id. at 6.  This Court denied Defendants' motions because it found that Plaintiff had identified its trade secrets with sufficient particularity.  Id. at 3–4.  On June 6, 2024, Defendants filed a motion for review of this Court's May 23, 2024 order pursuant to Local Rule 72-2.1.  Dkt. 124.  On January 9, 2025, the district judge granted Defendants' motion in part, and recommitted Defendants' motion to this Court to "determine whether iSpot's disclosure of its five non-data categories of trade secrets meets the trade secret particularity requirement."  Dkt. 167 ("Order" or "Ord.") at 17 (emphasis in original).

The Court finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); Local Rule 7-15.  This Court has reviewed the district judge's order.  For the reasons discussed below, Defendants' motion to compel is **GRANTED in part** and **DENIED in part**, and Defendants' motion for a protective order is **GRANTED.**

///
///
///
///
///
///
///

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                    Date:  February 27, 2025

Title:    *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

## II.
## DISCUSSION

### A.   WHETHER PLAINTIFF HAS DESCRIBED ITS TRADE SECRETS WITH SUFFICIENT PARTICULARITY

#### 1.   Applicable law

18 USC § 1839 defines a trade secret as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

Under the Defend Trade Secrets Act ("DTSA"), "[t]rade secrets cannot be vague concepts." Calendar Rsch. LLC v. StubHub, Inc., No. CV 17-04062-SVW (SS), 2020 WL 4390391, at *6 (C.D. Cal. May 13, 2020).  Rather, a plaintiff must "identify the specific set of 'methods, techniques, processes, procedures, programs, or codes'" that comprise a trade secret.  Id. (quoting 18 U.S.C. § 1839(3)).  "'Reasonable particularity' has been defined as a description of the trade secrets at issue that is sufficient to (a) put a defendant on notice of the nature of the plaintiff's claims and (b) enable the defendant to determine the relevancy of any requested discovery concerning its trade secrets." BioD, LLC v. Amnio Tech., LLC, No. 2:13-cv-1670-HRH, 2014 WL 3864658, at *5 (D. Ariz. Aug. 6, 2014) (quoting Hill v. Best Med.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                    Date:  February 27, 2025

Title:    *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

Int'l, Inc., No. 09-1194, 2010 WL 2546023, at *3 (W.D. Pa. June 24, 2010)).

The Ninth Circuit recently elaborated on the standard plaintiffs must meet when identifying their trade secrets:

> To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist.  The plaintiff should describe the subject matter of the trade secret with <u>sufficient particularity</u> to separate it from matters of general knowledge in trade or of special knowledge of those persons skilled in the trade.  Plaintiffs must clearly refer to tangible trade secret material instead of referring to a system which <u>potentially</u> qualifies for trade secret protection.  Plaintiffs may not simply rely upon catchall phrases or identify categories of trade secrets they intend to pursue at trial.  It is inadequate for plaintiffs to cite and incorporate by reference hundreds of documents that purportedly reference   or   reflect   the   trade   secret   information.

<u>InteliClear, LLC v. ETC Glob. Holdings, Inc.</u>, 978 F.3d 653, 658 (9th Cir. 2020) (internal citations and quotations omitted) (emphasis in original).

### 2.    Analysis

Defendants' motion to compel sought further responses to the two interrogatories below:

### EDO'S INTERROGATORY NO. 1

Describe all "intellectual property, data, and designs" ISPOT contends EDO "was using" to "develop[] its own competing products and TV monitoring and analytics service while an iSpot customer," as alleged in Paragraph 7 of the COMPLAINT.

///
///
///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                    Date:  February 27, 2025

Title:   *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

### NADYA TEYFUKOVA'S INTERROGATORY NO. 1:

Describe each alleged TRADE SECRET that ISPOT contends was misappropriated or otherwise misused by TEYFUKOVA and/or EDO.

Joint Stip. at 33, 38.

Plaintiff's responses to the two interrogatories were nearly identical.  Compare id. at 33–38 with id. at 38–45.  Plaintiff initially responded with objections but then supplemented its response to identify "data which it considers trade secrets, as well as five categories of non-data trade secrets, consisting of methodology, technology[,] and programs."  Ord. at 7 (emphasis in original); Joint Stip. at 34–36, 39–42.  The five categories included how Plaintiff (1) "targets and collects," (2) "processes," (3) "organizes," (4) "analyzes," and (5) "delivers" its "TV advertisement creative and airing data and metadata."  Joint Stip. at 33–34, 39.

The district judge found that the undersigned in its prior order "explicitly discuss[ed] [Plaintiff]'s trade secret data and the sufficiency of that disclosure," but failed to discuss "the sufficiency of [Plaintiff]'s trade secret disclosure for the remaining [five] categories of trade secrets."  Ord. at 9; see also Dkt. 124 at 8 n.2 (Defendants stating they did not object to this Court's finding that Plaintiff identified its data trade secrets with reasonable particularity).  Thus, the Court will discuss each of Plaintiff's non-data trade secrets in turn to determine whether Plaintiff identified each with sufficient particularity.  See MAI Sys. Corp. v. Peak Comp., Inc., 991 F.2d 511, 520–23 (9th Cir. 1993) (evaluating sufficiency of trade secrets on a category-by-category basis); see also Agency Solutions.com, LLC v. TriZetto Grp., Inc., 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011) ("Case authority pertaining to trade secrets makes it clear that, while courts are expected to make an item-by-item determination of what is and is not a trade secret . . . .").

### a.     Category One: targeting and collecting data

Plaintiff described the first category of non-data trade secrets—how it "targets and collects" television data—as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:21-cv-06815-MEMF-MAR                               Date:  February 27, 2025

Title:      *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

> iSpot's collection of TV creative and airing data begins with high-level, internal application of iSpot's industry expertise and decision-making about <u>what content and airing</u> data to target and collect.  In simple terms, this means what TV channels and airings to target and how to best identify an ad and capture important information about it in an automated way, including but not limited to discerning when an ad was modified enough to constitute a different version of the ad.  iSpot has formulated and revised this methodology through years of research and development (at substantial cost), details of which it does not provide to its customers and which it keeps confidential even within the company.  Next, having decided what data to target, iSpot utilizes its proprietary TV monitoring technology, a sophisticated computer program that iSpot internally developed and regularly updates and improves through ongoing internal research and development, to collect the raw creative and TV airing data.  The monitoring program, including the methods and techniques utilized in the program, as well as the resulting compilation of raw TV data, are also not disclosed publicly and are kept confidential from iSpot's customers and even within the organization.  iSpot's proprietary TV monitoring technology targets and collects specific data from live television, and the resulting data cannot be collected retroactively and is not readily ascertainable by other means.  Thus, iSpot's collection processes, programs, technique, and data compilation are core IP and business assets that are foundational to all of iSpot's products, services, and deliverables.

Joint Stip. at 34, 39–40 (emphasis in original).

The district judge discussed and analyzed the sufficiency of Plaintiff's description of this trade-secret:

> For example, in the first step of iSpot's process, (i) targets and collects, iSpot discloses that its trade secret includes a "proprietary TV monitoring technology . . . that iSpot internally developed and regularly updates and improves" "to collect the raw creative and TV airing data," and the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:21-cv-06815-MEMF-MAR                                      Date:  February 27, 2025

Title:      *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

"monitoring program, including the methods and techniques utilized in the program."   [Joint Stip. at 39–40].   However, iSpot provides no information about the methods and techniques that its proprietary program utilizes, and iSpot "cannot claim that a method or process is a trade secret without identifying the steps in the process and explaining how those steps make their method or process unique," [BioD, 2014 WL 3864658, at *6], because such a disclosure does not refer "to tangible trade secret material," but a "system which potentially qualifies for trade secret protection," and that is not enough to meet the particularity standard. InteliClear, 978 F.3d at 658 (emphasis in original) (internal quotation marks omitted); see also Diodes, Inc. v. Franzen, 260 Cal. App. 2d 244, 253 (1983) (where a trade secret is a process, the plaintiff must "supply sufficient data concerning the process, without revealing the details of it, to give both the court and the defendant reasonable notice of the issues" at stake).   Moreover, without providing some details as to the steps that compose iSpot's trade secret methodology, there is not sufficient particularity separating the alleged trade secret "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade" because it is unclear what about the methodology is outside matters of general knowledge.   [InteliClear, 978 F.3d at 658] (internal quotation marks omitted).   Many methods can reach the same result, some of which are either in whole or in part not a trade secret because they are general knowledge.   iSpot's disclosure merely reveals the end result of the trade secret, which, although may be a trade secret itself, does not provide reasonable particularity as to the underlying method that is also claimed to be a trade secret.

Ord. at 10–11 (emphasis in original) (footnotes omitted).

This Court similarly finds that Plaintiff's descriptions of Category One are too undefined.  Plaintiff identifies a "methodology" for "what TV channels and airings to target and how best to identify an ad and capture important information about it in an automated way."  Joint Stip. at 39.  However, Plaintiff offers no specific details about what constitutes the methodology.  Plaintiff describes what the methodology is and what it does, but not how it works.  The same is true for Plaintiff's TV monitoring

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                              Date:  February 27, 2025

Title:       *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

program.  Plaintiff explains that the program is a "sophisticated computer program" that "targets and collects specific data from live television," while emphasizing that it is "confidential."  Id. at 40.  However, this description offers nothing in terms of what makes the program sophisticated or how it collects and produces data from live television in practice.  Ultimately, this Court agrees that Plaintiff has described "system[s] which potentially qualif[y] for trade secret protection," but has failed to explain why they should be protected.  InteliClear, 978 F.3d at 658 (cleaned up); see also Yammine v. Toolbox for HR Spolka z Ograniczona Odpowiedzialnoscia Spolka Komandytowa, No. CV-21-00093-PHX-MTL, 2023 WL 6259412, at *6 (D. Ariz. Aug. 8, 2023) (finding that defendant's alleged trade secrets, the "knowhow regarding creating, marketing, selling, designing, updating, and using the software and service comprising the product and the internal workings and design of the domain and software," which were the result of "years of development, research, trial and error, . . . [and] specialized knowledge,"  merely described information that could be considered protected trade secrets).  Accordingly, the Court **GRANTS** Defendants' motion to compel with respect to Category One.

### b.    Category Two: processing data

Plaintiff described the second category of non-data trade secrets—how it "processes" the TV data it collects—as follows:

> iSpot processes the raw TV creative and airing data that it targeted through proprietary technology, another computer program that iSpot developed, updates and improves through internal research and development not shared with its customers, to convert the raw TV airing data to a readable and useful form.  In simple terms, this means validating that an extracted ad is truly an ad, whether it is a version of an existing ad, and processing the type of airing, which could be a national airing, local airing or one of several other types of airings.  The processing program, including the methods and techniques utilized in the program, as well as the resulting processed compilation of TV data, are also not publicly disclosed and are kept confidential from iSpot's customers and even within the organization, providing economic value to iSpot.  iSpot's data processing, programs, technique, and processed data compilation are also core IP and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                                     Date:  February 27, 2025

Title:      *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

> business assets—i.e., also trade secrets—that are likewise foundational to
> all of iSpot's products, services, and deliverables, are not generally known
> or disclosed to others, and iSpot derives economic value from their
> secrecy.

Joint Stip. at 40.

Like the first category, Plaintiff again fails to explain how its processing programs and technologies actually work.  For example, Plaintiff states that it "processes the raw TV creative and airing data that it targeted," but there is no explanation of how it processes the data.  Id.  Similarly, Plaintiff does not elaborate on how its program actually "validat[es] that an extracted ad is truly an ad, [determines] whether it is a version of an existing ad, [and] process[es] the type of airing."  Id.  Without an explanation, it is impossible for this Court to determine what parts of Plaintiff's processing technologies "are matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade."  Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1164 (9th Cir. 1998).  It appears to this Court that Plaintiff has "identif[ied] categories of trade secrets they intend to pursue at trial," but failed to sufficiently identify the trade secrets used to create their processing programs.  InteliClear, 978 F.3d at 658;  see also Imax, 152 F.3d at 1167 (finding that references to and descriptions of "a patented projector system" did not identify the trade secret with sufficient particularity).  Furthermore, Plaintiff asserts that the processing program utilizes other trade secrets related to "data processing, programs, technique, and processed data compilation."  Joint Stip. at 40.  However, Plaintiff is simply claiming that its programs "contain valuable trade secrets without specifically identifying those secrets."  Modus LLC v. Encore Legal Sols., Inc., No. CV-12-00699-PHX-JAT, 2013 WL 6628125, at *6 (D. Ariz. Dec. 17, 2013) (cleaned up) (citing MAI Sys., 991 F.2d at 522).  Thus, the Court **GRANTS** Defendants' motion with respect to Category Two.

### c.      Category Three: data organization

Plaintiff explained the third non-data category of trade secrets—how it organizes the TV data it collects—as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:21-cv-06815-MEMF-MAR                              Date:  February 27, 2025

Title:      *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

> iSpot applies its unique expertise, research, and experience to methodically organize its processed TV creative and ad airing data into 15 industries/segments, 179 subcategories, and approximately 80 million searchable data points that iSpot determined—based on its expertise, research, and experience— would be valuable to users.  For example, the data points for creative may include advertiser, advertiser classification, creative name, creative version, creative grouping, actors, songs, products featured, promotions, call to actions, phone numbers, web addresses and more.  Data points for ad airing may include airing date and time, network, program, airing type, length of ad, program, episode, pod number, pod position and more.  Many of these data points are unique to iSpot, meaning, for historic TV ad airing data, iSpot is the only source for such compiled information.  At the relevant times in the Complaint, iSpot's compilation of organized TV creative and ad airing data was commonly known as its TV Metrics service and was available only to licensed customers and users subject to subscription agreements with terms of use prohibiting customers' and users' competitive use, misappropriation or disclosure of iSpot's valuable compilation of organized TV ad airing data. TV Metrics, as described here, utilizes iSpot's trade secrets.  In iSpot's current products and services, this product is known as Media Measurement.

Joint Stip. at 40–41.

Unlike the first two categories, Plaintiff here has described how it organizes the TV data it collects in greater detail.  Specifically, Plaintiff explained that it organizes the data into "15 industries/segments, 179 subcategories, and approximately 80 million searchable data points" that Plaintiff has created.  Id. at 40.  Additionally, Plaintiff provides numerous examples of the data points it collects.  Id. at 40–41. Plaintiff has done more than point to a system that "potentially qualifies for trade secret protection;" it has provided specific details on how its TV Metrics program organizes data, with Plaintiff's exemplar data points creating a useful outline of the organization process.  InteliClear, 978 F.3d at 658; cf. Vendavo, Inc. v. Price f(x) AG, No. 17-cv-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (finding plaintiff's identification insufficient because it used "broad, categorical terms" and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                    Date:  February 27, 2025

Title:      *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

failed to provide "any kind of listing of particular trade secrets").  Ultimately, it appears that Plaintiff has "described the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge . . . and to permit [Defendants] to ascertain at least the boundaries within which the secret lies." Pellerin v. Honeywell Int'l, Inc., 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012). Accordingly, the Court finds that Plaintiff has described its data organization with sufficient particularity and **DENIES** Defendants' motion with respect to Category Three.

### d.      Category Four: data analysis

The fourth category of Plaintiff's non-data trade secret relates to how it analyzes the television data it collects.  Plaintiff's description of this category is below:

> In addition to TV Metrics, iSpot also develops, maintains, and sells proprietary tools and services to analyze and measure TV creative and ad airings and their effect on viewers and advertisers.  These tools are computer programs built inhouse by iSpot applying its unique expertise and experience and honed through years of research and development at significant expense to iSpot. iSpot's analytic tools, including Attention, Media Measurement, Digital Metrics, Audience Metrics, Creative Assessment, Unified Measurement and Conversion Analytics, are available only to licensed customers and users subject to subscription agreements with terms of use prohibiting customers' and users' competitive use, misappropriation, or disclosure of iSpot's valuable compilation of organized TV ad creative and airing []data.  iSpot derives significant economic value from such secrecy, confidentiality, and restrictions.  In all cases, these tools are built on top of and would not function without the underlying TV Metrics service.  Thus, these analytic tools are iSpot's trade secrets, which are not generally known or disclosed to others, and iSpot derives economic value from their secrecy.

Joint Stip. at 41.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                          Date:  February 27, 2025

Title:    *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

Like Category One and Two, here Plaintiff uses general "catchall phrases" and simply "identif[ies] categories of trade secrets" that could be protected.  InteliClear, 978 F.3d at 658.  Plaintiff lists several analytical tools—"Attention, Media Measurement, Digital Metrics, Audience Metrics, Creative Assessment, Unified Measurement and Conversion Analytics"—but does not provide any details on how these tools work or why they constitute protected trade secrets.  Joint Stip. at 41. Plaintiff's description of the analytical tools almost entirely focuses on the fact that it keeps them confidential, which in and of itself does not render them trade secrets. See Yeiser Rsch. & Dev. LLC v. Teknor Apex Co., 281 F. Supp. 3d 1021, 1045 (S.D. Cal. 2017) (explaining that "the existence of a confidentiality agreement d[id] not make information shared pursuant to it a trade secret").   Additionally, the fact that the analytical tools could not "function without the underlying TV Metrics service," does not in and of itself make the analytical tools trade secrets.  The fact that analytical tools analyze unique collections of data that are themselves trade secrets does not mean the tools themselves are trade secrets.  See BioD, 2014 WL 3864658, at *6 (explaining plaintiffs must "identify[] the steps in the process and explain[] how those steps make their method or process unique" and "thus legally protectable"). There is nothing in Plaintiff's description of these tools that allows this Court to determine whether these analytical tools are "matters of general knowledge in the trade or of special knowledge of [Plaintiff]."   InteliClear, 978 F.3d at 658; see also Princess Cruises, Inc. v. Amigron Enters., Inc., 51. Fed. App'x 626, 628 (9th Cir. 2002) (explaining that a party's failure "to provide specific evidence that its alleged trade secrets were not common or obvious concepts in the database industry" "rendered summary judgment . . . appropriate").  Accordingly, the Court **GRANTS** Defendants' motion with respect to Category Four.

### e.    Category Five: data delivery to customers

Plaintiff explained the final non-data category of trade secrets—how it delivers its TV data to consumers—as follows:

> Finally, iSpot delivers its products and services, which run on and incorporate all of the formulas, compilations, programs, methods, techniques, and processes described above, to its licensed customers and users via a proprietary user interface, called the iSpot dashboard, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:21-cv-06815-MEMF-MAR                                Date:  February 27, 2025

Title:       *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

> iSpot built through application of its unique expertise and industry knowledge regarding what customers find valuable, and significant investment of time and money in research and development, and which iSpot continuously refines and maintains. iSpot also delivers its TV Metrics data via its application programming interface (API), a program that allows customers' and users' software components to communicate directly with iSpot's system to transfer iSpot's data in accordance with iSpot's subscription agreements and terms of use.  iSpot's dashboard and API are also themselves valuable, not generally known or available trade secrets, like the data, products, and services that they deliver.

Joint Stip. at 41–42.

Regarding Category Five, Plaintiff again describes the data delivery methods indistinctly.  Plaintiff offers no specific details about what makes the iSpot dashboard or its API trade secrets; its response again only describes "system[s] which <u>potentially</u> qualif[y] for trade secret protection."  <u>InteliClear</u>, 978 F.3d at 658.  Plaintiff emphasizes certain characteristics of the dashboard and API—such as that they are based on Plaintiff's expertise and knowledge, valuable, and generally unavailable—yet offers no explanation of what specifically makes the dashboard and API unique.  <u>See</u> <u>Agency Solutions.com</u>, 819 F. Supp. 2d at 1023 (finding a document detailing the API to access a company's services was not a trade secret because it only "describe[d] how the [API] worked from the operators point of view").  Countless companies implement dashboards and APIs; Plaintiff offers no evidence showing that its dashboard and API are trade secrets.  <u>Cf.</u> <u>Valmarc Corp. v. Nike, Inc.</u>, No. 3:21-CV-01556-IM, 2024 WL 5056960, at *16 (D. Or. Dec. 10, 2024) (finding a party had identified a trade secret sufficiently because they "list[ed] the trade secrets, provide[d] a description of each, and list[ed] supporting documentations in the record").

In <u>InteliClear</u>, 978 F.3d at 658, the plaintiff initially described its trade secrets, "[a]t the highest level of generality," as "the InteliClear System's unique design and concepts and the unique software, formulas, processes, programs, tools, techniques, tables, fields, functionality, and logic by which its components interrelate and process data."  Plaintiff's description here are very similar.  Plaintiff explained that it built its dashboard "through application of its unique expertise and industry

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                                    Date:  February 27, 2025

Title:     _Ispot.TV, Inc. v. Nadya Teyfukova, et al._

knowledge regarding what customers find valuable, and significant investment of time and money in research and development, and which iSpot continuously refines and maintains." Joint Stip. at 41. Plaintiff added further that its "dashboard and API are also themselves valuable, not generally known or available trade secrets, like the data, products, and services that they deliver." Id. at 42. However, in InteliClear, 978 F.3d at 659, the plaintiff filed a declaration that later "specified the program processes, tables, columns and account identifiers" and "identified aspects of its database logic and architecture with enough specificity to create a triable issue of fact." Here, Plaintiff has not supplemented its general description of its data delivery systems, thus leaving its description "at the highest level of generality."

Accordingly, this Court **GRANTS** Defendants' motion with respect to Category Five. Furthermore, since this Court has granted Defendants' motion to compel with respect to four of the five categories at issue, the Court **GRANTS** Defendants' motion for a protective order. "Defendants do not have to respond to any of [Plaintiff's] discovery requests that would involve [D]efendants disclosing proprietary or confidential information until [Plaintiff has] identified [its] trade secrets with more specificity." BioD, 2014 WL 3864658, at *6 (D. Ariz. Aug. 6, 2014).

## B.     COSTS AND FEES

Rule 37(a)(5)(C) provides that "if the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(C) (emphasis added).

Here, the Court notes that neither party requests costs in the joint stipulation. In any case, Plaintiff's motion to compel and Defendants' motion for a protective order were granted, and Defendants' motion to compel was granted in part, which demonstrates, to an extent, that both parties had justifiable arguments  See Dkt. 122 at 6 (this Court granting Plaintiff's motion to compel).  Furthermore, since the Court ruled almost equally in favor of both parties, the Court finds that both parties' positions were reasonable and their arguments worthwhile.  Accordingly, the Court declines to apportion costs and fees.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:21-cv-06815-MEMF-MAR                          Date:  February 27, 2025

Title:   *Ispot.TV, Inc. v. Nadya Teyfukova, et al.*

## III.
## ORDER

**IT IS THEREFORE ORDERED** that:

1)      Defendants' motion to compel is **GRANTED in part** and **DENIED in part** as described in Section II.A.2;
2)      Defendants' motion for a protective order is **GRANTED**; and
3)      the Court declines to apportion fees and costs.  Each party shall bear its own costs.  Plaintiff shall supplement its interrogatory responses so as to identify its trade secrets with more particularity, and file any necessary supporting documents, within **ten (10) days of this order**.

**IT IS SO ORDERED.**

                                                                                        :

                                                **Initials of Preparer**            vv