Demian A. Ordway (*pro hac vice*)
  dordway@hsgllp.com
Victoria Roeck (*pro hac vice*)
  vroeck@hsgllp.com
Michael Freedman (*pro hac vice*)
  mfreedman@hsgllp.com
Daniel K. Phillips (*pro hac vice*)
  dphillips@hsgllp.com
**HOLWELL SHUSTER**
  **& GOLDBERG LLP**
425 Lexington Ave., 14th Floor
New York, NY 10017
Telephone: (646) 837-5151
Facsimile: (646) 837-5150

Jeffrey B. Valle (SBN 110060)
  jvalle@vallemakoff.com
Nuritsa S. Ksachikyan (SBN 221929)
  nksachikyan@vallemakoff.com
**VALLE MAKOFF LLP**
11777 San Vicente Blvd., Suite 890
Los Angeles, CA 90049
Telephone: (310) 476-0300
Facsimile: (310) 476-0333

*Attorneys for Defendants
Nadya Teyfukova and
Entertainment Data Oracle, Inc.*

Michael Eidel (SBN 119701)
  meidel@foxrothschild.com
**FOX ROTHSCHILD LLP**
2001 Market Street, 17th Floor
Philadelphia, PA 19103
Telephone: (215) 918-3568
Facsimile: (215) 299-2150

James Breitenbucher (*pro hac vice*)
  jbreitenbucher@foxrothschild.com
Al Roundtree (SBN 350531)
  aroundtree@foxrothschild.com
**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4400
Seattle, WA 98154
Telephone: (206) 624-3600
Facsimile: (206) 389-1708

Joshua Bornstein (SBN 311658)
  jbornstein@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, California 90067
Tel.:   310.598.4150
Fax:   310.556.9828

*Attorneys for Plaintiff iSpot.tv, Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| ISPOT.TV, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NADYA TEYFUKOVA and ENTERTAINMENT DATA ORACLE, INC.,<br><br>Defendants. | Case No. 2:21-cv-06815-MEMF-MAR<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**PARTIES' STATEMENTS OF UNCONTROVERTED FACTS AND GENUINE DISPUTES AND CONCLUSIONS OF LAW RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:          April 10, 2025<br>Time:                         10:00 a.m.<br>Courtroom:          350 W. 1st St., 8B<br>Discovery Cutoff:   January 10, 2025<br>Final Pretrial Conf.:       July 2, 2025<br>Jury Trial:                   July 21, 2025 |

Pursuant to Local Rule 56-1–3 and the Court's Civil Standing Order § IX.D, the parties respectfully submit the following Statements of Uncontroverted Facts and Genuine Disputes, in addition to Conclusions of Law, regarding Defendants' motion for summary judgment, filed herewith.

**DEFENDANTS' STATEMENT OF
UNCONTROVERTED FACTS AND GENUINE DISPUTES**

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| **A. EDO Provides Clients with Innovative Metrics for Measuring the Effectiveness of Marketing Efforts, Including TV Advertisements.** | | | |
| 1. EDO was founded in 2015 as Big Data Box Office to apply advanced data science and machine learning in the media and advertising space and to bring greater sophistication to the measurement of advertising efficacy. **Ex. A, EDO-00002961 at -983, -966 (Fall 2021 EDO Project Engage Presentation)** | Disputed | EDO told iSpot that its "business model is predictive box office forecasting for the movie studios." **Ex. VVVVVV, ISPOT_0007060, Apr. 1, 2016 email from J. Jensen to K. Sullivan [Sullivan Brock Depo. Ex. 14].** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 1 because it does not speak to EDO's business goals at founding. |
| 2. "Big Data Box Office" or "BDBO" also referred to EDO's first offering, a service that analyzed consumer interest and search engagement to estimate opening-weekend box-office returns for films. **Ex. B, EDO-00043807 at -834 (email attachment: December 2017 EDO Investor Presentation)** | Not disputed | | |
| 3. EDO's early clients were movie studios to whom it provided box-office predictions through BDBO. | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | Ex. C, EDO-00002334–37 (June 2016 email chain between Nadler (EDO), Chiu (EDO) and ████████); Ex. D, EDO-00002219–20 (July 2015 email chain between Chiu ████████ ████████ et al.). | | | |
| 4. | EDO's core business quickly became providing "spike-based" search engagement analytics. **Ex. E, Excerpts from the Deposition Transcript of Kevin Krim (Oct. 18, 2024) at 105:5–107:11 ("Krim Tr."); Ex. B, EDO-00043807 at -821, -827 (December 2017 EDO Investor Presentation); Ex. A, EDO-00002961 at-992 (Fall 2021 EDO Project Engage Presentation); Ex. F, EDO, Ad-Driven Engagement: Prove the value of your ads with investment-grade data,** available at https://www.edo.com/ad-engage-platform/ad-driven-engagement (last visited Feb. 1, 2025). | Not disputed but iSpot was unaware of any shifts in EDO's core business. | | iSpot's awareness of "any shifts in EDO's core business" does not dispute the truth of the factual statement in paragraph 4. |
| 5. | Spike-based analysis looks at internet searches following marketing events, such as celebrity talk show appearances or TV ads (also called "creatives"). **Ex. E, Krim Tr. 105:5-107:11 (". . . [W]e would match up TV ad airings to changes in the** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | **search engagement time series looking for spikes above the baseline level of searches in the minutes following an ad airing occurring on national TV.”);** Ex. G, EDO, White Paper: Share of Search Predicts Market Share Growth, at -6 (providing example of "spike" in searches following airing of Burger King tv ads); Ex. H, Video Advertising Bureau, Partner Insights: How Engaged Impressions Maximize TV Advertising Performance, *available at* https://thevab.com/vab-voices/how-engaged-impressions-transform-tv-advertising-performance-edo (last visited Feb. 2, 2025). | | | |
| 6. | If the marketing event provokes consumer interest or "search engagement" by its audience, the number of internet searches will "spike" right after the event. Ex. G, **EDO, White Paper: Share of Search Predicts Market Share Growth, at -6 (providing example of "spike" in searches following airing of Burger King tv ads).** | Not disputed | | |
| 7. | "Search engagement" refers to internet searches made on a particular search platform, e.g. ▮▮▮. **Ex. E, Krim Tr. 105:5–107:11.** EDO has | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | always collected search engagement data independently. **Ex. I, Declaration of Joshua Lee (Feb. 6, 2025) ¶ 8 ("Lee Decl.").** | | | |
| | 8. The purpose of spike-based search engagement metrics is to understand the impact of marketing events and, for movie studios, to predict the eventual performance of a campaign in increasing box office results. **Ex. E, Krim Tr. 106:4–107:7, 232:4–233:8.** | Not disputed | | |
| | 9. EDO measures "spikes" primarily through its proprietary search engagement metrics: search engagement volume ("SEV"), effectively the number of incremental consumer searches conducted shortly after seeing the marketing event, and search engagement rate ("SER"), effectively the average of such searches across all times the ad was run. **Ex. G, EDO, White Paper: Share of Search Predicts Market Share Growth, at -7; Ex. Q, Excerpts from the Deposition of Joshua Lee (Oct. 16, 2024) 72:2–11 ("Lee Tr."); Ex. E, Krim Tr. 105:5–107:11; Ex. I, Lee Decl. ¶ 8; Ex. H, Video Advertising Bureau, Partner Insights: How** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | **Engaged Impressions Maximize TV Advertising Performance**, *available at* https://thevab.com/vab-voices/how-engaged-impressions-transform-tv-advertising-performance-edo (last visited Feb. 2, 2025). | | | |
| | 10. In February 2016, EDO began offering clients search engagement analysis through a consulting service called "Studio Advanced Analytics Group" or "SAAG." **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 9:15–25.** | Not disputed, but disputed that iSpot was aware of EDO's actions. | | iSpot's "aware[ness] of EDO's actions" does not dispute the truth of the factual statement in paragraph 10. |
| | 11. Through SAAG, EDO offered custom reports concerning specific marketing events that analyzed the connection between consumer search activity and the airing of TV ads. **Ex. K, EDO-00014504–07 (Aug. 6, 2016 Email chain between Sebastian Chiu and representatives from ▮▮); Ex. L, EDO-00058063 at -064 (email attachment: Aug. 12, 2016 ▮▮▮▮ Ad Traction Report).** | Not disputed, but disputed that iSpot was aware of EDO's actions. | | iSpot's "aware[ness] of EDO's actions" does not dispute the truth of the factual statement in paragraph 11. |
| | 12. The marketing events EDO most frequently analyzed were linear TV ads, or advertisements broadcast within fixed programming schedules on broadcast or | Not disputed, but disputed that iSpot | | iSpot's "aware[ness] of EDO's actions" does not dispute the truth of the |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | cable TV. **Ex. K, EDO-00014504–07 (Aug. 6, 2016 Email chain between Chiu (EDO) and representatives from ▇ ); Ex. M, Arielle Feger, EMarketer, Linear TV: What It Is and What Marketers Need to Know About It (Sept. 6, 2024),** *available at* https://www.emarketer.com/insights/definition-linear-tv-advertising/ (last visited Jan. 30, 2025); **Ex. N, Marta Grgurović, targetvideo, What Is Linear TV and Is It Becoming Obsolete? (March 25, 2024),** *available at* https://target-video.com/what-is-linear-tv/ (last visited Feb. 2, 2025); **Ex. O, LTN, What Is Linear TV? A Guide to Linear TV vs. OTT (Dec. 2, 2024),** *available at* https://ltnglobal.com/blog/what-is-linear-tv (last visited Feb. 2, 2025). | was aware of EDO's actions. | | factual statement in paragraph 12. |
| | 13. Analyzing live TV ads requires airings data, meaning data about an individual ad airing on linear TV, as opposed to streaming. **Ex. K, EDO-00014504 at -07 (email attachment: Aug. 6, 2016 spreadsheet of SAAG analysis of linear TV ads reflecting columns for ▇ ); Ex. P, Excerpts from the Deposition of Sean** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | Muller (Oct. 9, 2024) 225:10–13 ("Muller Tr.") ("... Airings data is tracking every instance of when an ad airs ... on a network or in a program."). | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | 14. In January 2016, EDO began developing a platform called "Ava Data" to power SAAG. Ava Data ingested event data from any source and combined it with search engagement data to produce SER and SEV metrics. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 9:18–21; Ex. E, Krim Tr. 105:7–107:11.** | Disputed | EDO developed Ava after obtaining access to the iSpot service and data in March 2016. On March 30, 2016, Josh Lee wrote: "Having seen the iSpot demo though, I think there is value is [sic] letting us play with and learn from the iSpot UI." **Ex. MMMMM, EDO-00016228–38, Mar. 30, 2016 Email from K. Krim to S. Chiu [Krim Depo. Ex. 245].** In April 2016, the EDO engineering team held a "hackathon" to start replicating iSpot from the inside out. **Ex. ZZ, Cui Tr. 41:3–12; Ex. NNNNN, EDO-00640050, Apr. 5, 2016 Eng Meeting [Cui Depo. Ex. 117].** EDO's efforts to replicate iSpot focused on building a tv ad analytics service to compete with iSpot | iSpot does not dispute that "Ava Data ingested event data from any source and combined it with search engagement data to produce SER and SEV metrics." iSpot's misleading citations to evidence postdating the inception of the 2016 Agreement otherwise do not dispute the factual statement in paragraph 14 that development of Ava Data began in January 2016. |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | using iSpot's data. | |
| | | | First, EDO created "tv_ads" and "tv_ad_airings" tables within EDO's database schema to store ad airings data and develop EDO's Ava tv ad analytics product. **Ex. ZZ, Cui Tr. 157:21–159:5.** Dr. Georgios Zervas of Boston University analyzed EDO's "tv_ads" and "tv_ad_airings" tables, and concluded that EDO used iSpot's service develop EDO's tv ad airings database. **Ex. QQQ, Expert Report of Dr. Georgios Zervas ("Zervas Report") at 6, 39.** The tables on pages 32 and 36 of Dr. Zervas' Report show how EDO copied iSpot's API endpoints to build its tv ad airings database. | |
| | | | Next, EDO used the iSpot service and data to develop and supply data to EDO's Ava tv ad analytics dashboard that allowed EDO's clients to perform Competitive Intelligence, *i.e.*, compare the | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | effectiveness of the client's tv ads to the effectiveness of the competitor tv ads. **Ex. E, Krim Tr. 129:5–130:5.** This service depended on iSpot's data, and EDO could not provide competitive intelligence at this time without iSpot. ***Id.* at 130:6–13.** | |
| | | | For this dashboard, copied many of the features and functionality of iSpot's dashboard. Dr. Zervas compared iSpot's tv ad analytics dashboard with EDO's tv ad analytics dashboard, and again concluded that EDO used iSpot's service to build the tv ad airings dashboard tables for EDO's competing products. **Ex. QQQ, Zervas Report at 6, 39.** | |
| | 15. Initially, EDO received airings data directly from clients on an as-needed basis. **Ex. Q, Lee Tr. 20:7–20, 54:3–55:6, 79:23–80:12, 251:14–252:9; Ex. E, Krim Tr. 119:11–17, 130:6–13, 124:18–125:4.** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 16. | Using airings data only from clients proved problematic. It was cumbersome to request the data from clients and the data's narrow scope—EDO's use of a client's ad airings was limited to that client— did not allow EDO to perform benchmarking against the advertisements of competitors or predict the likely success or failure of similar creatives. **Ex. R, EDO-00637230 at -230 (Mar. 7, 2016 email from Krim to Norton); Ex. E, Krim Tr. 122:10–123:9.** | Not disputed | | |
| 17. | EDO realized that it would improve its services with reliable airings data across all studio advertisers on a going-forward basis, or so-called "syndicated" airings data. **Ex. E, Krim Tr. 122:10–123:9 ("[W]e realized in that sort of March 2016 time frame . . . that it would be preferable to have a single standardized source of TV ad airings for the . . . movie campaigns, both current and historical."); Ex. S, Excerpts from the Expert Deposition of Sean Muller (Dec. 16, 2024) 94:18–22 ("Muller Expert Tr.") ("[A]lways on generally . . . refers to syndicated. In other words, you are always measuring all ads all the time for everybody, whether or not they are customers of yours."); Ex.** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | P, Muller Tr. 254:22–255:5 ("Always on [is] also known as syndicated. A measurement where – we're always collecting information on every advertiser, 24/7, across hundreds of networks, across all their ads . . . even if they're not customers."). | | | |
| | **B. EDO Licenses iSpot Airings Data to Provide Analysis to its Clients** | | | |
| | 18. When EDO began to look for a source of syndicated airings data in March 2016, several companies offered access to syndicated airings data, including Kantar, Nielsen, MediaRadar, and iSpot. **Ex. T, EDO-00646655 [Deshpande Ex. 142] at -655 (Mar. 23, 2016 meeting agenda noting iSpot, MediaRadar, and Kantar as potential sources); Ex. E, Krim Tr. 122:10–123:9 (noting iSpot, Kantar, and Nielsen); Ex. P, Muller Tr. 225:22–226:7 (noting Kantar, Nielsen, and Kinetiq).** | Disputed | While Kantar, Nielsen, and MediaRadar offered syndicated tv ad airings data in early 2016, their data was highly delayed and not available through an API for automated downloads. EDO's only option in early 2016 for real-time tv ad airings data (within 24 to 48 hours of airing date) and ad airings data that could be downloaded automatically through an API was iSpot. **Ex. DDDDD, Declaration of Sean Muller ("Muller Decl.") ¶ 10.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 18 because iSpot concedes that Kantar, Nielsen, and MediaRadar offered "syndicated airings data" in some form "in March 2016." |
| | 19. By March 2016, EDO was already familiar with iSpot, having previously licensed iSpot's airings data for six months for their BDBO | Not disputed | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| product. **Ex. U, EDO-00002427 (Apr. 19, 2015 Email chain between McLay, Nadler, and Chiu discussing ending iSpot subscription); Ex. V, EDO-00002375 (June 11, 2015 email chain between McLay and Chiu et al confirming iSpot subscription was canceled); Ex. E, Krim Tr. 191:13–192:8.** | | | |
| 20. Although EDO had concerns about using iSpot's data given prior reliability problems, EDO's studio clients encouraged it to use iSpot. **Ex. W, ISPOT_0007262 (chain re inaccurate spend data for ▮▮▮▮); ECF 92 (Answer to SAC) ¶ 3; Ex. Q, Lee Tr. 83:8–84:7.** | Disputed | EDO's claimed concerns about iSpot's data was related to iSpot's "spend" estimates, which were estimates of how much the advertiser paid to air the ad. **Ex. PPPPP, Primrose Tr. 40:5–24; Ex. IIII, Jensen Tr. 45:21–46:9.** The alleged concern had nothing to do with the "accuracy" of other data associated with linear ads. iSpot's "spend" data was not needed for EDO to produce its SER and SEV metrics for its tv ad analytics service. **DSUF ¶ 6.** | iSpot does not dispute that "EDO's studio clients encouraged it to use iSpot." iSpot's proffered evidence otherwise does not dispute the truth of the factual statement in paragraph 20 because it does not contradict that EDO previously faced reliability problems with iSpot data. |
| 21. EDO entered into an agreement with iSpot to license data in iSpot's "Life & Entertainment: Movies" vertical that was effective from March 31, 2016 to March 28, 2017 (the "2016 | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | Agreement"). **ECF 92 (Answer to SAC) ¶ 4; Ex. X, EDO-00001745 at -746 (2016 licensing agreement between EDO and iSpot) ("2016 Agreement").** | | | |
| | 22. The 2016 Agreement permitted EDO to "[s]hare any work product created following the use of the iSpot Data with an unlimited number of people within or outside of Company's organization" and to "use the iSpot Data . . . to create insights from such data and provide such insight to its customers as part of its services . . . ." **Ex. Y, ISPOT_0012008 at -015 (2014 Terms of Service ("TOS")); Ex. Z, ISPOT_0007003 [Jensen Ex. 50] (email from iSpot stating that 2016 TOS same as 2014); Ex. X, EDO-00001745 at -746 (email attachment: 2016 Agreement).** | Not disputed | | |
| | 23. The 2016 Agreement included as restrictions that EDO work product contain only "a limited subset of the . . . iSpot Data," and that EDO "not use the iSpot Service to build or contribute to any other third party TV Monitoring or analytics service." **Ex. Y, ISPOT_0012008 at -016** | Disputed | At EDO's request, EDO and iSpot modified the provision in the 2016 Agreement under which EDO could "not use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service" to exclude EDO's | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 23 because iSpot does not contest the text of the 2016 Agreement. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| (email attachment: 2014 [2016] TOS). | | "services related its own analytics services unrelated to TV monitoring." **Ex. X, EDO-00001745 at - 746, Apr. 1, 2016 Email from J. Jensen to K. Krim, attaching 2016 Agreement; Ex. FFFFF, ISPOT_00007911, Mar. 31, 2016 Email from K. Krim to J. Jensen [Jensen Depo. Ex. 51].** | |
| 24. While the 2016 Agreement was in effect, EDO used iSpot's airings data to perform its spike analysis of search engagement data (that EDO independently procured). **Ex. E, Krim Tr. 114:23-117:23; Ex. Q, Lee Tr. 70:14–72:11; Ex. I, Lee Decl. ¶ 8.** | Disputed | While the 2016 Agreement was in effect, EDO also used the iSpot's airings and non-airings data (like estimated spend and estimated impressions) to supply data to EDO's Ava tv ad analytics dashboard that allowed EDO's clients to perform Competitive Intelligence, *i.e.,* compare the effectiveness of the client's tv ads to the effectiveness of the competitor tv ads. **Ex. E, Krim Tr. 129:5– 130:5.** This service depended on iSpot's data, and EDO could not provide competitive intelligence at this | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 24 because iSpot does not contest that EDO used iSpot's airings data to perform its spike analysis of search engagement data or that EDO independently procured its search engagement data. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | time without iSpot. *Id.* at 130:6–13. | |
| 25. Just as it had with client airings data, EDO used data like time stamps to locate the search spikes related to the ads in question. It would then provide reports to its clients containing requested analysis. **Ex. E, Krim Tr. 259:20–25; Ex. L, EDO-00058063 at -064 (email attachment: Aug. 12, 2016 ▬▬▬ Ad Traction Report); Ex. AA, EDO-00178518 at -519 (email attachment: Nov. 20, 2016 ▬▬▬l Ad Traction Report); Ex. BB, EDO-00635212 at -216 email attachment: EDO Creatives Update – ▬ (12/8)); Ex. CC, EDO-00003892 at -897 (email attachment: Mar. 7, 2017 ESPN Integrations Report ▬▬▬ films]); Ex. I, Lee Decl. ¶ 8.** | Disputed | EDO's reports impermissibly included iSpot's raw data, and was not limited to airings data like time stamps. For example, EDO includes a ▬ Creative Spot Analysis" that includes iSpot data unnecessary for EDO to report its SER score, including ▬ ▬▬▬▬▬▬ ▬▬▬ Mr. Lee's list of iSpot's raw data included with EDO's dashboard is also incomplete. EDO produced access to its tv analytics dashboard that was in use between 2016 and 2020. **Ex. FF, Pflaum Report at 77 n.242.** A review that dashboard shows that EDO shared additional iSpot raw data unnecessary for the SEV and SER metrics with EDO's customers, including ▬▬▬▬ ▬▬▬ ▬▬▬▬ ▬▬▬ | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 25 because it does not contest that EDO used time stamp data to locate search spikes for ads or that EDO provided reports to its clients containing requested analysis. |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | ███████████ | |
| 4 | | | ███████████ | |
| 5 | | | ███████████ | |
| 6 | | | ███████████ | |
| 7 | | | ████ | |
| 8–28 | 26. EDO's reports contained certain iSpot airings data, like timestamps, alongside EDO's SEV and SER metrics, but others would not have any airings data displayed. **Ex. DD, EDO-00004533 at -534 (email attachment: Oct. 3, 2016, ████: EDO Ad Traction Report); Ex. L, EDO-00058063 at -064 (email attachment: Aug. 15, 2016, ████ EDO Ad Traction Report).** An example report is Figure 1 below **(Ex. EE, EDO-00045543 at -569 (email attachment: Apr. 4, 2017 Creative Spot Analysis report for ██)):** | Disputed | Defendants' statement is incomplete and therefore misleading. EDO's reports to its clients impermissibly included iSpot's raw data, and was not limited to airings data like time stamps. For example, EDO includes a '██ Creative Spot Analysis" that includes iSpot data, including first airing, ██████████ ██████████ Mr. Lee's list of iSpot's raw data included with EDO's dashboard is also incomplete. EDO produced access to its tv analytics dashboard that was in use between 2016 and 2020. **Ex. FF, Pflaum Report at 77 n.242.** A review that dashboard shows that EDO shared additional iSpot raw data unnecessary for the SEV and SER | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 26 because iSpot does not contest that timestamps of airings are one iSpot data point EDO used in its reports, nor does it contest that some reports did not contain iSpot airings data. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | metrics with EDO's customers, including ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███For the ███████ ███████ EDO fails to explain the source of the "Estimated Impressions" data, which was sourced from iSpot as shown below in **Ex. PPPPPP, EDO-00004735–48, EDO's** ███████ **Analysis, dated Aug. 16, 2016) (highlighting added).** | |

28

18

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 27. To provide its clients with information on how their ads were performing relative to competitors' current or historical ads, EDO needed access to the full universe of TV ads for past and present movies. **Ex. E, Krim Tr. 122:10 –123:9, 125:24– 126:22.** The 2016 Agreement provided EDO with access to (1) iSpot's API, a set of protocols whereby software applications can exchange information, and (2) iSpot's "dashboard," a webpage where users can manually access iSpot's data. **Ex. Y, ISPOT_0012008 at -015 (email attachment: TOS including information re dashboard and API); Ex. FF, Expert Report of Isaac Pflaum ¶¶ 61, 73 ("Pflaum Report") (explanation of API).** | Not disputed | | |
| 28. Because iSpot's API provided EDO with an automated means to download data, EDO built code using iSpot's documentation to call the API's "endpoints" or slices of available airings data. **Ex. Q, Lee Tr. 223:20–224:13; Ex. FF, Pflaum Report ¶¶ 73– 79 (explanation of endpoints); Ex. GG, EDO-** | Not disputed | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 00003026 (code EDO used to call iSpot API). | | | |
| 29. For example, iSpot's "Metadata" endpoint ▬▬▬▬▬▬ ▬▬▬▬▬▬ ▬▬▬▬▬ ▬▬▬ **Ex. HH, ISPOT_0008441 [Sinclair Ex. 183] at -448 (Jan. 2017 API Integration Documentation); Ex. II, ISPOT_0020683 (Aug. 2017 API Integration Documentation).** | Not disputed | | |
| 30. Because EDO needed an updated full universe of TV ads for movies to do its competitive analysis, EDO's code needed to and did call iSpot's API continuously, consistent with iSpot's API design. **Ex. Q, Lee Tr. 216:14–217:8, 219:8–220:23.** | Disputed | EDO did not need to repeatedly call iSpot's API in order to obtain update information for a legitimate purpose. EDO could have called iSpot's "update" endpoint for this purpose. **Ex. S, Muller Tr. 131:25–132:7.** | Mr. Muller's testimony does not materially dispute the truth of the factual statement in paragraph 30 because Mr. Muller concedes that repeatedly calling the metadata endpoint could retrieve changes to metadata information over time. **Ex. P, Muller Tr. 131:11–24.** Further, Mr. Pflaum opined that Mr. Lee's testimony was consistent with iSpot using a polling API architecture. **Ex. FF, Pflaum Report ¶ 155.** |
| 31. In addition to generating reports for clients, EDO developed a dashboard | Not disputed, but disputed | | iSpot's "aware[ness] of EDO's actions" does not dispute the truth of |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | through which its clients could generate their own analysis. EDO called this dashboard "Ava Product" and began offering it to clients in October 2016. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 10:4–18, 17:3–9; Ex. E, Krim Tr. 112:21–119:5; Ex. I, Lee Decl. ¶¶ 2–3.** | that iSpot was aware of EDO's actions. | | the factual statement in paragraph 31. |
| 10 | 32. Of the 56 unique airings data fields that EDO retrieved from iSpot, the Ava Product dashboard only displayed the following iSpot data fields: ███████ ███████████████ ████ These iSpot data fields were always shown alongside EDO's proprietary search engagement metrics—SEV (search engagement volume) and SER (search engagement rate). Users could not view iSpot data fields in Ava Product separate from EDO's search engagement analysis. **Ex. B, EDO-00043807 at -828 (email attachment: Dec. 12, 2017 Investor Presentation, EDO-00043807); Ex. JJ, EDO-00639304 at-306 (client pitch presentation featuring Sept. 10, 2017 dashboard screenshot); Ex. E, Krim Tr. 257:12–259:19; Ex. I, Lee Decl. ¶ 3.** | Disputed | A review that dashboard shows that EDO shared additional iSpot raw data unnecessary for the SEV and SER metrics with EDO's customers, including ██████████ ████████ ████ ██████ ████ ███████ ████████ ████████ ████ ████████ ██ ████ For the ██████ ██████ Report, EDO fails to explain the source of the "Estimated Impressions" data, which was sourced | iSpot does not dispute that "iSpot data fields were always shown alongside EDO's proprietary search engagement metrics— SEV (search engagement volume) and SER (search engagement rate)" or that "[u]sers could not view iSpot data fields in Ava Product separate from EDO's search engagement analysis." iSpot's proffered evidence otherwise does not dispute the truth of the factual statement in paragraph 32. First, paragraph 32 describes what iSpot data was used in EDO's Ava Product dashboard, which EDO began offering to clients in October 2016. Exhibit PPPPPP |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | from iSpot as shown below in **Ex. PPPPPP, EDO-00004735–48, EDO's** ▇▇▇▇ **Analysis, dated Aug. 16, 2016 (highlighting added).** | was a report generated in August 2016, two months before the Ava Product dashboard was first offered to clients in October 2016. *See* **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 10:4–18, 17:3–9; Ex. E, Krim Tr. 112:21–119:5; Ex. I, Lee Decl. ¶¶ 2–3.** <br><br>Second, iSpot cannot assume based just on the fact that iSpot offered certain data points that EDO used that data in its Ava Product dashboard. Dr. Zervas did no analysis to show that the fields ▇▇▇▇ ▇▇▇▇ ▇▇▇▇ in EDO's dashboard came from iSpot. |
| | 33. Figure 2 is an example of a client's view of the EDO dashboard in 2017. **Ex. KK, EDO-00057746 at -752 (May 12, 2017 ▇▇ Presentation.** | Not disputed | | |

| | | | |
|---|---|---|---|
| 34. In Figure 2, the graph depicts a spike identified in search engagement.  The row of data below identifies the airing associated with ███, ███████████, and EDO's proprietary SER and SEV metrics. **Ex. KK, EDO-00057746 at -752 (email attachment: May 12, 2017** | Disputed | The only data that was not directly sourced from iSpot is SEV and SER, which were calculated using iSpot's data. Through iSpot, EDO also had access to "███████, which EDO used for its dashboard. **Ex. QQQ, Zervas Report at 52.** EDO's Report also confirms that ███████ *See* **Ex. PPPPPP, EDO-00004735–48,** | iSpot does not dispute that Figure 2 depicts a spike identified in search engagement or that the row of data below identifies the airing associated with ███████ and EDO's proprietary SER and SEV metrics. iSpot's proffered evidence does not otherwise dispute the truth of the factual statement in paragraph 34 because iSpot |

| | | | |
|---|---|---|---|
| ██████ Presentation); **Ex. I, Lee Decl. ¶ 3.** | | **EDO's ██████ ██████ Analysis, dated Aug. 16, 2016).** | cannot assume based just on the fact that iSpot offered certain data points that EDO used that data in its Ava Product dashboard. Dr. Zervas did no analysis to show that ████████ ██████████████ ██████████████ ████████████████ in EDO's dashboard came from iSpot. |
| 35. Isaac Pflaum opined that in the data licensing industry, "raw data" commonly means the input data licensed from the licensor that is "used to generate" derivative insights. **Ex. FF, Pflaum Report ¶ 153.** Mr. Pflaum also opined that, in the data licensing industry, "derivative insights" commonly mean "analyses that are derived from the provider's data." ***Id. ¶¶ 150-151.*** Mr. Pflaum further opined that derivative insights commonly "include small portions of the [provider's] data, or summaries of the data. ***Id. ¶ 151.*** | Disputed | Regardless of what is or is not common practice, Mr. Pflaum is not offering any opinion about whether EDO's use of iSpot's data was permitted under any of its agreements with iSpot. **Ex. FFFFFF, Pflaum Tr. 67:11–21.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 35 about what Mr. Pflaum opined. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 36. Isaac Pflaum opined that because "[c]ustomers frequently wish to understand the inputs for key metrics" to "lend[] credence to the metrics' validity," "[p]resenting derived data alongside some of the raw data used to generate it is common practice." **Ex. FF, Pflaum Report ¶¶ 150–53.** Mr. Pflaum further opined that in the data licensing industry, "it is atypical for data analytics providers to supply customers with derived data without any raw inputs to contextualize the derivations." *Id.* | Disputed | Regardless of what is or is not common practice, Mr. Pflaum is not offering any opinion about whether EDO's use of iSpot's data was permitted under any of its agreements with iSpot. **Ex. FFFFFF, Pflaum Tr. 67:11–21.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 36 about what Mr. Pflaum opined. |
| 37. During the contracting period, in an abundance of caution, EDO required that its movie-studio clients license iSpot separately. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 10:4–9; Ex. LL, Excerpts from the Deposition of Saagar Deshpande (Sept. 26, 2024) 38:8–39:14, 64:23–65:3 ("Deshpande Tr."); Ex. Q, Lee Tr. 100:24–102:4.** | Disputed | EDO did not thing to verify whether its clients had subscriptions for the data that EDO was sharing through its dashboard. **Ex. E, Krim Tr. 179:25–180:25.** EDO has produced no documentation to prove that it imposed this requirement on movie studio clients. | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 37 because whether or not EDO "verif[ied]" its movie-studio clients' iSpot subscriptions does not undermine the fact that EDO required them to have such subscriptions.<br><br>Uncontroverted interrogatory responses and deposition testimony are sufficient bases on which to establish facts entitling a movant to summary judgment. *See* |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)(1)(A). |
| 38. By March 2017, all EDO movie-studio clients were iSpot clients. *Compare* **Ex. WWWW, EDO-00638522 at -523 (EDO revenue by client schedule),** *with* **Ex. AAAAA, ISPOT_0021277 (iSpot revenue by client schedule).** | Disputed | EDO did not thing to verify whether its clients had subscriptions for the data that EDO was sharing through its dashboard. **Ex. E, Krim Tr. 179:25-180:25.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 38 that all of EDO's movie-studio clients actually were iSpot clients by March 2017. |
| 39. EDO also continued to receive iSpot data directly from clients, which EDO understood to be permitted under those clients' iSpot subscriptions. EDO segregated that data in Ava Data and used it only to serve the specific client it came from. **Ex. J, EDO's Responses to First Set of Interrogatories at 22:26–23:7; Ex. Q, Lee Tr. 135:8–12.** | Disputed | **Evidentiary Objections:**<br><br>**Inadmissible Hearsay** (Fed. R. Evid. 801-802): Communications from EDO clients and the terms of EDO clients' iSpot subscriptions.<br><br>**Best Evidence Rule** (Fed. R. Evid. 1002): The original writing or duplicate thereof is required to prove the contents of the documents referred to and relied upon Defendants (EDO's clients' iSpot subscriptions, and data as it exists in EDO's system)<br><br>**Lacks Foundation of Personal Knowledge** | iSpot does not dispute that EDO continued to receive iSpot data directly from clients, or that EDO segregated that data in Ava Data and used it only to serve the specific client it came from.<br><br>iSpot's evidentiary objections otherwise are unavailing.<br><br>(1) EDO's understanding of communications from clients is not a statement. **FRE 801.**<br><br>(2) EDO's understanding of communications from clients is not presented to prove the terms and conditions of those clients' iSpot |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | (Fed. R. Evid. 602, 901): Insufficient foundation for EDO's purported "understanding." | subscriptions. **FRE 801(c)(2).** |
| 4 | | | | (3) EDO's |
| 5 | | | | understanding was based on |
| 6 | | | | communications from its clients. EDO does |
| 7 | | | | not purport to characterize the |
| 8 | | | | contents of any document. |
| 9 | | | | |
| 10 | | | | (4) iSpot's foundation and authenticity |
| 11 | | | | objections are unavailing because |
| 12 | | | | EDO is not seeking to present evidence or |
| 13 | | | | testimony regarding the truth of the client |
| 14 | | | | communications, and the documents to |
| 15 | | | | which they may relate, identified in paragraph |
| 16 | | | | 39. |
| 17 | | | | |
| 18 | | | | Additionally, iSpot cannot demonstrate |
| 19 | | | | that the fact cannot be presented in |
| 20 | | | | admissible form at trial, including by |
| 21 | | | | calling an EDO client as a witness. ***United*** |
| 22 | | | | ***States v. Eggleston***, 2017 WL 11503431, at *7 (N.D. Cal. Sept. 22, 2017) ("The |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | standard is not whether summary |
| 27 | | | | judgment evidence would be admissible |
| 28 | | | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | | at trial, but whether it could be presented in an admissible form at trial." (citing |
| 4 | | | | |
| 5 | | | | *Fraser v. Goodale*, 342 F.3d 1032, 1036– |
| 6 | | | | 37 (9th Cir. 2003)); |
| 7 | | | | *see also* Fed. R. Civ. P. 56(c)(1)(B). |
| 8 | | | | |
| 9 | 40. One client that provided iSpot data to EDO was ███████ In early March 2017, ███y asked EDO to run an analysis of co-branded ads using ███████'s key to iSpot's API because those ads were unavailable through EDO's license. **Ex. Q, Lee Tr. 64:4–14, 65:10–15; Ex. MM, EDO-00033920 at -920 (Mar. 1, 2017 email from ███████) to Lee (EDO)).** | Disputed | **Evidentiary Objection:** **Inadmissible Hearsay** (Fed. R. Evid. 801-802): Statements as to what ███████ purportedly asked EDO. | iSpot does not dispute that ███ provided iSpot data to EDO or that co-branded ads were unavailable through EDO's license. |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | iSpot's evidentiary objections otherwise are unavailing. First, EDO's invocation of ███████ request to demonstrate the effect of that statement on EDO's subsequent actions, *infra* ¶¶ 42–48, falls outside the rule against hearsay. *Cf.* FRE 801(c)(2). |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | Mr. ███████ email to Mr. Lee requesting an analysis of co-branded ads using ███████s key to iSpot's API is a business record and therefore satisfied an exception to the rule against hearsay. **FRE 803(6).** |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

28

Parties' SUF & Genuine Disputes, Conclusions of Law re Defs.' MSJ
Case No. 2:21-cv-06815-MEMF-MAR

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | | Finally, iSpot cannot show that EDO would be unable to establish the fact asserted in paragraph 40 at trial, including because EDO reserves the right to call ▮▮▮ or another witness with personal knowledge. ***See, e.g., United States v. Eggleston***, 2017 WL 11503431, at *7 (N.D. Cal. Sept. 22, 2017) (**"The standard is not whether summary judgment evidence would be admissible at trial, but whether it could be presented in an admissible form at trial."** (citing ***Fraser v. Goodale***, 342 F.3d 1032, 1036–37 (9th Cir. 2003)); **see also** Fed. R. Civ. P. 56(c)(1)(B). |
| 20 | | | | |
| 21 | 41. ▮▮▮ shared its key to iSpot's API with EDO on the assurance that ▮▮▮ iSpot license permitted it to do so. **Ex. Q, Lee Tr. 63:13–23, 65:22–66:15, 67:17–25; 116:17–117:24; Ex. MM, EDO-00033920 at -920 (Mar. 1, 2017 email from ▮▮▮) to Lee (EDO)).** | Disputed | **Factual Dispute:** There was no bug in iSpot's API. ▮▮▮ was given access to iSpot's entire database for ▮▮▮y to access its co-brand ads outside the theatrical category. **Ex. S, Muller Tr. 142:20–144:6.** Before using ▮▮▮ iSpot credentials, EDO | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 41 that ▮▮▮ shared its API key with EDO and that EDO understood it was permitted under ▮▮▮ iSpot license. |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | knew that ▮▮ had access to iSpot's entire database. **Ex. VVVVV, EDO-00003386, Email from Chiu to Ava Team, dated 1/27/2017.** Accordingly, EDO knew that it would obtain ad airings data unrelated to ▮▮ if it download all available data using ▮▮iSpot credentials. On March 1, 2017—with the March 31, 2017 expiration of the 2016 Agreement looming—Josh Lee at EDO obtained ▮▮ iSpot credentials, and Mr. Lee's boss, EDO's Chief Technology Officer, Tony Ho, told Mr. Lee that "[w]e should access this [iSpot] API through some proxy to hide who we are" when using▮▮iSpot credentials. **Ex. UUUUU, EDO-00003259, Email from Ho to Lee, dated 3/1/2017 [Lee. Ex. 225].** A few days later, on March 6, 2017, EDO | iSpot's evidentiary objections are unavailing: (1) The factual statement regarding EDO's understanding of communications from clients is not presented to prove the terms and conditions of those clients' iSpot subscriptions. *See* **FRE 801(c)(2).** (2) ▮▮ email to Mr. Lee is a business record and therefore satisfies an exception to the rule against hearsay. **FRE 803(6).** (3) iSpot's foundation objection fails, because EDO is not seeking to prove the terms and conditions of▮▮ iSpot license. Additionally, iSpot cannot demonstrate that the fact cannot be presented in admissible form at trial, including by calling▮▮ as a witness. *United States v. Eggleston*, **2017 WL 11503431, at \*7 (N.D. Cal. Sept. 22, 2017) ("The** |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | used ▮▮▮ credentials to download from iSpot's database the data for 71,153,917 ad airings that aired between January 1, 2015 and March 6, 2017, most of which were outside EDO's limited subscription to the movie-theatrical category. **Ex. DDDDD, Muller Decl. ¶¶ 16–17 & Ex. C; Ex. XXXXX, ISPOT_0043139–44, API Access Analysis Prepared by Sean Muller, dated October 2024.** **Evidentiary Objections:** **Inadmissible Hearsay** (Fed. R. Evid. 801-802): Statements as to ▮▮▮ assurances to EDO. **Lacks Foundation of Personal Knowledge** (Fed. R. Evid. 602, 901): Foundation lacking as to what ▮▮▮ iSpot license permitted. | **standard is not whether summary judgment evidence would be admissible at trial, but whether it could be presented in an admissible form at trial." (citing** *Fraser v. Goodale*, **342 F.3d 1032, 1036– 37 (9th Cir. 2003));** *see also* **Fed. R. Civ. P. 56(c)(1)(B).** |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 42. EDO set up code to automatically call iSpot's API for airings data using ▮▮▮▮ API key and segregate the results in its database to ensure that the data was used only for ▮▮▮. **Ex. Q, Lee Tr. 80:23–81:12; Ex. NN, EDO-00638421 at row 22205 (EDO Commit Log).** An "API key" is "an alphanumeric string that API developers use to control access to their APIs." Different API keys may provide users with differing levels of service or functionality. **Ex. OO, Amazon Web Services, What is an API key?,** *available at* https://aws.amazon.com/what-is/api-key/ (last visited Feb. 2, 2025). | Not disputed | | |
| 43. Due to a bug in iSpot's API, EDO's calls to iSpot's API using ▮▮▮▮ API key between March 6–7, 2017 and March 16–22, 2017 returned data from all industries. **Ex. Q, Lee Tr. 80:23–82:8; Ex. PP, ISPOT_0043139 at -141 (Oct. 2024 iSpot Presentation, ▮▮▮▮ Studios: API Access Analysis).** | Disputed | There was no bug in iSpot's API. ▮▮▮ was given access to iSpot's entire database for ▮▮▮ to access its co-brand ads outside the theatrical category. **Ex. S, Muller Tr. 142:20–144:6.** Before using ▮▮▮ iSpot credentials, EDO knew that ▮▮▮ had access to iSpot's entire database. **Ex. VVVVV, EDO-** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 43 that EDO's calls to iSpot's API using ▮▮▮ API key between March 6–7, 2017 and March 16–22, 2017 returned data from all industries.

Contrary to iSpot's assertions, Mr. Muller acknowledged that iSpot failed to limit |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | **00003386, Email from Chiu to Ava Team, dated 1/27/2017.** | ████API access to those categories of information actually licensed by █████ |
| 4 | | | | |
| 5 | | | Accordingly, EDO knew that it would obtain ad airings data unrelated to ████ if it download all available data using ████ iSpot credentials. | licensed by █████ **Ex. P, Muller Tr. at 142:18–143:25.** |
| 6 | | | | |
| 7 | | | | Whether or not that failure is characterized as a "bug" is immaterial to EDO's motion. |
| 8 | | | | |
| 9 | | | | |
| 10 | | | On March 1, 2017— with the March 31, 2017 expiration of the 2016 Agreement looming—Josh Lee at EDO obtained ████ iSpot credentials, and Mr. Lee's boss, EDO's Chief Technology Officer, Tony Ho, told Mr. Lee that "[w]e should access this [iSpot] API through some proxy to hide who we are" when using ████s iSpot credentials. **Ex. UUUUU, EDO-00003259, Email from Ho to Lee, dated 3/1/2017 [Lee Ex. 225].** | Further, EDO's CTO Josh Lee testified that EDO had a "practice to access third-party APIs and servers through proxies." **Ex. Q, Lee Tr. 124:6–125:11.** |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | iSpot's remaining evidence is entirely inapposite to the factual statement in paragraph 43. |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | A few days later, on March 6, 2017, EDO used ████ credentials to download from iSpot's database the | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW
RE DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | data for 71,153,917 ad airings that aired between January 1, 2015 and March 6, 2017, most of which were outside EDO's limited subscription to the movie-theatrical category. **Ex. DDDDD, Muller Decl. ¶¶ 16–17 & Ex. C; Ex. XXXXX, ISPOT_0043139–44, API Access Analysis Prepared by Sean Muller, dated October 2024.** | |
| 44. On March 10, 2017, ▮▮▮ asked EDO to put the co-branded analysis it requested temporarily on hold.  EDO agreed and informed ▮▮▮ that it would continue to retrieve data via ▮▮▮ API key in the background so it would be ready to start the analysis when ▮▮▮ asked it to. **Ex. QQ, EDO-00003253 at -253 (Mar. 10, 2017 email chain between ▮▮▮ and Lee (EDO)); Ex. I, Lee Decl. ¶ 6.** | Disputed | **Factual Dispute:** EDO continued to use ▮▮▮ API key through a proxy to hide who EDO was when retrieving the massive amount of iSpot data. On March 1, 2017—with the March 31, 2017 expiration of the 2016 Agreement looming—Josh Lee at EDO obtained ▮▮▮ iSpot credentials, and Mr. Lee's boss, EDO's Chief Technology Officer, Tony Ho, told Mr. Lee that "[w]e should access this [iSpot] API through some proxy to hide who we are" | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 44 because it does not speak to communications between ▮▮▮ and EDO.<br><br>iSpot's evidentiary objection fails because the emails between ▮▮▮ and Mr. Lee are a business record and therefore satisfy an exception to the rule against hearsay.  **FRE 803(6).**<br><br>Additionally, EDO's invocation of ▮▮▮ request to demonstrate the effect of that statement on EDO's |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | when using ▆▆▆ iSpot credentials. **Ex. UUUUU, EDO-00003259, Email from Ho to Lee, dated 3/1/2017 [Lee. Ex. 225].** **Evidentiary Objection:** **Inadmissible Hearsay** (Fed. R. Evid. 801-802): Statements as to what ▆▆▆ purportedly asked EDO. | actions, falls outside the rule against hearsay. *See* **FRE 801(c)(2).** Finally, iSpot cannot demonstrate that the fact cannot be presented in admissible form at trial, including by calling ▆▆▆ as a witness. ***United States v. Eggleston*, 2017 WL 11503431, at \*7 (N.D. Cal. Sept. 22, 2017) ("The standard is not whether summary judgment evidence would be admissible at trial, but whether it could be presented in an admissible form at trial." (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003)); *see also* Fed. R. Civ. P. 56(c)(1)(B).** |
| 45. On March 19, 2017, EDO code inadvertently called iSpot's API through its own key using ad IDs retrieved from the use of ▆▆▆ API key. Due to another bug in iSpot's code, those calls retrieved data outside the movie industry. **Ex. Q, Lee Tr. 108:20–110:10; Ex. RR,** | Disputed | Using "ad id" information that EDO obtained using ▆▆▆ iSpot credentials, EDO used its own iSpot credentials to retrieve ad airing data for 57,011 ads outside of EDO's subscription. | iSpot does not dispute that on March 19, 2017, EDO code called iSpot's API through its own key using ad IDs retrieved from the use of ▆▆▆ API key. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| iSpot's Responses to EDO's Third Set of Interrogatories at 5:18–6:15; Ex. P, Muller Tr. 140:7–18. | | The ads intentionally retrieved by EDO outside its subscription were a survey across many industries and were unrelated to ▮▮ or any ▮▮ co-branded add. **Ex. DDDDD, Muller Decl. ¶ 18; Ex. S, Muller Tr. 135:17–137:10.** | Further, Mr. Muller's testimony cannot speak to whether EDO's actions were intentional. While iSpot disputes whether or not EDO's actions were inadvertent, that dispute is immaterial because there is no dispute that EDO deleted the retrieved data before the 2017 Agreement came into effect. *Infra* ¶ 46. |
| 46. Within 24 hours, EDO had identified the issue, temporarily stopped all its API calls, fixed the issue, deleted the data, and changed its code to stop any future such calls. **Ex. FF, Pflaum Report ¶¶ 170–72; Ex. Q, Lee Tr. 80:23–82:8; Ex. NN, EDO-00638421 at rows 22044–47, 22049–52 (EDO Commit Log).** | Disputed | Pflaum's report is based on hearsay and he never confirmed that any data was deleted. **Ex. FFFFFF, Pflaum Tr. 93:5–95:2.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 46, which is based on testimony from Joshua Lee and EDO's contemporaneous commit log.<br><br>Additionally, expert witnesses may rely on hearsay in providing their opinions. **FRE 703.** |
| 47. On March 22, 2017, ▮▮ asked EDO to discontinue using ▮▮ API key moving forward, and EDO did. ▮▮ also told EDO that it did not need to delete the data it had previously retrieved through ▮▮ | Disputed | **Evidentiary objection:**<br><br>**Inadmissible Hearsay (Fed. R. Evid. 801-802):** Statements as to what | Exhibit SS are notes made contemporaneously with a business meeting at which notes would be ordinarily recorded by EDO employees and |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| API key. **Ex. SS, EDO-00645278 at -279 (notes on Mar. 22, 2017 lunch meeting with** ▓▓▓▓ | | ▓▓▓▓ purportedly asked and told EDO. | therefore satisfy an exception to the rule against hearsay. **FRE 803(6).** Additionally iSpot cannot demonstrate that the fact cannot be presented in admissible form at trial, including by calling ▓▓▓▓ as a witness. ***United States v. Eggleston*, 2017 WL 11503431, at \*7 (N.D. Cal. Sept. 22, 2017) ("The standard is not whether summary judgment evidence would be admissible at trial, but whether it could be presented in an admissible form at trial." (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003)); *see also* Fed. R. Civ. P. 56(c)(1)(B).** |
| 48. EDO deleted the iSpot data retrieved using ▓▓▓▓ API key when EDO deleted the iSpot data retrieved using EDO's API key in March 2018. **Ex. Q, Lee Tr. 46:13–47:18; Ex. TT, EDO-00644865 at -865–867 (March 2018 "Standard Data Retention Policy"); Ex. I, Lee Decl. ¶¶ 5–6.** | Disputed | EDO's own documentation from September 2020 confirms that EDO continued to retain iSpot historical data: "Additionally, historical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for movies are in the | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 48 because it does not contradict EDO's evidence of deletion. Exhibit EEEEEE refers to "Standard Retention Airings," |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | Common Set." **Ex. EEEEEE, EDO-00058446, Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo. Ex. 157].** The Common Set is airings data. **Ex. LL, Deshpande Tr. 170:22–171:1.**<br><br>In addition, for a May 4, 2018 demonstration to ▮▮▮▮—after the 2017 Agreement expired—EDO acknowledged concerns about its continued reliance on iSpot data: "Is it a risk that we admit we have iSpot data from December to January?" **Ex. DDDDDD, EDO-00644889, ▮▮▮ Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** This document directly contradicts Mr. Lee's declaration that all iSpot data was delete before the 2017 Agreement expired. | which is the name of the database table in which EDO stored the derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. ***See* SUF ¶¶ 68–69; Ex. I, Lee Decl. ¶ 10.** "Standard Retention Airings" does not refer to iSpot data or any data generated from iSpot data.<br><br>Additionally, iSpot's reference to Mr. Desphande's testimony does not create a dispute.  Mr. Deshpande could not recall the purpose of Exhibit EEEEEE, and merely speculated regarding the contents of the "Common Set." **Ex. LL, Deshpande Tr. at 170:5–171:10.** Mr. Deshpande further responded, "Not to my knowledge" when asked whether "EDO continue[d] to use historical data from iSpot . . . after EDO's subscription with iSpot expired." ***Id.* at 171:12–16.**<br><br>Exhibit DDDDDD is notes EDO prepared to pitch ▮▮▮▮▮ in |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | March 2018 on TV Ad Database. The pitch touts Kantar as a "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 Agreement)—despite having licensed Kantar in December 2017—that it might undermine its endorsement of Kantar. |
| 49. In late 2016, iSpot expressed concerns that EDO was using its service to build a "competing product" in violation of the 2016 Agreement, and discussed those concerns with Kevin Krim, EDO's then-COO. **Ex. UU, ISPOT_0008225 [Jensen Ex. 55] at -226; Ex. VV, Excerpts from the Deposition of Mark Myers (Oct. 8, 2024) 104:18–106:5 ("Myers Tr."); Ex. WW, Muller Tr. 43:6–12; Ex. WW, ISPOT_0008229 [Primrose Ex. 104] at -229.** | Not disputed | | |
| 50. iSpot elected to continue its relationship with EDO, and the parties signed a renewal agreement that was effective | Disputed | iSpot relied upon the representations of EDO before entering a new subscription | iSpot's proffered evidence does not dispute the truth of the factual statement in |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| from March 29, 2017, to March 28, 2018 ("the 2017 Agreement"). **Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] (email attachment: 2017 Agreement).** | | agreement with EDO. The parties did not simply "renew" the 2016 agreement.<br><br>In October 2016, Alex Andujar of Sony Pictures reported to iSpot's Jon Primrose that EDO had made a presentation to Sony wherein it appeared EDO had built a tv ad analytics dashboard using iSpot's data. **Ex. PPPPP, Primrose Tr. 50:12–52:3, 53:8–54:4, 55:13–57:6.** In an email to his iSpot colleagues recapping his conversation with Mr. Andujar, Mr. Primrose wrote: "Sony is confused as to why we license our data to [EDO] who is creating a competitive offering." **Ex. UU, ISPOT_0008225, Oct. 2016 email chain between J. Primrose et al. [Jensen Depo. Ex. 55].**<br><br>Mr. Jensen spoke with Mr. Krim on November 1, 2016. Mr. Krim feigned surprise at Sony's claim and assured iSpot that EDO did | paragraph 50 because it does not contest that iSpot elected to continue its relationship with EDO by signing the 2017 Agreement. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | not have any plans to compete with iSpot. **Ex. IIIII, ISPOT_00075329, Jeff Jensen's notes memorialized in email from J. Primrose to J. Jensen, dated 11/18/2016 [Jensen Depo. Ex. 59].** On November 18, 2016, during a follow-up call amongst Mr. Jensen, iSpot's Mark Myers, Mr. Primrose and Mr. Krim, Mr. Krim denied that EDO had presented a dashboard product to Sony that was similar to anything that iSpot offered, and claimed that "Sony must have gotten it wrong." **Ex. VV Myers Tr. 105:9–106:5.** Mr. Krim further assured iSpot that EDO was complying with the parties' 2016 Agreement. *Id.* at 106:6–18. During the call, iSpot warned Mr. Krim that iSpot would terminate the Subscription Agreement if iSpot learned that EDO was violating its terms. **Ex. IIII, Jensen Tr.** | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | 133:3–17. | |
| 4 | | | In early 2017, EDO's subscription was up | |
| 5 | | | for renewal. As part of those negotiations, | |
| 6 | | | iSpot asked for more information about | |
| 7 | | | how EDO was using iSpot's data. Mr. | |
| 8 | | | Krim told Shamez Dharamsi and Keeley | |
| 9 | | | Sullivan at iSpot that EDO is in the | |
| 10 | | | business of | |
| 11 | | | "predicting box office sales based on various | |
| 12 | | | inputs including our data, digital, etc" and | |
| 13 | | | that EDO presents its analysis in "bespoke, | |
| 14 | | | customized reports in excel." **Ex. QQQQQ,** | |
| 15 | | | **ISPOT_0019245,** | |
| 16 | | | **Dharamsi email to Myers and Muller,** | |
| 17 | | | **dated 3/2/2017; Ex. SSSSSS, Dharamsi** | |
| 18 | | | **Tr. 167:1–171:17; Ex. TTTTTT,** | |
| 19 | | | **ISPOT_0011073, Dharamsi email to** | |
| 20 | | | **Muller and Myers, dated 2/22/2017.** | |
| 21 | | | One EDO employee summarized the call | |
| 22 | | | as follows: "Kevin basically said f- off | |
| 23 | | | during the call, but he's going to think | |
| 24 | | | about how to respond and whether there's | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | any work-product we can show them in a non-incriminating way." **Ex. RRRRR, EDO-00057829, Email with Slack message from D. Cui dated 2/22/2017 [Cui Depo. Ex. 139]; Ex. ZZ, Cui Tr. 170:13– 172:14 (relaying Krim's summary of the phone call with iSpot to certain EDO engineers).** Mr. Krim then had a follow-up call with Ms. Sullivan during which Mr. Krim again claimed that "Sony was a huge misunderstanding" and that "Everything is report based built in Excel. **Ex. SSSSS, Declaration of Keeley Sullivan Brock (Feb. 19, 2025) ("Sullivan Brock Decl.") ¶¶ 4– 5, Ex. A (contemporaneous notes of Sullivan Brock's call with Krim).**<br><br>The parties then entered a new 2017 Agreement. **Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] (email attachment: 2017** | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | Agreement). | |
| 51. During the pendency of the 2017 Agreement, EDO continued to use iSpot data to power its search engagement analysis. Its code continued to call iSpot's API endpoints to maintain an updated, full universe of TV ads for movies in EDO's own database. **Ex. Q, Lee Tr. 213:9-20, 218:17-220:13 ("We had created the code . . . to keep the iSpot and EDO data feeds in sync, and that code continued to run until we canceled the iSpot license.").** It continued to provide the same types of reports and the same dashboard access to its clients. **Ex. EE, EDO-00045543 at -568 (email attachment: Apr. 4, 2017 TV Campaign Summary ▮▮▮); Ex. YY, EDO-00036264 at -270 (email attachment: Nov. 6, 2017 TV Campaign Summary [*Daddy's Home 2*]).** | Not disputed, but disputed that iSpot was aware EDO was building a competitive product. | | iSpot's lack of "aware[ness]" that "EDO was building a competing product" does not dispute the truth of the factual statement in paragraph 51. |
| 52. After iSpot raised concerns with EDO in 2016, EDO began to doubt that a long-term relationship with iSpot was in EDO's best interests. **Ex. E, Krim Tr. 245:24–247:4; Ex. ZZ, Excerpts from the Deposition of Dennis Cui (Sept. 24, 2024)** | Disputed | After iSpot raised concerns about how EDO was using iSpot's service and data, EDO became concerned that iSpot would learn what EDO was really doing and cutoff EDO's | iSpot's proffered evidence does dispute the factual statement in paragraph 52 because none of it contradicts the evidence that EDO doubted a long-term relationship with iSpot |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 89:25–90:22 ("Cui Tr."); Ex. AAA, EDO-00636273 [Krim Ex. 252] at -276 (Weekly Update 2017-02-24 email, "Flagging iSpot risk"). | | access to iSpot's service and data. Ex. AAA, EDO-00636273 at -276 [Krim Ex. 252]; Ex. Q, Lee Tr. 250:19–251:11; Ex. LL, Deshpande Tr. 102:1–11. | was in its best interests. |
| 53. While the 2017 Agreement was in effect, clients continued to report inaccuracies in iSpot's airings data. Ex. Q, Lee Tr. 216:14–25. The iSpot license was expensive. Ex. E, Krim Tr. 156:2–19. EDO was concerned that termination without a backup source of airings data could disrupt its services to clients. Ex. AAA, EDO-00636273 [Krim Ex. 252] at -276; Ex. Q, Lee Tr. 250:19–251:11; Ex. LL, Deshpande Tr. 102:1–11. | Disputed | **Factual Disputes:** EDO's claimed concerns about iSpot's data was related to iSpot's "spend" estimates, which were estimates of how much the advertiser paid to air the ad. Ex. PPPPPP, Primrose Tr. 40:5–24; Ex. IIII, Jensen Tr. 45:21–46:9. iSpot's "spend" data was not needed for EDO to produce its SER and SEV metrics for its tv ad analytics service. **Evidentiary Objection:** **Inadmissible Hearsay** (Fed. R. Evid. 801-802): Statements as to what unidentified "clients" purportedly reported to EDO. | iSpot does not dispute that its license was expensive or that EDO was concerned that termination without a backup source of airings data could disrupt its services to clients. iSpot's proffered evidence does not otherwise dispute the factual statement in paragraph 53 because Mr. Lee's testimony discusses inaccuracies in iSpot's airings data, not spend data. Ex. Q, Lee Tr. 216:14–25. iSpot's evidentiary objection is meritless, because the factual statement that "clients continued to report inaccuracies in iSpot's airings data" is not made to prove or disprove the accuracy of iSpot's airings data. *Cf.* FRE 801(c)(2). |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | Additionally, iSpot cannot demonstrate that the fact cannot be presented in admissible form at trial, including by calling EDO clients as witnesses. ***United States v. Eggleston*, 2017 WL 11503431, at \*7 (N.D. Cal. Sept. 22, 2017) ("The standard is not whether summary judgment evidence would be admissible at trial, but whether it could be presented in an admissible form at trial." (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003));** *see also* Fed. R. Civ. P. 56(c)(1)(B). |
| 54. In late 2016, EDO began experimenting with creating its own airings logs, hiring contractors abroad to manually review recorded feeds of live TV.  This research project was called "TV Ad Dataset," often referred to as "TAD." **Ex. Q, Lee Tr. 172:22–173:12; Ex. ZZ, Cui Tr. 85:1–16; Ex. VVVV, EDO-00637090 at -092 (Weekly Update 2016-10-28).** | Not disputed, but disputed that iSpot was aware EDO was building a competing product. | | Whether or not iSpot "was aware EDO was building a competing product" does not dispute the truth of the factual statement in paragraph 54. |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | 55. In a handful of instances, EDO compared samples of TAD and iSpot data to evaluate if EDO could transition its existing search engagement analytics from iSpot to TAD. **Ex. UUUU, EDO-00639993 [Cui Ex. 134] (ispot_vs_tad table); Ex. AAA, EDO-00636273 [Krim Ex. 252] at -676 (Weekly Update 2017-02-24 email).** | Disputed | EDO systematically used iSpot data to help build TV Ad Dataset. To build TV Ad Dataset for EDO's competitive tv ad analytics service, EDO compared the data generated by TV Ad Dataset with iSpot's data. **Ex. ZZ, Cui Tr. 135:17–24, 154:5–21; Ex. UUUU, EDO-00639993 [Cui Ex. 134] (ispot_vs_tad table); Ex. AAAAAA, EDO-00644295–96, Proposed Changes to Cost Projection [Cui Depo. Ex. 133].** EDO engineers testified that EDO's comparisons of ad airings data from two different sources could be used to identify any discrepancies and investigate potential problems with the data sources. **Ex. LLL, Schorow Tr. 135:17–136:12; Ex. ZZ, Cui Tr. 137:20–23.** In fact, EDO set benchmarks for the development of TV Ad Dataset *by measuring how it compared to iSpot's* | iSpot does not dispute that EDO "compared samples of TAD and iSpot data." <br><br> iSpot's proffered evidence does not otherwise dispute the truth of the factual statement in paragraph 55 that EDO did so "to evaluate if EDO could transition its existing search engagement analytics from iSpot to TAD." <br><br> First, Mr. Cui testified that EDO compared TAD and iSpot data "to figure out what the next airings dataset is" for its existing metrics. **Ex. ZZ, Cui Tr. 135:11–16.** <br><br> Second, testimony that EDO could have used these comparisons for some other purpose does not establish that they did so. <br><br> Third, Ex. SSSS does not state that EDO compared TAD data to iSpot data "to calculate accuracy." Nor does the document itself raise a reasonable inference that EDO did so. In fact, Mr. Deshpande |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | *data*, using iSpot's data as a source of truth to calculate accuracy: ███ | testified that the May 2017 TAD Brainstorm document only spoke to the fact that "there was a comparison" between iSpot and TAD data (an undisputed fact), not that the comparison was done for accuracy. He further testified, "I don't know if people believed iSpot to be a source [of] accurate . . . information." **Ex. LL, Deshpande Tr. 138:15–18.** |
| | | | ████ | |
| | | | ████ | |
| | | | ████ | |
| | | | ████ **Ex. SSSS, EDO-00641012, May 8, 2017, TAD Brainstorm [Cui Depo. Ex. 131]; Ex. LL, Deshpande Tr. 137:16–139:7.** | |
| | | | | As Mr. Cui testified, "the only reliable source of truth that EDO had at this point in time [*i.e.*, when EDO ran comparisons between iSpot and TAD data] is the actual live footage that EDO is collecting, and EDO would have had live footage for every single TAD airing because that's where those airings came from in the first place." **Ex. ZZ, Cui Tr. 156:5–10.** |
| | | | | iSpot's remaining evidence is entirely inapposite to the factual statement in paragraph 55. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 56. EDO ramped up its TAD efforts in mid-2017 but determined by late 2017 that the project was not scalable and could not adequately support EDO's predictive movie analytics service. **Ex. BBB, EDO-00645613 (TV Ad Dataset Full Scale Productionizing: Project Apocalypse Now); Ex. CCC, EDO-00638194 at -197 (Weekly Update 2017-04-07 email, "Entering apocalypse planning mode"); Ex. DDD, EDO-00644354 [Deshpande Ex. 155] at -357 (EDO Objectives & Key Results: 2018 Q1 (10/21/17–3/30/18), noting that having "Ava for Movies" run on TV Ad Dataset was "deliberately deprioritized since we have Kantar"); Ex. Q, Lee Tr. 193:13–194:14, 200:6–12.** | Not disputed, but disputed that iSpot was aware that EDO was building a competing product. | | Whether or not iSpot "was aware that EDO was building a competing product" does not dispute the truth of the factual statement in paragraph 56. |
| 57. EDO abandoned the project by early 2018, never offering it as a feature or stand-alone product to clients. **Ex. Q, Lee Tr. 176:12–177:2, 181:17–182:2, 192:23–194:14; Ex. E, Krim Tr. 175:3–25; Ex. DDD, EDO-00644354 [Deshpande Ex. 155] at -357–358 (EDO Objectives & Key Results: 2018 Q1 (10/21/17–3/30/18)).** | Disputed | In 2017, EDO was again concerned that iSpot might not renew its subscription and discovered Kantar as a potential backup source of ad airings data. Ex. ZZ, Cui Tr. 30:10–18. EDO, however, was concerned that Kantar could not provide real-time data like iSpot, but EDO eventually worked out | iSpot does not dispute that EDO never offered TAD as a feature or stand-alone product to clients. iSpot's proffered evidence otherwise fails to dispute the truth of the factual statement in paragraph 57. Mr. Deshpande does not testify that EDO used TAD data to fill holes in Kantar data. **Ex. LL,** |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | a special arrangement to receive a raw feed of real-time data from Kantar. **Ex. LL, Deshpande Tr. 165:15–166:12; Ex. ZZ, Cui Tr. at 161:21–162:8.** Kantar data also had holes that EDO had to fill using data collected with TV Ad Dataset, which had been developed with the help of iSpot data. **Ex. LL, Deshpande Tr 154:11–20; Ex. ZZ, Cui Tr. 161:8–20, 164:15-25.** | **Deshpande Tr. 154:9–20.** And the document iSpot introduced in this exchange sets a goal of having TAD data "power[] Ava for Kantar holes" for January 19, 2017, but the document was last modified December 13, 2017, meaning it cannot support that this goal was achieved. **Ex. HHH, EDO-00646924, Kantar Integration, last modified Dec. 13, 2017 [Cui Depo. Ex. 136].** While Mr. Cui testified that EDO "may have" used TAD to "patch[] up some of the Kantar issues," he was testifying about the same document as Mr. Deshpande and further testified that he did not remember any specific Kantar issues. **Ex. ZZ, Cui Tr. 161:8–20.** |
| 58. In late 2017, EDO entered into discussions with Kantar, another provider of airings data, to see if it could replace iSpot and provide EDO with syndicated TV ad airings data for all advertisers, not only movie studios. **Ex.** | Not disputed, but disputed that iSpot was aware that EDO was building a | | Whether or not iSpot "was aware that EDO was building a competitive product like a 'TV Advertising Analytics Product'" does not dispute the truth of the factual |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| **EEE, EDO-00646818 (2017-09-21 Kantar Meeting Notes).** On December 1, 2017, EDO signed a licensing agreement with Kantar for provision of syndicated TV ad airings data for all advertisers and not just movie studios. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 23:8–10; Ex. FFF, KANTAR-0006 (EDO-Kantar greement), at -006.** The Kantar Agreement ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋▋ ▋▋ **Ex. FFF, KANTAR-0006 at -010 (EDO-Kantar agreement).** | competitive product like a "TV Advertising Analytics Product" | | statement in paragraph 58. |
| 59. After EDO signed the agreement with Kantar, it compared samples of Kantar and iSpot airings data to transition its existing search engagement analytics from iSpot to Kantar. **Ex. Q, Lee Tr. 170:10–171:8; Ex. ZZ,** | Not disputed | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| Cui Tr. 176:20–177:18; Ex. E, Krim Tr. 249:14–251:17; Ex. GGG, EDO-00236714 [Cui Ex. 137] at -714; Ex. HHH, EDO-00646924 [Cui Ex. 136] at -925; Ex. III, EDO-00646947 at -947; Ex. JJJ, EDO-00639608 (Kantar comparison spreadsheet). | | | |
| 60. Isaac Pflaum opined that when "entities that license third party data to switch data providers," "it is common practice to compare raw data from multiple providers to ensure that existing derivatives and work product can be maintained with the new data source." **Ex. FF, Pflaum Rep. ¶ 157.** Mr. Pflaum further opined that "it is not typical for data services contracts to contain provisions prohibiting purchasers" from "compar[ing] raw data from multiple providers to ensure that existing derivatives and work product can be maintained with the new data source." *Id.* In response to counsel reading that passage from Mr. Pflaum's report, Dr. Zervas testified, "I would say [that] it can be true. It's not inconceivable that this would happen, that people would compare data sources." **Ex. KKK, Excerpts from the** | Disputed | It is industry practice for data providers to prohibit their licensees and customers from comparing their data with another provider's data for any purpose. As a result, data providers frequently impose restrictions on clients' data use. **Ex. DDDDD, Muller Decl. ¶ 7.**<br><br>For example, Nielsen includes the following Restriction: "You shall not and shall not permit any third party to (e) combine, integrate, match, connect, fuse, validate or in any way use the Services or Nielsen Information with any other data or with software programs provided from any other source. **Ex. DDDDD, Muller** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 60 because none of it speaks to what Mr. Pflaum opined or what Dr. Zervas testified.<br><br>Further, Mr. Muller is not qualified to offer expert testimony on "industry practice" regarding data licensing, and iSpot's Rule 26(a)(2) expert disclosures did not indicate that Mr. Muller would offer testimony on the topic of data-licensing agreements. **Ex. YYYYYY, iSpot Expert Disclosures (Nov. 1, 2024).**<br><br>Regardless, a single counterexample is not sufficient to dispute industry practice. |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW
RE DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| **Deposition of Dr. Georgios Zervas (Jan. 10, 2025) 195:15–196:1 ("Zervas Tr.").** | | **Decl. ¶¶ 8–10, Ex. A, Ex. B (Kantar).** Regardless of what is or is not common practice, Mr. Pflaum is not offering any opinion about whether EDO's use of iSpot's data was permitted under any of its agreements with iSpot. **Ex. FFFFFF, Pflaum Tr. 67:11–21.** | |
| 61. From 2017–2018, "the only reliable source of truth that EDO had" for the accuracy of ad airings data was its own recordings of the linear television feed itself. **Ex. LL, Deshpande Tr. 68:25–69:9, 75:2–7; Ex. ZZ, Cui Tr. 155:21–156:10; Ex. LLL, Excerpts from the Deposition of Marcus Schorow (July 24, 2024) 49:5–8 ("Schorow Tr.").** | Disputed | From 2017 to 2018, EDO had access to iSpot, which EDO used as a "source of truth" benchmark for evaluating other data sources: ▓▓▓▓▓ ▓▓▓▓▓▓ ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ ▓▓▓▓▓ **Ex. SSSS, EDO-00641012, May 8, 2017, TAD Brainstorm [Cui Depo. Ex. 131]; Ex. LL, Deshpande Tr. 137:16–139:7.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 61 because it does not contradict EDO's evidence that live TV feeds were its only reliable source of truth from 2017–2018. Again, Ex. SSSS does not state that EDO compared TAD data to iSpot data "as a benchmark." Nor does the document itself raise a reasonable inference that EDO did so. In fact, Mr. Deshpande testified that the May 2017 TAD Brainstorm document only spoke to the fact that "there |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | was a comparison" between iSpot and TAD data (an undisputed fact), not that the comparison was done for accuracy. He further testified, "I don't know if people believed iSpot to be a source [of] accurate . . . information." **Ex. LL, Deshpande Tr. 138:15-18.** And he testified that he had no knowledge of any data comparison. He testified that "[o]ther people would have done the work" on any data comparison and that he "wasn't really involved in that," and that he "couldn't really tell" whether such comparisons were made "for accuracy purposes." **Exhibit LL, Deshpande Tr. at 137:9–14.**<br><br>And, as Mr. Cui testified, "the only reliable source of truth that EDO had at this point in time [*i.e.*, when EDO ran comparisons between iSpot and TAD data] is the actual live footage that EDO is collecting, and EDO |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | would have had live footage for every single TAD airing because that's where those airings came from in the first place." **Ex. ZZ, Cui Tr. 156:5–10.** |
| 62. EDO notified iSpot on February 23, 2018, that it would not renew the 2017 Agreement. **Ex. TTTT, EDO-00000274 at -274 (Feb. 23, 2018 Email chain between Krim (EDO) and Manning (iSpot)).** | Not disputed | | |
| 63. Before the 2017 Agreement terminated on March 28, 2018, EDO deleted all iSpot data from its database by truncating the tables in EDO's database schema that EDO used to store iSpot data. **Ex. Q, Lee Tr. 45:23–47:18; Ex. TT, EDO-00644865 at -866 (March 2018 Standard Data Retention Policy tasklist, listing various "ispot_" database tables under the heading "[t]runcate these tables"); Ex. MMM, EDO Responses to First Set of RFAs, at 12:14–13:17; Ex. I, Lee Decl. ¶ 6.** | Disputed | EDO's own documentation from September 2020 confirms that EDO continued to retain iSpot historical data: "Additionally, historical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for movies are in the Common Set." **Ex. EEEEEE, EDO-00058446, Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo. Ex. 157].** The Common Set is airings data. **Ex. LL,** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 63 because it does not contradict EDO's evidence of deletion.<br><br>Exhibit EEEEEE refers to "Standard Retention Airings," which is the name of the database table in which EDO stored the derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. *See* **SUF ¶¶ 68–69; Ex. I, Lee Decl. ¶ 10.** "Standard Retention Airings" does not refer to iSpot data or any data |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | Deshpande Tr. 170:22–171:). | generated from iSpot data. |
| | | In addition, for a May 4, 2018 demonstration to ▇▇▇—after the 2017 Agreement expired—EDO acknowledged concerns about its continued reliance on iSpot data: "Is it a risk that we admit we have iSpot data from December to January?" **Ex. DDDDDD, EDO-00644889, ▇▇ Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** This document directly contradicts Mr. Lee's declaration that all iSpot data was delete before the 2017 Agreement expired. | Additionally, iSpot's reference to Mr. Deshpande's testimony does not create a dispute. Mr. Deshpande could not recall the purpose of Exhibit EEEEEE, and merely speculated regarding the contents of the "Common Set." **Ex. LL, Deshpande Tr. at 170:5–171:10.** Mr. Deshpande further responded, "Not to my knowledge" when asked whether "EDO continue[d] to use historical data from iSpot . . . after EDO's subscription with iSpot expired." *Id.* **at 171:12–16.** Exhibit DDDDDD is notes EDO prepared to pitch ▇▇ in March 2018 on TV Ad Database. The pitch touts Kantar as a "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | Agreement)—despite having licensed Kantar in December 2017—that it might undermine its endorsement of Kantar. |
| 64. EDO kept the search engagement metrics and other insights it derived from iSpot data during the contracting period. **Ex. Q, Lee Tr. 103:25–105:18 ("EDO did retain insights that it derived from iSpot data . . . . [T]he core insights . . . are search engagement volume and engagement rate, and so EDO retained those insights."); Ex. ZZ, Cui Tr. 112:24–116:5 (". . . EDO retained some individual search engagement values.").** EDO did not preserve any data that would allow it to reproduce the iSpot dataset at an individual ad airings level, *i.e.*, that would allow it to "reverse engineer" iSpot data from its derivative insights. **Ex. ZZ, Cui Tr. 112:6–12.** | Disputed | iSpot's data showing when an ad aired on tv. EDO, however, then claims that it was permitted to retain its SER and SEV metrics created with that reference iSpot data while claiming that it deleted all of iSpot's data by March 2018. This makes no sense and is contradicted by EDO's own documentation from September 2020, which confirms that EDO continued to retain iSpot historical data: "Additionally, historical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for movies are in the Common Set." Ex. **EEEEEE, EDO-00058446, Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 64 because it does not contradict EDO's evidence of deletion. Exhibit EEEEEE refers to "Standard Retention Airings," which is the name of the database table in which EDO stored the derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. *See* SUF ¶¶ 68–69; Ex. I, Lee Decl. ¶ 10. "Standard Retention Airings" does not refer to iSpot data or any data generated from iSpot data. Additionally, iSpot's reference to Mr. Deshpande's testimony does not create a dispute. Mr. Deshpande could not recall the purpose of |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | Ex. 157]. The Common Set is airings data. **Ex. LL (Deshpande Tr. 170:22–171:1).** | Exhibit EEEEEE, and merely speculated regarding the contents of the "Common Set." **Ex. LL, Deshpande Tr. at 170:5–171:10.** Mr. Deshpande further responded, "Not to my knowledge" when asked whether "EDO continue[d] to use historical data from iSpot . . . after EDO's subscription with iSpot expired." *Id.* at 171:12–16.

Exhibit DDDDDD is notes EDO prepared to pitch ███ in March 2018 on TV Ad Database. The pitch touts Kantar as a "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 Agreement)—despite having licensed Kantar in December 2017— that it might undermine its endorsement of Kantar. |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | 65. Isaac Pflaum opined that "under most data licensing agreements the customer retains ownership over any derived data it created unless the contract contains a specific provision to the contrary." **Ex. FF, Pflaum Report ¶ 154; Ex. KKK, Zervas Tr. 289:20-290:13 (iSpot's expert stating that he would not enter into a data licensing agreement that did not "allow [him] to use the data and create derivative analysis" that he could ultimately publish.).** | Disputed | **Disputed Facts:** Regardless of what is or is not common practice, Mr. Pflaum confirmed that he was not offering any opinion about whether EDO's use of iSpot's data was permitted under any of its agreements with iSpot. **Ex. FFFFF, Pflaum Tr. 67:11–21.** **Evidentiary Objections:** **Inadmissible Hearsay** (Fed. R. Evid. 801–802): Statements as to terms, rights, and provisions in other, unidentified data licensing agreements. This hearsay is not made admissible simply because it is offered through an expert. **Inadmissible Expert Opinion** (Fed. R. Evid. 703): Isaac Pflaum does not establish he is an expert in data licensing contracts. **Best Evidence Rule** (Fed. R. Evid. 1002): | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 65 because it does not speak to what Mr. Pflaum opined. iSpot's evidentiary objections are unavailing: (1) Mr. Pflaum is not claiming to provide the terms and contentions of any data licensing agreement, but providing his opinion as to industry custom and practice regarding such agreements, which is permissible expert testimony. **FRE 703.** For the same reason, iSpot's best evidence rule argument fails. (2) Additionally, Mr. Pflaum may establish his expertise regarding data licensing agreements at trial. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | The original writing or duplicate thereof is required to prove the contents of the documents (other licensing agreements) relied upon Defendants. | |
| 66. For SEV and SER metrics to be meaningful to clients, they must be paired with certain airings data, *e.g.*, brand name and timestamp. **Ex. I, Lee Decl. ¶ 8.** | Not disputed | | |
| 67. As part of transitioning away from iSpot, EDO wanted to preserve the context for its SEV and SER metrics produced using iSpot airings data. In most instances, EDO did this by replacing the underlying iSpot airings data associated with those SEV and SER metrics with Kantar airings data. **Ex. NNN, EDO-00042091 (Weekly Update 2018-01-26 email), at -099–100; Ex. Q, Lee Tr. 201:6–18; Ex. I, Lee Decl. ¶ 9.** | Disputed | iSpot's coverage of networks is greater than Kantar's coverage of networks, which means some networks covered by iSpot were not covered by Kantar when EDO transitioned to them. EDO's claim that it replaced iSpot's data with data from the SEV and SER metrics derived from iSpot's data makes no sense. EDO needed iSpot's airings to generate the SEV and SER metrics. If EDO uses those metrics to infer when a tv ad aired, EDO is still using iSpot's airings data. **Ex. DDDDD, Muller Decl. ¶ 11.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 67 because it does not contradict EDO's evidence that it replaced most of the underlying iSpot airings data associated with those SEV and SER metrics with Kantar airings data.<br><br>Mr. Muller has no personal knowledge of EDO's SEV and SER metrics, or its process to preserve historical SEV and SER metrics.<br><br>In fact, the scope of Kantar's *movies* data was largely the same as iSpot's. **Ex. DDDDDD, EDO-00644889 (███ Demo** |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW
RE DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | | **Plan), at -891** ("iSpot covers more channels [than Kantar] but those channels had no movie airings[.]"). |
| | 68. As part of transitioning away from iSpot, EDO identified a limited subset of SEV and SER metrics whose iSpot airings data did not match any Kantar airings data. To preserve the context for those SEV and SER metrics, EDO replaced iSpot airings data with data that EDO derived from other sources, such as EDO's proprietary search engagement data. **Ex. I, Lee Decl. ¶ 10; Ex. Q, Lee Tr. 103:25–105:16.** | Disputed | iSpot's coverage of networks is greater than Kantar's coverage of networks, which means some networks covered by iSpot were not covered by Kantar when EDO transitioned to them. EDO's claim that it replaced iSpot's data with data from the SEV and SER metrics derived from iSpot's data makes no sense. EDO needed iSpot's airings to generate the SEV and SER metrics. If EDO uses those metrics to infer when a tv ad aired, EDO is still using iSpot's airings data. **Ex. DDDDD, Muller Decl. ¶ 11.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 68 that for a limited subset of SEV and SER metrics whose iSpot airings data did not match any Kantar airings, EDO replaced iSpot airings data with data that EDO derived from other sources, such as EDO's proprietary search engagement data.

First, the scope of Kantar's *movies* data was largely the same as iSpot's. **Ex. DDDDDD, EDO-00644889 (▇ Demo Plan), at -891** ("iSpot covers more channels [than Kantar] but those channels had no movie airings[.]").

Second, EDO did not infer airings data points from the SER or SEV *metrics* but from search |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | engagement *data* it independently derived (e.g. the timestamps of spikes pulled from ▇▇▇) and other third-party sources. **Ex. I, Lee Decl. ¶ 10; Ex. ZZ, Cui. Tr. 26:18–27:6.** EDO did not "infer" anything from iSpot data. <br><br> Third, Mr. Muller has no personal knowledge of EDO's SEV and SER metrics, or its process to preserve historical SEV and SER metrics. |
| 69. EDO stored the data it used to replace the iSpot airings data in a table in its database named "standard_retention_airings." **Ex. I, Lee Decl. ¶10; Ex. Q, Lee Tr. 103:25–105:17.** | Disputed | **Evidentiary Objections:** <br><br> **Inadmissible Hearsay** (Fed. R. Evid. 801-802): Statements as to what the purported "table" stated or the type of data it contained. <br><br> **Best Evidence Rule** (Fed. R. Evid. 1002): The original writing or duplicate thereof is required to prove the contents of the document relied upon by Defendants. | iSpot fails to dispute that "EDO stored the data it used to replace the iSpot airings data in a table in its database named "standard_retention_ai rings." <br><br> Additionally, Mr. Lee testified to his own actions in relying on sources other than iSpot to replace iSpot data, not to the truth of any statements contained within that table.  His testimony is therefore not hearsay. *See* FRE 801(c)(2). <br><br> The best evidence rule is inapplicable here |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | because the particular data within the table are not facts relevant to this case. ***See, e.g., United States v. Gonzales-Benitez*, 537 F.2d 1051, 1053–54 (9th Cir. 1976) (Kennedy, J.) (content of recorded conversation may be established by participant's testimony and does not require introduction of the recordings themselves, when the "sounds . . . embodied" were not in question).** |

**C.  EDO Independently Develops Its Own TV Ad Airings Database**

| | | | |
|---|---|---|---|
| 70. In August 2018, EDO launched a new effort to create its own airing logs by developing automated content recognition technology for collecting television ad airings data. This new effort was made successful by a breakthrough discovery by Bobby Shen, an experienced data scientist, former math prodigy, and International Mathematical Olympiad gold medalist hired by EDO only months earlier.  **Ex. E, Krim Tr. 176:2-24; Ex. B, EDO-00043807 at -813 (email** | Disputed | Bobby Shen was never identified as a witness in EDO's Rule 26 disclosures. **Ex. RRRRRR, Defendants' Rule 26 Initial Disclosures at 2:12–4.** EDO also did not produce a single email or any other documents from Mr. Shen during discovery, so iSpot has no way of knowing what he did or did not work on. **Ex. KKKKKK, Declaration of** | iSpot does not dispute that Atlas is EDO's automated content recognition technology for collecting television ad airings data or that it was launched in August 2018.

iSpot's proffered evidence otherwise does not dispute the truth of the factual statement in paragraph 70 because it does not speak to whether Mr. Shen had a |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3–12 | attachment: Dec. 2017 **EDO Investor Presentation**); Ex. OOO, LinkedIn, "Bobby Shen," available at https://www.linkedin.com/in/ bobby-c-shen.  Mr. Shen's contributions enabled the development of automated content recognition technology for collecting television ad airings data. **Ex. J, EDO's Responses to First Set of Interrogatories at 15:24–28; Ex. Q, Lee Tr. 48:2–12.** | | **James E. Breitenbucher (February 20, 2025) ("Breitenbucher Decl.") ¶ 2.** EDO produces no declaration from Mr. Shen, and misrepresents that he began work at EDO "only months" before August 2018, when in fact his LinkedIn profile reflects his EDO employment commenced almost a year earlier in October 2017—when EDO still had an iSpot subscription. **Ex. OOO, LinkedIn, "Bobby Shen," available at https://www.linkedin .com/in/bobby-c- shen.** | breakthrough discovery that enabled EDO to develop Atlas. Further, EDO does not intend to rely on Mr. Shen as a trial witness. In any event, EDO identified Mr. Shen as a primary developer of Atlas in its June 2023 interrogatory responses, putting iSpot on notice of his identity at the outset of discovery. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–28;** *Davis v. Davison Hotel Co.,* **LLC, 2013 WL 3337669, at *2-3 (C.D. Cal. July 1, 2013) (no prejudice when witness not identified in initial disclosures if opposing party was "on notice" of that witness through interrogatory responses).** |
| 13–28 | | | In addition, EDO does not claim that Mr. Shen never worked with iSpot data or any EDO products that utilized iSpot data. EDO's interrogatory responses also identify Edward Rozycki as an engineer who worked on Atlas and he started at EDO in September 2017 (just | Additionally, that search terms targeted at EDO's use of iSpot did not hit on Mr. Shen's documents only underscores that EDO did not rely on |

64

Parties' SUF & Genuine Disputes, Conclusions of Law re Defs.' MSJ
Case No. 2:21-cv-06815-MEMF-MAR

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | before Shen started) when EDO was developing TV Ad Dataset, the precursor to TV Ad Database, which both used iSpot data in their development. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–28.** Second, Atlas is merely an ACR (automatic content recognition) tool that EDO used as a data source for its tv ad analytics product that EDO originally developed using iSpot's service. **DSUF ¶ 70–73.**<br><br>EDO created "tv_ads" and "tv_ad_airings" tables within EDO's database schema to store ad airings data and develop EDO's Ava tv ad analytics product. **Ex. ZZ, Cui Tr. 157:21–159:5.** EDO continued to use these same "tv_ads" and "tv_ad_airings" tables for its tv ad analytics and competitive intelligence database product called TV Ad Database, which was later renamed | iSpot in developing Atlas.<br><br>iSpot's remaining evidence is inapposite to the factual statement in paragraph 70. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | AdEngage. **Ex. LLL, Schorow Tr 127:1–3, 128:2–7; Ex. Q, Lee Tr. 45:10–22, 74:10–75:9; Ex. UUUUU, EDO-00003259–60, Email from T. Ho to J. Lee, dated 3/1/2017 [Lee Depo. Ex. 225].** And Dr. Zervas concluded that EDO used iSpot's service develop EDO's tv ad airings database and dashboard. **Ex. QQQ, Zervas Report at 6.** | |
| 71. EDO's automated content recognition technology would be called "Atlas." **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–28; Ex. Q, Lee Tr. 48:2–12.** | Not disputed | | |
| 72. None of the EDO engineers who worked on Atlas had previously worked on TV Ad Dataset. **Ex. J, EDO's Responses to First Set of Interrogatories at 15:24–28; Ex. E, Krim Tr. 176:2–24; Ex. Q, Lee Tr. 168:18–23, 181:17–182:2, 194:19–195:5.** | Disputed | Bobby Shen was never identified as a witness in EDO's Rule 26 disclosures. **Ex. RRRRRR, Defendants' Rule 26 Initial Disclosures at 2:12–4.** EDO also did not produce a single email or any other documents from Mr. Shen during discovery, so iSpot has no way of knowing what he did or did not work on. **Ex. KKKKKK,** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 72 because it does not bear on whether any of the EDO engineers who worked on Atlas had previously worked on TV Ad Dataset.

Further, EDO does not intend to rely on Mr. Shen as a trial witness. In any event, EDO identified Mr. Shen as |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | **Breitenbucher Decl.** **¶ 2.** EDO produces no declaration from Mr. Shen, and misrepresents that he began work at EDO "only months" before August 2018, when in fact his LinkedIn profile reflects his EDO employment commenced almost a year earlier in October 2017—when EDO still had an iSpot subscription. **Ex. OOO, LinkedIn, "Bobby Shen," available at https://www.linkedin.com/in/bobby-c-shen.** | a primary developer of Atlas in its June 2023 interrogatory responses, putting iSpot on notice of his identity at the outset of discovery. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–28;** *Davis v. Davison Hotel Co.,* **LLC, 2013 WL 3337669, at \*2-3 (C.D. Cal. July 1, 2013) (no prejudice when witness not identified in initial disclosures if opposing party was "on notice" of that witness through interrogatory responses).** |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | In addition, EDO does not claim that Mr. Shen never worked with iSpot data or any EDO products that utilized iSpot data. EDO's interrogatory responses also identify Edward Rozycki as an engineer who worked on Atlas and he started at EDO in September 2017 (just before Shen started) when EDO was developing TV Ad Dataset, the precursor | Additionally, that search terms targeted at EDO's use of iSpot did not hit on Mr. Shen's documents only underscores that EDO did not rely on iSpot in developing Atlas. iSpot's remaining evidence is inapposite to the factual statement in paragraph 72. |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | to TV Ad Database, which both used iSpot data in their development. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–28.** Second, Atlas is merely an ACR (automatic content recognition) tool that EDO used as a data source for its tv ad analytics product that EDO originally developed using iSpot's service. **DSUF ¶¶ 70–73.** | |
| 73. In December 2019, EDO began using Atlas as the source for going-forward airings data in its database. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–25.** | Not disputed. | | |
| 74. After December 2019, EDO continued to use Kantar for historical data for airings run before December 2019. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 7:6–10; Ex. LL, Deshpande Tr. 17:4–6, 94:4–12.** | Disputed | EDO's own documentation from September 2020 confirms that EDO continued to retain iSpot historical data: "Additionally, historical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for movies are in the Common Set." **Ex. EEEEEE, EDO-00058446,** | iSpot does not dispute that EDO began developing TV Ad Database in September 2018 or that TV Ad Database was a set of features, including a database of television ad airings data, populated by data licensed from Kantar or generated by Atlas.

Again, Exhibits EEEEEE and |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | **Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo. Ex. 157].** The Common Set is airings data. **Ex. LL, Deshpande Tr. 170:22–171:1.** <br><br> In addition, for a May 4, 2018 demonstration to ▇▇▇—after the 2017 Agreement expired—EDO acknowledged concerns about its continued reliance on iSpot data: "Is it a risk that we admit we have iSpot data from December to January?" **Ex. DDDDDD, EDO-00644889, ▇▇▇ Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** This document directly contradicts Mr. Lee's declaration that all iSpot data was delete before the 2017 Agreement expired. | DDDDDD do not contradict EDO's evidence that EDO deleted all iSpot data in March 2018. <br><br> Exhibit EEEEEE refers to "Standard Retention Airings," which is the name of the database table in which EDO stored the derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. *See* SUF ¶¶ 68–69; Ex. I, Lee Decl. ¶ 10. "Standard Retention Airings" does not refer to iSpot data or any data generated from iSpot data. <br><br> Exhibit DDDDDD is notes EDO prepared to pitch ▇▇▇ in March 2018 on TV Ad Database. The pitch touts Kantar as a "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 Agreement)—despite having licensed Kantar |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | | in December 2017—that it might undermine its endorsement of Kantar. |
| | 75. In September 2018, EDO began developing TV Ad Data*base*, which was a distinct project from then-defunct TV Ad Dataset. TV Ad Database was a set of features, including a database of television ad airings data, populated by data licensed from Kantar or generated by Atlas. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 7:6–10, 18:11–21.** | Disputed | EDO created "tv_ads" and "tv_ad_airings" tables within EDO's database schema to store ad airings data and develop EDO's Ava tv ad analytics product. **Ex. ZZ, Cui Tr. 157:21–159:5.** The source of data for "tv_ads" and "tv_ad_airings" included TV Ad Dataset. **Ex. LL, Deshpande Tr. 158:12–20; Ex. Q, Lee Tr. 195:6–13.** <br><br> EDO continued to use these same "tv_ads" and "tv_ad_airings" tables for its tv ad analytics and competitive intelligence database product called TV Ad Database, which was later renamed AdEngage. **Ex. LLL, Schorow Tr. 127:1–3, 128:2–7; Ex. Q, Lee Tr. 45:10–22, 74:10–75:9; Ex. UUUUU, EDO-00003259–60, Email from T. Ho to J. Lee, dated 3/1/2017 [Lee** | iSpot does not dispute that EDO began developing TV Ad Database in September 2018 or that TV Ad Database was a set of features, including a database of television ad airings data, populated by data licensed from Kantar or generated by Atlas. <br><br> iSpot's proffered evidence does not otherwise dispute the truth of the factual statement in paragraph 75 that TV Ad Database was distinct from then-defunct TV Ad Dataset. <br><br> Again, Exhibits EEEEEE and DDDDDD do not contradict EDO's evidence that EDO deleted all iSpot data in March 2018. <br><br> Exhibit EEEEEE refers to "Standard Retention Airings," which is the name of the database table in which EDO stored the |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | Depo. Ex. 225]. And Dr. Zervas concluded that EDO used iSpot's service develop EDO's tv ad airings database and dashboard. Ex. QQQ at 6. Thus, even if Atlas were created independently from iSpot's data, there remains substantial evidence that EDO used iSpot's trade secrets to develop its Ava Product, TV Ad Dataset, and TV Ad Database (later renamed AdEngage). In addition, EDO's own documentation from September 2020 confirms that EDO continued to retain iSpot historical data: "Additionally, historical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for movies are in the Common Set." **Ex. EEEEEE, EDO-00058446, Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo. Ex. 157]. The** | derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. ***See* SUF ¶¶ 68–69; Ex. I, Lee Decl. ¶ 10.** "Standard Retention Airings" does not refer to iSpot data or any data generated from iSpot data. Exhibit DDDDDD is notes EDO prepared to pitch ▮▮▮▮▮ in March 2018 on TV Ad Database. The pitch touts Kantar as a "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 Agreement)—despite having licensed Kantar in December 2017— that it might undermine its endorsement of Kantar. iSpot's remaining evidence is inapposite to the factual statement in paragraph 75. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | Common Set is airings data. **Ex. LL, Deshpande Tr. 170:22–171:1.**<br><br>In addition, for a May 4, 2018 demonstration to ▮▮▮▮—after the 2017 Agreement expired—EDO acknowledged concerns about its continued reliance on iSpot data: "Is it a risk that we admit we have iSpot data from December to January?" **Ex. DDDDDD, EDO-00644889, ▮▮▮ Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** This document directly contradicts Mr. Lee's declaration that all iSpot data was delete before the 2017 Agreement expired. | |
| 76. TV Ad Database was announced in November 2018 but not offered to clients until April 2019. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 18:11–18.** | Not disputed | | |
| 77. EDO sometimes referred to TV Ad Database as "TAD." **Ex. PPP, EDO-00039763 at -764 (Weekly Update 2018-** | Not disputed | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 11-30 email, referring to "TV Ad Database" and potential client review of the "TAD dashboard"). | | | |
| 78. No EDO employee has testified that EDO used any information received from iSpot during the term of the 2017 Licensing Agreement to develop products that compete or appear to compete with iSpot. **Ex. E, Krim Tr. 293:8–24; Ex. ZZ, Cui Tr. 67:8–17; Ex. LL, Deshpande Tr. 23:18–21.** | Disputed | Mr. Krim testified that EDO used iSpot's data for its tv ad analytics dashboard. **Ex. E, Krim Tr. 123:10–130:13.** According to Mr. Krim, this service depended on iSpot's data, and EDO could not provide competitive intelligence at this time without iSpot. *Id.* at 130:6–13. | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 79 because Mr. Krim did not testify that EDO used iSpot "to develop" EDO's dashboard. Rather, Mr. Krim's testimony is consistent with EDO's evidence that EDO used iSpot airings data merely as an input for predictive movie analytics offered to its movie-studio clients through its Ava Product dashboard. SUF ¶¶ 31–34. |
| 79. EDO's "commit log" or "revision history" of its code includes 22,609 entries generated between January 2017 and May 2024 that show all modifications, additions, and deletions of source code for EDO's products. **Ex. NN, EDO-00638421 (EDO Commit Log); Ex. FF, Pflaum Report ¶ 136.** | Disputed | As EDO's own expert admitted, EDO's commit log showing changes made to EDO's source code is insufficient to prove independent development and does not prove that EDO never used the iSpot service to build or contribute to EDO's products. **Ex. FFFFFF, Pflaum Tr. 217:23–219:13.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 79 because it does not contradict that EDO's commit log "includes 22,609 entries generated between January 2017 and May 2024 that show all modifications, additions, and deletions of source |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | code for EDO's products." |
| 80. Nothing in EDO's automatically generated "commit log" describes any modifications to EDO's products or services based on iSpot's intellectual property. **Ex. FF, Pflaum Report ¶¶ 136–142; Ex. NN, EDO-00638421 (EDO Commit Log); Ex. QQQ, Expert Report of Dr. Georgios Zervas (containing no analysis of commit log).** | Disputed | As EDO's own expert admitted, EDO's commit log showing changes made to EDO's source code is insufficient to prove independent development and does not prove that EDO never used the iSpot service to build or contribute to EDO's products. **Ex. FFFFFF, Pflaum Tr. 217:23–219:13.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 80 because it does not speak to whether EDO's commit log describes any modifications to EDO's products or services based on iSpot's intellectual property. Moreover, it is not EDO's burden to prove independent development. EDO presents evidence of independent development to "rebut an inference of use." ***Morawski v. Lightstorm Ent., Inc.,* 2013 WL 12081818, at \*5 (C.D. Cal. Jan. 31, 2013).** |
| 81. Isaac Pflaum opined that most of EDO's references to "iSpot" in its commit log between March 2017 and March 2018—the period in which the Subscription Agreement was effective— relate to the processing and storage of data that EDO had licensed from iSpot. Most of EDO's references to "iSpot" after March 2018 discuss the deprecation of obsolete functionality for processing | Disputed | As EDO's own expert admitted, EDO's commit log showing changes made to EDO's source code is insufficient to prove independent development and does not prove that EDO never used the iSpot service to build or contribute to EDO's products. **Ex.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 81 because it does not speak to what Mr. Pflaum opined or the substance of EDO's commit log entries. Moreover, it is not EDO's burden to prove independent development. EDO |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | iSpot's licensed data. Ex. FF, Pflaum Report ¶ 142. | | **FFFFFF, Pflaum Tr. 217:23–219:13.** | presents evidence of independent development to "rebut an inference of use." *Morawski*, 2013 WL 12081818, at *5. |
| | 82. Isaac Pflaum opined that contemporaneous development documents besides the commit log, including planning documents and project roadmaps, were consistent with independent development of EDO's products and services. **Ex. FF, Pflaum Report ¶¶ 143– 48 (EDO product development timeline consistent with independent development); Ex. RRR, EDO-00640307 (May 6, 2016 Ava Data Team Sync); Ex. SSS, EDO-00640305 (May 13, 2016 Ava Data Team Sync); Ex. TTT, EDO-00645168 (Aug. 2016 Project Ava Weekly Agenda); Ex. UUU, EDO-00640319 (May–October 2016 Ava Team Sync documents); Ex. VVV, EDO-00646857 (Oct. 11, 2017 Ava Weekly Update); Ex. WWW, EDO-00040176 at -199 (email attachment: Sept. 2018 Agenda and Strategy); Ex. XXX, EDO-00643969 at -973 (Dec. 2018 agenda notes); Ex.** | Disputed | As EDO's own expert admitted, EDO's commit log showing changes made to EDO's source code is insufficient to prove independent development and does not prove that EDO never used the iSpot service to build or contribute to EDO's products. **Ex. FFFFFF, Pflaum Tr. 217:23–219:13.** The analysis of Dr. Zervas refutes any reliance on the commit log as evidence of independent development. First, EDO created "tv_ads" and "tv_ad_airings" tables within EDO's database schema to store ad airings data and develop EDO's Ava tv ad analytics product. **Ex. ZZ, Cui Tr. 157:21–159:5.** Dr. Georgios Zervas of Boston University analyzed EDO's "tv_ads" and | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 82 because it does not speak to what Mr. Pflaum opined or the substance of EDO's planning documents and project roadmaps. In reaching his conclusions, Dr. Zervas did not analyze EDO's commit log or contemporaneous planning documents and project roadmaps. Nor did he analyze whether the similar data fields in iSpot's API and EDO's data tables and data dictionary or dashboard similarities reflect standard practice in the advertising industry. Indeed, iSpot does not dispute that similar data fields in iSpot's API and EDO's data tables and data dictionary reflect standard practice in |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | **YYY, EDO-00643685 at -90 (March 2019 Project Vision notes).** | | "tv_ad_airings" tables, and concluded that EDO used iSpot's service develop EDO's tv ad airings database. **Ex. QQQ, Zervas Report at 6, 39.** The tables on pages 32 and 36 of Dr. Zervas' Report show how EDO copied iSpot's API endpoints to build its tv ad airings database.<br><br>Next, EDO used the iSpot service and data to develop and supply data to EDO's Ava tv ad analytics dashboard that allowed EDO's clients to perform Competitive Intelligence, i.e., compare the effectiveness of the client's tv ads to the effectiveness of the competitor tv ads. **Ex. E, Krim Tr. 129:5–130:5.** This service depended on iSpot's data, and EDO could not provide competitive intelligence at this time without iSpot. **Ex. E, Krim Tr. 130:6–13.**<br><br>For this dashboard, copied many of the | the advertising industry and are also found in public advertising databases, such as those offered by Google, Spotify, and PBS, or that similar features in iSpot's and EDO's dashboards reflect standard practice in the advertising industry and are also found in other analytics dashboards, like those offered by Google, Facebook, and Adobe. **SUF ¶¶ 83–84.**<br><br>Additionally, Mr. Krim did not testify that EDO used iSpot "to develop" EDO's dashboard. Rather, Mr. Krim's testimony is consistent with EDO's evidence that EDO used iSpot airings data merely as an input for predictive movie analytics offered to its movie-studio clients through its Ava Product dashboard. **SUF ¶¶ 31–34.**<br><br>iSpot's remaining evidence is inapposite to the factual |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | | | features and functionality of iSpot's dashboard. Dr. Zervas compared iSpot's tv ad analytics dashboard with EDO's tv ad analytics dashboard, and again concluded that EDO used iSpot's service to build the tv ad airings dashboard tables for EDO's competing products. **Ex. QQQ, Zervas Report at 6, 39.** | statement in paragraph 82. |
| | 83. Isaac Pflaum opined that similar data fields in iSpot's API and EDO's data tables and data dictionary reflect standard practice in the advertising industry and are also found in public advertising databases, such as those offered by Google, Spotify, and PBS. **Ex. FF, Pflaum Report ¶¶ 70–84.** | Disputed | Dr. Zervas compared iSpot's tv ad analytics dashboard with EDO's tv ad analytics dashboard, and again concluded that EDO used iSpot's service to build the tv ad airings dashboard tables for EDO's competing products. **Ex. QQQ, Zervas Report at 6, 39.** Before iSpot, no company had yet developed a reliable technology for programmatically, accurately and timely tracking television ads and ad airings data from linear television. **Ex. DDDDD, Muller Decl. ¶ 2.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 83 because it does not speak to what Mr. Pflaum opined or to whether the similar data fields in iSpot's API and EDO's data tables and data dictionary reflect standard practice in the advertising industry and are also found in public advertising databases, such as those offered by Google, Spotify, and PBS.<br><br>Dr. Zervas did not consider whether similar data fields in iSpot's API and EDO's data tables and |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | data dictionary reflect standard industry practice when formulating his opinions.<br><br>Even accepting that iSpot was the first company to accurately and timely track TV ads and airings data, that does not contradict that the data fields and features that Dr. Zervas identified as overlapping with EDO's products were widely used in public databases.<br><br>iSpot's remaining evidence is inapposite to the factual statement in paragraph 83. |
| 84. Isaac Pflaum opined that similar features in iSpot's and EDO's dashboards reflect standard practice in the advertising industry and are also found in other analytics dashboards, like those offered by Google, Facebook, and Adobe. **Ex. FF, Pflaum Report ¶¶ 85–87, 110–24.** | Disputed | Dr. Zervas compared iSpot's tv ad analytics dashboard with EDO's tv ad analytics dashboard, and again concluded that EDO used iSpot's service to build the tv ad airings dashboard tables for EDO's competing products. **Ex. QQQ, Zervas Report at 6, 39.** Before iSpot, no company had a functional dashboard like iSpot's for | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 83 because it does not speak to what Mr. Pflaum opined or to whether similar features in iSpot's and EDO's dashboards reflect standard practice in the advertising industry and are also found in other analytics dashboards, like those offered by |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | performing competitive intelligence based on real-time ad airings data. **Ex. DDDDD, Muller Decl. ¶ 6.** | Google, Facebook, and Adobe.<br><br>Dr. Zervas did not consider whether iSpot's and EDO's dashboards both reflect standard industry practice when formulating his opinions.<br><br>Even accepting that iSpot was the first company to have a functional dashboard for performing competitive intelligence based on real-time ad airings data, that does not contradict that the dashboard features Dr. Zervas identified as overlapping with EDO's dashboard were widely used in public databases. |
| 85. iSpot has shared its API fields publicly online on its own website and in patent applications. **Ex. FF, Pflaum Report ¶¶ 97–98; Ex, ZZZ, Muller et al., Unique content sequence identification method and apparatus, Patent No. US 10,602,236 B2 (Mar. 24, 2020); Ex, AAAA, Muller et al., Advertisement scoring system and method, Pub No. US 2015/0332309** | Disputed | iSpot never shared any of its API fields publicly online until after the 2017 Agreement expired in March 2018. Even then, the iSpot pages referenced by Defendants were not indexed and returnable through an internet search engine like Google. Instead, a user would need the | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 85 because iSpot does not dispute that it has shared its API fields publicly online. Nor does it dispute that at least one of the patent applications |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| **A1 (Nov. 19, 2015); Ex. BBBB, iSpot, API Metrics Data Glossary,** *available at* https://developer.ispot.tv/sites/default/files/iSpot_API_Glossary.pdf (last visited Feb. 2, 2025); **Ex. CCCC, Internet Archive Wayback Machine capture of "iSpot.tv Developer | REST API v3,"** *available at* https://web.archive.org/web/20180606063709/http://developer.ispot.tv:80/api/v3; **Ex. DDDD, Internet Archive Wayback Machine capture of "iSpot Integration Documentation – March 2018,"** *available at* https://web.archive.org/web/20180714012353/http://developer.ispot.tv:80/pdf/v3_API.pdf; **Ex. EEEE, Internet Archive Wayback Machine capture of "iSpot.tv REST API,"** *available at* https://web.archive.org/web/20180910132025/http://developer.ispot.tv:80/assets/openapi.json. | | exact URL to access the information, which iSpot provided to customers only. **Ex. DDDDD, Muller Decl. ¶ 12.** Accordingly, there is no evidence iSpot's API fields were available "publicly" during the time EDO was a customer of iSpot. | Defendants cite predates March 2018. |
| 86. iSpot has shared elements of its dashboard view publicly online on its own website and in industry articles. **Ex. FF, Pflaum Report ¶¶ 121–123; Ex. FFFF, John Cook, Geekwire, iSpot.tv raises $5M, looks to provide better advertising insights by analyzing 35,000 TV commercials (Oct. 8, 2013),** | Disputed | The limited information that iSpot has shared about its dashboard for marketing purposes would be insufficient to understand the full functionality of iSpot's dashboard. **Ex. DDDDD, Muller Decl. ¶ 6.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 86 because it does not contradict that iSpot shared elements of its dashboard view publicly online on its |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | *available at* https://www.geekwire.com/2013/ispottv-scores-5-million-measures-35000-tv-commercials/ (last visited Feb. 2, 2025); **Ex. GGGG, iSpot, Introducing Attention Analytics Index, Attention Scoring and Creative Wear (Sept. 5, 2017)**, *available at* https://www.ispot.tv/hub/introducing-attention-analytics-index-attention-scoring-creative-wear/ (last visited Feb. 2, 2025); **Ex. HHHH, iSpot, Cross-Screen Media Measurement,** *available at* https://www.ispot.tv/products/measurement (last visited Feb. 2, 2025). | | | own website and in industry articles. |
| 16 | 87. iSpot shared a demo of its API (reflect the API data fields) and dashboard with EDO on a non-confidential basis before the 2016 Agreement was executed. **Ex. IIII, Excerpts from the Deposition of Jeff Jensen (June 27, 2024) 69:15–74:17 ("Jensen Tr."); Ex. JJJJ, SPOT_0007083 [Jensen Ex. 46] at -083 (March 29, 2016 email from Jensen to Krim);** *Id.* **at -084 (email attachment: iSpot API Integration Documents);** *Id.* **at -102 (email attachment: iSpot Dashboard Audience Metrics);** *Id.* **at -103 (email** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| | attachment: iSpot Dashboard Performance by Creative); *Id.* at -104 (email attachment: iSpot Airings Report); *Id.* at 105 (email attachment: iSpot Dashboard Performance by Episode). | | | |
| | **D.  Nadya Teyfukova Accesses the iSpot Service While Employed at EDO** | | | |
| | 88. Nadya Teyfukova joined EDO as a media analytics manager on September 3, 2019, and left that employment on September 16, 2022.  **Ex. KKKK, Teyfukova's Responses to First Set of Interrogatories, at 7:9–11.** | Not disputed | | |
| | 89. Before EDO, Ms. Teyfukova worked at Horizon Media. While she was at Horizon Media, iSpot issued Ms. Teyfukova login credentials to access the iSpot dashboard in her own name, pursuant to a licensing agreement between iSpot and STX Studios, a Horizon client. **Ex. LLLL, Teyfukova's Responses to First Set of RFAs, at 13:1–26; Ex. MMMM, ISPOT_0020730 [Teyfukova Ex. 3] (iSpot-STX Agreement); Ex. NNNN, Excerpts from the Deposition of Nadya Teyfukova (June 11, 2024)** | Not disputed | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | 36:7–13, 37:2–5 ("Teyfukova Tr."). | | | |
| 4 | 90. Ms. Teyfukova never signed a user agreement with iSpot governing her use of those credentials. **Ex. BBBBB, iSpot's Responses to EDO's RFAs at 3:20–24 (no communication from Teyfukova to iSpot indicating agreement to iSpot terms and conditions), 3:25–4:1 (no contractual relationship between Teyfukova and iSpot).** | Disputed | Upon Ms. Teyfukova's departure from Horizon, Ms. Teyfukova received a copy of a Protective Covenants Agreement that she had previously signed with Horizon. **Ex. NNNN, Teyfukova Tr. 79:15–80:20; Ex. GGGGGG, EDO-00638313, Horizon Media Letter to N. Teyfukova about Horizon Media Handbook and Agreements, dated 8/27/2019 [Teyfukova Depo. Ex. 6].** By signing the Protective Covenants Agreement, Ms. Teyfukova acknowledged her obligation to keep secret the confidential business information and trade secrets of Horizon, Horizon's clients, and Horizon's vendors. **Ex. HHHHHH, EDO-00638389, Horizon Media Protective Covenants Agreement [Teyfukova Depo.** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 90 because the Horizon documents it cites are not agreements Ms. Teyfukova signed *with iSpot*. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | **Ex. 7].** When accessing iSpot's services while employed by EDO, Ms. Teyfukova knew that she would not have been given access to iSpot except by virtue of a subscription agreement that provided her access. **Ex. NNNN, Teyfukova Tr. 64:14–64:23.** | |
| 91. While at EDO, Ms. Teyfukova discovered that her login credentials were saved in her web browser and still allowed access to iSpot's dashboard. iSpot had not deactivated them when she left Horizon Media. **Ex. LLLL, Teyfukova's Responses to First Set of RFAs, at 13:1–26; Ex. NNNN, Teyfukova Tr. 113:1–6.** | Not disputed | | |
| 92. Ms. Teyfukova's supervisor at EDO, Ed Rugoff, was present when Ms. Teyfukova realized her iSpot login credentials still worked. Mr. Rugoff then directed Ms. Teyfukova to log into the iSpot dashboard with those credentials to spot check certain instances of EDO spend and airings data versus iSpot. **Ex. NNNN, Teyfukova Tr. 31:14–32:11,** | Not disputed | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| 33:1–7, 132:19–133:3; Ex. LLLL, Teyfukova Responses to First Set of RFAs, at 5:15–27, 8:16–23; Ex. KKKK, Teyfukova Responses to First Set of Interrogatories, at 8:25–9:1, 16:22–26. | | | |
| 93. Ms. Teyfukova never shared her iSpot login credentials with anyone else at EDO. She did not even remember her password. **Ex. MMM, EDO Responses to First Set of RFAs, at 24:24–25:8; Ex. LLLL, Teyfukova Responses to First Set of RFAs, at 17:4–11; Ex. NNNN, Teyfukova Tr. 97:24–98:10, 112:23–25.** | Not disputed | | |
| 94. Isaac Pflaum opined that iSpot's logs show that Ms. Teyfukova accessed the iSpot Service while at EDO fewer than 60 times. **Ex. FF, Pflaum Report ¶ 190–91.** | Disputed | Mr. Pflaum bases his opinion on a flawed methodology that involved looking at the location associated with IP addresses in 2024. iSpot's access logs capture more than IP address, including specific information about the internet browser used to login, including version updates. Based on this information, the iSpot logins from the IP address now associated with Santa Ana were made with the same Apple | iSpot fails to create a factual dispute material to the Court's determination of Defendants' motion because the number of times Ms. Teyfukova logged into iSpot does not "affect the outcome of the case" given the absence of evidence that Ms. Teyfukova or anyone at EDO used the information she retrieved for an unfair business advantage. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010); *Pickens v. Mercedes-Benz USA, LLC*, 2024 |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | computer that made the iSpot logins from EDO's offices. **Ex. DDDDD, Muller Decl. ¶¶ 19–22 & Exs. D-F.** | **WL 4342784, at \*1 (C.D. Cal. Sept. 27, 2024).** |
| 95. On a handful of occasions, Ms. Teyfukova sent Mr. Rugoff screenshots of iSpot data by Slack, and on one occasion, included one piece of iSpot data in a text message to Mr. Rugoff.  Mr. Rugoff did not do anything with these messages and did not open several of them. **Ex. KKKK, Teyfukova Responses to First Set of Interrogatories, at 15:15–16:10, 18:11-19:6; Ex. NNNN, Teyfukova Tr. 122:1–123:8; Ex. OOOO, Excerpts from the Deposition of Edward Rugoff (Aug. 6, 2024) 51:2–21 ("Rugoff Tr.").** | Disputed | While at EDO, Ms. Teyfukova used the login credentials (username and password) of Horizon's client, which she had obtain while at Horizon, to access iSpot's dashboard and download iSpot's trade secret information, including airings logs and spend data. **Ex. NNNN, Teyfukova Tr. 12:21–13:8, 29:9–22, 85:25–86:13, 89:7–90:4; Ex. IIIII, Teyfukova's Responses to iSpot's Requests for Admissions at 11:5–15, 13:1–26 (RFA Nos. 13, 16, 17).** Ms. Teyfukova accessed the iSpot service and collected information for the iSpot service in the course of her work for EDO at the direction of her supervisor, Ed Rugoff, an EDO | iSpot does not dispute that on a handful of occasions, Ms. Teyfukova sent Mr. Rugoff screenshots of iSpot data by Slack, and on one occasion, included one piece of iSpot data in a text message to Mr. Rugoff.

iSpot's proffered evidence otherwise does not create a factual dispute that Mr. Rugoff did not do anything with these messages and did not open several of them because it does not speak to *Mr. Rugoff's* use of iSpot information Ms. Teyfukova sent to him.

While Mr. Rugoff admitted that he deleted the iSpot information he received from Ms. Teyfukova after the complaint was filed in this case, that alone |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | Executive Vice President. **Ex. IIIIII, Teyfukova's Responses to iSpot's Requests for Admissions at 6:1–26, 8:1–14, 8:24–9:17, 10:14–25, 15:6–16:5 (RFA Nos. 2, 3, 6, 8, 9, 12, 20, 21).** Ms. Teyfukova has ever paid any subscription fees to iSpot. ***Id.* at 23:1–22 (RFA Nos. 38, 39).** EDO used the data obtained from iSpot to conduct comparisons with EDO's data and quality check the accuracy of EDO's data, including whether an ad aired on tv and comparisons of estimated spend, *i.e.*, the costs of an ad time slot. **Ex. NNNN, Teyfukova Tr. 23:4–23, 24:11–13, 24:23–25:20, 30:19–32:19; 33:11–33:24; Ex. JJJJJJ, Teyfukova's Responses to iSpot's First Set of Interrogatories at 15:15–16:10 (Rog No. 15).** Ms. Teyfukova was also involved in product | cannot raise an adverse inference of use because any evidence of use would have remained in EDO's files. ***Cisco Sys., Inc. v. Chung,* 2023 WL 2622155, at \*10 (N.D. Cal. Mar. 22, 2023).** iSpot's remaining evidence is inapposite to the factual statement in paragraph 95. While not material to the factual statement in paragraph 95 (or any issue in Defendants' motion), ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮ |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | development at EDO, and provided feedback on improving how EDO structured its database and EDO's data accuracy. **Ex. NNNN, Teyfukova Tr. 125:8–126:22.**<br><br>**Spoliation:** Mr. Rugoff deleted the iSpot information provided by Ms. Teyfukova at ▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ including text messages from Ms. Teyfukova with iSpot information. **Ex. OOOO, Rugoff Tr. 19:5–16, 22:25–25:5, 38:20–39:23.** | |
| 96. None of the information Ms. Teyfukova retrieved from iSpot was incorporated into any EDO product or analysis. **Ex. KKKK, Teyfukova Reponses to First Set of Interrogatories, at 8:14–9:1; Ex. Q, Lee Tr. 250:5–11; Ex. MMM, EDO Responses to First Set of RFAs, at 12:14–13:17, 26:18–25.** | Disputed | EDO used the data obtained from iSpot to conduct comparisons with EDO's data and quality check the accuracy of EDO's data, including whether an ad aired on tv and comparisons of estimated spend, i.e., the costs of an ad time slot. **Ex. NNNN, Teyfukova Tr. 23:4–23, 24:11–13, 24:23–** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 96 because it does not speak to whether EDO incorporated any iSpot information Ms. Teyfukova retrieved into any EDO product or analysis.<br><br>Ms. Teyfukova testified that she ran one comparison |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | 25:20, 30:19–32:19; 33:11–33:24; **Ex. JJJJJJ, Teyfukova's Responses to iSpot's First Set of Interrogatories at 15:15–16:10 (Rog No. 15).** Ms. Teyfukova was also involved in product development at EDO, and provided feedback on improving how EDO structured its database and EDO's data accuracy. **Ex. NNNN, Teyfukova Tr. 125:8–126:22.** | spreadsheet between iSpot spend and airings data and EDO spend and airings data. **Ex. KKKK, Teyfukova Responses to First Set of Interrogatories, at 15:15–16:10.** But there is no evidence that she or anyone else at EDO used that spreadsheet in EDO's products or services. *Id.* at 8:14–9:1; **Ex. Q, Lee Tr. 250:5–11; Ex. MMM, EDO Responses to First Set of RFAs, at 12:14–13:17, 26:18–25.**

Additionally, Ms. Teyfukova was an analyst with no technical expertise and no role in product development. **SUF ¶ 97.** Just because Ms. Teyfukova occasionally was asked for feedback on dashboard workflow and data quality does not mean that she used iSpot information in that process. In fact, she testified that she never "g[ave] any feedback to anyone at EDO that it needed to add or modify features to match iSpot." Nor did she "provide any comparisons between |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | | | EDO and iSpot to the EDO engineering team." **Ex. NNNN, Teyfukova Tr. 128:24–129:6.** |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | 97. Neither Ms. Teyfukova nor Mr. Rugoff was an engineer or a data scientist. Ms. Teyfukova was a media analytics manager, and Mr. Rugoff worked in sales and studio analytics. **Ex. NNNN, Teyfukova Tr. 46:4–5, 103:3–5; Ex. B, EDO-00043807 at -812 (email attachment: Dec. 2017 EDO Investor Presentation).** | Disputed | Ms. Teyfukova was also involved in product development at EDO, and provided feedback on improving how EDO structured its database and EDO's data accuracy. **Ex. NNNN, Teyfukova Tr. 125:8–126:22.**  Ms. Teyfukova's supervisor, Ed Rugoff, was the Executive Vice President of EDO, reporting directly to Mr. Krim the CEO, and his responsibilities included managing EDO's entertainment client relationships, soliciting new business, participating in the day-to-day analyses and sending of EDO reports to clients, and responding to questions from clients. **Ex. OOOO,** | iSpot's proffered evidence does not dispute the truth of the factual statement in paragraph 97 because it does not contradict that neither Ms. Teyfukova nor Mr. Rugoff was an engineer or data scientist. Nor does it contradict that Ms. Teyfukova was a media analytics manager, and Mr. Rugoff worked in sales and studio analytics. |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | Rugoff Tr. 58:3–8; 60:22–24. | |
| 98. Other than Mr. Rugoff, no EDO employees knew of Ms. Teyfukova's iSpot access while at EDO until this lawsuit was filed. **Ex. NNNN, Teyfukova Tr. 115:6–22; Ex. KKKK, Teyfukova Responses to First Set of Interrogatories, at 9:14–16, 15:10–14; Ex. MMM, EDO Responses to First Set of RFAs, at 23:15–28.** | Disputed | **Evidentiary Objections:** **Inadmissible Hearsay** (Fed. R. Evid. 801-802): Statements as to what was told, or not told, to other unidentified EDO employees. **Inadmissible Speculation** (Fed. R. Evid. 701): Statements as to what other, unidentified EDO employees had knowledge of. | iSpot does not dispute the truth of the factual statement in paragraph 98. The factual statement in paragraph 98 is supported by competent summary-judgment evidence—deposition testimony and verified interrogatory responses—and unrebutted by contrary evidence. Additionally iSpot cannot demonstrate that the fact cannot be presented in admissible form at trial, including by calling Mr. Rugoff , who is competent to testify as to what he told other EDO employees, as a witness. ***United States v. Eggleston*, 2017 WL 11503431, at \*7 (N.D. Cal. Sept. 22, 2017) ("The standard is not whether summary judgment evidence would be admissible at trial, but whether it could** |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW re DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | | be presented in an admissible form at trial." (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003)); *see also* Fed. R. Civ. P. 56(c)(1)(B). |
| 99. Ms. Teyfukova's login credentials were deactivated in May 2021.  **Ex. NNNN, Teyfukova Tr. 33:25–34:5; Ex. PPPP, ISPOT_0004018 at -019 at Tab: Disabled, Row: 42 (STX Entertainment_account_users).** | Not disputed | | |
| 100.    Neither Ms. Teyfukova, Mr. Rugoff, nor anyone at EDO currently has access to iSpot.  **Ex. PPPP, ISPOT_0004018 at -019 at Tab: Disabled, Row: 42 (STX Entertainment_account_users); Ex. QQQQ, ISPOT_0014094 at -097 at Tab: Lost Data, Row 17 (Lost Opportunity Detail); Ex. KKKK, Teyfukova Responses to First Set of Interrogatories, at 10:6–10.** Any iSpot information Ms. Teyfukova retrieved from the iSpot dashboard as an EDO employee has been deleted. **Ex. NNNN, Teyfukova Tr. 19:3–9; Ex. KKKK,** | Disputed | iSpot disabled Ms. Teyfukova's iSpot credentials through STX's subscription. **DSUF ¶ 99.** Ms. Teyfukova testified that she deleted iSpot information in her possession, and the report from FTI only relates to Ms. Teyfukova's laptop. **Ex. NNNN, Teyfukova Tr. 19:3–9; Ex. KKKK, Teyfukova Responses to iSpot's First Set of Interrogatories at** | iSpot does not dispute that neither Ms. Teyfukova nor anyone else currently has access to the iSpot service. iSpot's proffered evidence otherwise does not dispute the truth of the factual statement in paragraph 100 because it does not contradict EDO's evidence that all iSpot data in its systems have been deleted. The fact that the FTI report only analyzes Ms. Teyfukova's |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | **Teyfukova Responses to First Set of Interrogatories, at 15:28–16:10; Ex. E, Krim Tr. 16:8–17:2.** | | 15:28–16:10; Ex. E, Krim Tr. 16:8–17:2. | laptop does not create a dispute that the iSpot information she retrieved does not exist elsewhere in EDO's systems. If it did, iSpot would have found it in three years of discovery. |
| 4 | | | In addition, EDO's own documentation from September 2020 confirms that EDO continued to retain iSpot historical data: "Additionally, historical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for movies are In the Common Set." **Ex. EEEEEE, EDO-00058446, Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo. Ex. 157]. The Common Set is** airings data. **Ex. LL, Deshpande Tr. 170:22–171:1.** | Again, Exhibits EEEEEE and DDDDDD do not contradict EDO's evidence that EDO deleted all iSpot data in March 2018. |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | Exhibit EEEEEE refers to "Standard Retention Airings," which is the name of the database table in which EDO stored the derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. *See* **SUF ¶¶ 68–69; Ex. I, Lee Decl. ¶ 10.** "Standard Retention Airings" does not refer to iSpot data or any data generated from iSpot data. |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | In addition, for a May 4, 2018 demonstration to ▮▮▮▮—after the 2017 Agreement expired—EDO acknowledged concerns about its continued reliance on iSpot data: "Is it a risk that we admit we have iSpot data from December to January?" **Ex.** | |
| 23 | | | | |
| 24 | | | | Exhibit DDDDDD is notes EDO prepared to pitch ▮▮▮ in March 2018 on TV Ad Database. The pitch touts Kantar as a |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW
RE DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| | | DDDDDD, EDO-00644889, ▉ Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156]. This document directly contradicts Mr. Lee's declaration that all iSpot data was delete before the 2017 Agreement expired. | "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 Agreement)—despite having licensed Kantar in December 2017—that it might undermine its endorsement of Kantar. <br><br> Additionally, iSpot's reference to Mr. Deshpande's testimony does not create a dispute. Mr. Deshpande could not recall the purpose of Exhibit EEEEEE, and merely speculated regarding the contents of the "Common Set." **Ex. LL, Deshpande Tr. at 170:5–171:10.** Mr. Deshpande further responded, "Not to my knowledge" when asked whether "EDO continue[d] to use historical data from iSpot . . . after EDO's subscription with iSpot expired." ***Id.*** at 171:12–16. |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| **E. Provisions of the 2017 Agreement** | | | |
| 101. Section 1.2 of the 2017 Agreement, titled "Permitted Use," provides: "Company may use the iSpot Service: <br><br> a. To view, download and analyze the iSpot Data and iSpot Digital Assets to track advertising activities in the licensed Industries. <br><br> b. For internal research purposes. <br><br> c. To create insights from the iSpot Data and share such work product with its customers, provided that the insights derived from the iSpot Data are combined with other insights and that iSpot's raw data or reports are not passed through directly to its customers. <br><br> **Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] at -018 (email attachment: 2017 Agreement).** | Not disputed | | |
| 102. Section 1.3 of the 2017 Agreement, titled "Restrictions," provides, in part: <br><br> . . . . <br><br> b. Company may not share any data retrieved via the iSpot Service outside of Company's organization, other than as permitted in Section 1.2 | Not disputed | | |

95

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| c. Company may not resell, redistribute, sublicense, copy, transfer, lease, or authorize the resale or redistribution, sublicensing, copying, transferring or leasing of the iSpot Service or any element thereof to any third party.<br><br>d. Company may not modify, create derivative works of, reverse engineer, disassemble, decompile, or otherwise attempt to derive the source code or underlying trade secrets of the iSpot Service.<br><br>e. Company may not use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service.  For purposes of clarity, using the iSpot Service to support Company's own predictive movie analytics service in compliance with Section 1.2 above, shall not be a violation of this restriction.<br><br>. . . .<br><br>g. Company may not (i) access (or attempt to access) the iSpot Service by any means other than through the iSpot Dashboard or iSpot APIs, unless otherwise authorized by iSpot in writing; or (ii) make use of any iSpot Materials other than in accordance with the terms of this agreement. | | | |

| | Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|---|
| 2 | | | | |
| 3 | . . . . | | | |
| 4 | i. The Company may not utilize data to build any service that | | | |
| 5 | complete [*sic*] with iSpot.tv, Inc. or gives the impression that they | | | |
| 6 | compete with iSpot.tv, Inc. | | | |
| 7 | | | | |
| 8 | **Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] at -018 (email attachment: 2017** | | | |
| 9 | **Agreement).** | | | |
| 10 | 103.    Section 2.3 of the 2017 | Not disputed | | |
| 11 | Agreement, titled "Events Upon Termination," | | | |
| 12 | provides, in part: "Upon the | | | |
| 13 | expiration or termination of this Agreement for any | | | |
| 14 | reason, Company will promptly cease all use of the | | | |
| 15 | iSpot Service. [. . . .]" **Ex. XX, ISPOT_0011016 at -** | | | |
| 16 | **019 [Sullivan Brock Ex. 31]** | | | |
| 17 | **(email attachment: 2017** | | | |
| 18 | **Agreement).** | | | |
| 19 | 104.    Section 3.1 of the 2017 | Not disputed | | |
| 20 | Agreement, titled "Confidential Information," | | | |
| 21 | defines that term to exclude, in part, information that | | | |
| 22 | "becomes publicly known other than by breach of this | | | |
| 23 | Agreement" and "becomes | | | |
| 24 | known to the disclosing party, without restriction, | | | |
| 25 | from a source free of any obligation of | | | |
| 26 | confidentiality." **Ex. XX, ISPOT_0011016 [Sullivan** | | | |
| 27 | **Brock Ex. 31] at -019** | | | |
| 28 | | | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| **(email attachment: 2017 Agreement).** | | | |
| 105.    Section 3.3 of the 2017 Agreement, titled "Retained Rights," provides, in part:<br><br>As between the parties, and except as otherwise set forth in this Agreement, each party retains all right, title and interest in and to its Materials and Marks.  Each party reserves all rights not expressly granted to the other party under this agreement. . . . . "<u>Materials</u>" shall mean, collectively, any content, links, marks, functionality, technology, websites, modules, and/or other information, technology, rights and materials owned, operated, marketed, provided by, and/or distributed by the party, including, without limitation, all related patents, patent rights, trademarks, service marks, copyright, works of authorship, trade secrets and other proprietary interests.<br>**Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] at -019 (email attachment: 2017 Agreement).** | Not disputed | | |
| 106.    Section 4.8 of the 2017 Agreement, titled "Governing Law," provides: "This Agreement will be governed and interpreted in accordance with the laws of | Not disputed | | |

| Undisputed Fact | Status | Opposition | Reply |
|---|---|---|---|
| the State of Washington without regard to principles of conflict of laws." **Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] at -019 (email attachment: 2017 Agreement).** | | | |

## DEFENDANTS' CONCLUSIONS OF LAW

| Conclusion | Relevant Facts |
|---|---|
| The 2017 Agreement permitted EDO to include limited iSpot airings data in work product that EDO delivered to its movie-studio clients. | **¶¶ 1–39, 49–51, 101–06** |
| No jury could reasonably find that EDO violated any provision of the 2017 Agreement by including limited iSpot airings data in work product it delivered to its movie-studio clients during the contracting period. | **¶¶ 1–39, 49–51, 101–06** |
| The 2017 Agreement permitted EDO to retain derivative insights it generated from iSpot data during the contracting period. | **¶¶ 1–39, 62–69, 101–06** |
| No jury could reasonably find that EDO violated any provision of the 2017 Agreement by improperly retaining iSpot data because EDO did not retain any iSpot data after the expiration of the 2017 Agreement. | **¶¶ 1–39, 62–69, 101–06** |
| The 2017 Agreement permitted EDO to compare iSpot data to data from a different source to transition or determine whether to transition its existing work product to that new data source. | **¶¶ 1–39, 52–61, 101–06** |
| No jury could reasonably find that EDO violated any provision of the 2017 Agreement by comparing iSpot data with Kantar data or data generated by TV Ad Dataset. | **¶¶ 1–39, 52–61, 101–06** |
| No jury could reasonably find that EDO violated any provision of the 2017 Agreement by accessing iSpot data outside the licensed category of "Life & Entertainment: Movies" because any such access occurred prior to the effective date of the 2017 Agreement. | **¶¶ 1–48, 101–06** |

| Conclusion | Relevant Facts |
|---|---|
| No jury could reasonably find that EDO violated any provision of the 2017 Agreement by using the iSpot Service to build a competing product or third party TV monitoring or analytics service. | ¶¶ 1–87, 101–06 |
| No jury could reasonably find that EDO violated any provision of the 2017 Agreement. | ¶¶ 1–87, 101–06 |
| iSpot cannot recover unjust enrichment damages for any breach of contract as a matter of law because, under Washington law, a plaintiff suing for breach of contract is not entitled to unjust enrichment damages of avoided development costs or disgorgement of profits. | ¶¶ 1–87, 101–06 |
| No jury could reasonably find that iSpot has established the elements of its trade secrets claim because it cannot prove resulting damages or entitlement to injunctive relief. | ¶¶ 88–100 |

**PLAINTIFF'S STATEMENT OF
MATERIAL FACTS AND GENUINE DISPUTES**[1]

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 107 | Sean Muller founded iSpot.tv in 2012 after concluding that advertisers would be benefit from advanced analytics that measure the effectiveness of their tv ads benchmarked against their competitors' tv ads. **Ex. DDDDD, Declaration of Sean Muller (Feb. 19, 2025) ("Muller Decl."), ¶ 2; Ex. S, Muller Tr. 20:5–22:11, 236:3–21 (explaining the void for information for tv advertising online and the development of iSpot's data taxonomy); Ex. EEEEE, iSpot.tv, About, available at https://www.ispot.tv/about (last visited Feb. 18, 2025).** | Not disputed. | |
| 108 | To create this service, iSpot developed software for computers to programmatically capture detailed information about every commercial that runs on linear tv, and then organize the data on an industry-by-industry basis in a proprietary database and in real-time (*i.e.*, within hours, or faster of when | Not disputed. | |

---

[1] Defendants provide the following responses to Plaintiff's Statement of Material Facts and Genuine Disputes solely for the purpose of resolving Defendants' Motion for Summary Judgment. Defendants reserve the right to dispute additional "Material Facts" listed in Plaintiff's Statement at trial. Defendants also reserve the right to make additional evidentiary objections at trial. Finally, Defendants reserve the right to provide at trial additional grounds upon which they dispute "Material Facts" disputed herein. To the extent Defendants dispute any facts asserted in Plaintiff's Statement at trial, Defendants do not consider them material to Defendants' motion.

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | the ad aired). **Ex. DDDDD, Muller Decl. ¶ 3.** | | |
| 109 | Building iSpot technology to programmatically collected ad airings data was extremely challenging, because iSpot had no reference source to check whether iSpot's technology was accurately capturing the thousands upon thousands of ads that air on tv. **Ex. DDDDD, Muller Decl. ¶ 4.** | Not Disputed. | |
| 110 | To access iSpot's database of every ad airing on linear tv, iSpot required users to be under a paid subscription for one of iSpot's password-protected tv ad analytics services. **Ex. DDDDD, Muller Decl. ¶ 5.** | Not disputed. | |
| 111 | To this day, no company other than iSpot and EDO offer advanced tv ad performance analytics based on a "syndicated" database of real-time airings data for every ad that airs on linear tv. **Ex. DDDDD, Muller Decl. ¶ 23; Ex. S, Muller Tr. 226:16–24 (iSpot competitors do not deliver airings data at the same speed as iSpot).** | Disputed. | Kantar, Nielsen, Oracle, TVSquared, and VideoAmp "offer advanced tv ad performance analytics based on a 'syndicated' database of real-time airings data for every ad that airs on linear tv." **Ex. WWWWWW, ISPOT_0018665 at -89 (NBCUniversal Measurement Framework Look Book v1) (noting Kantar, Nielsen, TVSquared, and VideoAmp's ability to deliver analysis for linear TV ads within 24 hours); Ex. ZZ Cui Tr. 29:17-30:18; SUF ¶ 18.** Mr. Muller has provided no basis for his "expert" testimony regarding industry facts about which he has no personal knowledge. For that reason, |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | his declaration on this point should be ignored. |
| 112 | In 2014, EDO approached iSpot about using iSpot's service to improve EDO's model for predicting move box office ticket sales. **Ex. IIII, Jensen Tr. 16:17–17:14.** | Not disputed. | |
| 113 | In 2014, EDO subscribed to the service for six months. **Ex. VV, Myers Tr. 90:12–90:24.** | Not disputed. | |
| 114 | In early 2016, EDO's only option for real-time tv ad airings data (within 24 to 48 hours of airing date) and ad airings data that could be downloaded automatically through an API was iSpot. **Ex. DDDDD, Muller Decl. ¶ 10.** | Partially disputed. | When EDO began to look for a source of syndicated airings data in March 2016, several companies offered access to syndicated airings data, including Kantar, Nielsen, MediaRadar, and iSpot. **Ex. T, EDO-00646655 [Deshpande Ex. 142] at -655 (Mar. 23, 2016 meeting agenda noting iSpot, MediaRadar, and Kantar as potential sources); Ex. E, Krim Tr. 122:10–123:9 (noting iSpot, Kantar, and Nielsen); Ex. P, Muller Tr. 225:22–226:7 (noting Kantar, Nielsen, and Kinetiq); Ex. ZZ Cui Tr. 29:17-30:18 (discussing Kantar).**<br><br>Mr. Muller has provided no basis for his "expert" testimony regarding industry facts about which he has no personal knowledge. For that reason, his declaration on this point should be ignored. |
| 115 | When EDO reapproached iSpot about a new subscription, EDO's CEO, Kevin Krim, personally took charge of the negotiations for EDO, speaking with iSpot's Jeff Jensen. **Ex. HHHHH,** | Partially disputed. | Kevin Krim was EDO's COO in March 2016. **Ex. X, EDO-00001745 at -746 (2016 Agreement, noting Mr. Krim's title as "President & COO").** |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | ISPOT_0006972-82, Email from J. Jensen to K. Krim, dated 3/24/2016 [Jensen Depo. Ex. 44]. | | |
| 116 | Not surprisingly, Mr. Krim viewed iSpot as a competitor in 2016. **Ex. E, Krim Tr. 144:8–145:11.** | Partially disputed. | Mr. Krim testified that in 2016 "we only viewed [iSpot] as a broad competitor," having previously defined "broad competitor" as any company that "brands, agencies and the sellers of advertising" pay out of their budget for "media measurement, market research, data and insights." Mr. Krim's testimony only speaks to his understanding that, in 2016, EDO clients paid both EDO and iSpot out of their budget for "media measurement, market research, data and insights." **Ex. E, Krim Tr. 139:25–141:14; 144:8–145:11.** |
| 117 | In early 2016, when Jeff Jensen asked Kevin Krim how EDO intended to use iSpot's service, Kevin Krim told Jeff Jensen that EDO still planned to just use iSpot's service to model box office ticket sales. **Ex. IIII, Jensen Tr. 59:2–62-5; 96:15–18; 99:5–15.** | Disputed. | The evidence cited does not say that "Kevin Krim told Jeff Jensen that EDO still planned to" "use iSpot's service [only] to model box office ticket sales[.]" Jensen testified that Mr. Krim told him EDO "planned to use iSpot's data to model box office openings," EDO was "in the business of prediction modeling," and that modeling "was for use with studio clients as you understood from before." **Ex. IIII, Jensen Tr. 62:2–17.** Mr. Jensen also testified that he "understood that EDO was using the iSpot data to do its own predictions and to provide those predictions, potentially with some iSpot information, to movie studio clients." *Id.* **at 99:22–100:1.**

In any event, this dispute is not material because Mr. Jensen's |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | subjective understanding of how EDO intended to use iSpot data under the 2016 Agreement does not change unambiguous terms of the 2017 Agreement. |
| 118 | In Jeff Jensen's contemporaneous notes from his first conversation with Kevin Krim, Jeff Jensen wrote: "Prediction modeling. Use our data to model box office openings." **Ex. IIIII, ISPOT_0008229 at-30 (Jensen Depo. Ex. 59); Ex. IIII, Jensen Tr. 147:23–149:25.** | Partially disputed. | The evidence cited does not indicate that Mr. Jensen's "notes" were contemporaneous, or that they were notes "from his first conversation with Kevin Krim." In fact, the notes document is titled, "Big Data Box Office Notes from conversation from Jon & Mark (10/31)." **Ex. IIIII, ISPOT_0008229 at-230 [Jensen Depo. Ex. 59].** |
| | | | In any event, this dispute is not material because Mr. Jensen's subjective understanding of how EDO intended to use iSpot data under the 2016 Agreement does not change unambiguous terms of the 2017 Agreement. |
| 119 | EDO's notes from Kevin Krim's first call with Jeff Jensen provide: "We're still focused on doing movie predictions, after stopping data last year, now coming back to belief that ad data could be useful for our models." **Ex. JJJJJJ, EDO-00640034, EDO's 2016-03-24 iSpotTV Notes [Krim Depo Ex. 240.]; Ex. E, Krim Tr. 147:12–148:22.** | Not disputed. | |
| 120 | While still negotiating with iSpot over the terms of the 2016 Agreement, Kevin Krim was | Not disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | internally evaluating the terms of the subscription agreement, concluding that there was "some grey area in there if we are summarizing and aggregating." **Ex. E, Krim Tr. 108:8–110:8; Ex. KKKKK, EDO-00016340, Email notification to S. Chiu of Slack message from K. Krim, dated Mar. 24, 2016 [Krim Depo. Ex. 239].** | | |
| 121 | One day before entering the 2016 Subscription Agreement, Mr. Krim wrote to EDO's chief data scientist, one of the principal creators of SAAG and Ava: "This is probably the closest competitor we've found and we should immerse ourselves in their product given the chance for it." **Ex. E, Krim Tr. 194:6–198:6; Ex. LLLLL, EDO-00004962, Email from K. Krim to S. Chiu, dated 3/30/2016 [Krim Depo. Ex. 244].** | Partially disputed. | Mr. Krim testified that in 2016 EDO and iSpot did not offer products that were "directly competitive" and that his concern was that iSpot would attempt to market a product that was "directly competitive" in the future. **Ex. E, Krim Tr. 211:1–213:18.** Ex. LLLLL expresses Mr. Krim's concern about potential future competitive product offerings by iSpot, stating "[t]hey're pushing into the same value proposition as Traction and Ava[.]" **Ex. LLLLL, EDO-00004962 at -962, Email from K. Krim to S. Chiu, dated 3/30/2016 [Krim Depo. Ex. 244].** |
| 122 | Kevin Krim, however, told iSpot that it required a clarification to the 2016 Agreement so that EDO could do its basic business, *i.e.*, predict opening-weekend movie box office ticket sales. **Ex. E, Krim Tr. 281:3–289:2; Ex. FFFFF, ISPOT_00007911, Email from K. Krim to J. Jensen, dated Mar. 31, 2016 [Jensen Depo. Ex. 51].** | Disputed. | The evidence cited does not say that EDO's "basic business" was "predict[ing] opening-weekend movie box office ticket sales[.]" Mr. Krim testified that in 2016 one of the "primary features or benefits" of its Studio Ad Analytics Group service was "predictive analytics of the tactics that were most influential in increasing movie box office results." **Ex. E, Krim Tr. 113:10–25.**<br><br>In any event, this dispute is immaterial because Mr. Krim's purpose for |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW
RE DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | seeking an amendment to Section 1.4(g) is irrelevant to the provision's unambiguous terms. |
| 123 | At EDO's request, EDO and iSpot modified the provision in the 2016 Agreement under which EDO could "not use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service" to exclude EDO's "services related its own analytics services unrelated to TV monitoring." **Ex. X, EDO-00001745 at-746 (email attachment: 2016 Agreement); Ex. FFFFF, ISPOT_00007911, Email from K. Krim to J. Jensen, dated Mar. 31, 2016 [Jensen Depo. Ex. 51].** | Not disputed. | |
| 124 | On March 30, 2016, Josh Lee wrote: "Having seen the iSpot demo though, I think there is value is [sic] letting us play with and learn from the iSpot UI." **Ex. MMMMM, EDO-00016228–38, Email from K. Krim to S. Chiu, dated 3/30/2016 [Krim Depo. Ex. 245].** | Not disputed. | |
| 125 | The iSpot user interface, or UI, is its tv ad analytics dashboard. **Ex. DDDDD, Muller Decl. ¶ 6.** | Partially Disputed. | Mr. Muller's declaration only provides his understanding of what iSpot's UI is, not what Mr. Lee meant by "iSpot UI" in Ex. MMMMM. |
| 126 | In April 2016, the EDO engineering team held a "hackathon" to start replicating iSpot from the inside out. **Ex.** | Disputed. | The evidence cited does not indicate that EDO employees "start[ed] replicating iSpot from the inside out." Ex. NNNNN is an agenda for an EDO |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | ZZ, Cui Tr. 41:3–12; Ex. NNNNN, EDO-00640050, 2016-04-05 Eng Meeting [Cui Depo. Ex. 117]. | | engineering team meeting which lists one of the projects for an upcoming "hackathon" that took place shortly after EDO signed the 2016 Agreement. One project listed was "[h]ow hard is it to replicate iSpot[?]" **Ex. NNNNN, EDO-00640050, 2016-04-05 Eng Meeting [Cui Depo. Ex. 117].** Mr. Cui testified that the term "replicate iSpot" referred to the "build[ing] of [EDO's] own TV ad airings dataset" **Ex. ZZ, Cui Tr. 39:17–40:4.** Ex. NNNNN does not suggest any EDO employee attempted to copy any element of iSpot's products. |
| 127 | EDO's efforts to replicate iSpot began by structuring a database to store and organize ad airings data for EDO's Ava tv ad analytics platform, including the primary "tv_ads" and "tv_ad_airings" tables within EDO's database schema. **Ex. ZZ, Cui Tr. 157:21–159:5.** | Disputed. | Mr. Cui's testimony says that EDO built tables to store and organize ad airings data for Ava, called "tv_ads" and "tv_ad_airings." It says nothing about "EDO's efforts to replicate iSpot." |
| 128 | Dr. Georgios Zervas of Boston University analyzed EDO's "tv_ads" and "tv_ad_airings" tables, and concluded that EDO used iSpot's service develop EDO's tv ad airings database. **Ex. QQQ, Zervas Report at 6, 39.** | Disputed. | Evidence cited only indicates that there were similarities between EDO's "tv_ads" and "tv_ad_airings" tables and iSpot's API endpoints and does not speak to whether "EDO used iSpot's service[.]" In fact, iSpot does not dispute that the data fields Dr. Zervas identified as similar reflect standard practice in the advertising industry and are also found in public advertising databases, such as those offered by Google, Spotify, and PBS. **SUF ¶ 83.**<br><br>No EDO employee has testified that EDO used any information received from iSpot during the term of the 2017 |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | Licensing Agreement to develop products that compete or appear to compete with iSpot. **SUF ¶ 78.** |
| 129 | Dr. Zervas's expert analysis shows how EDO copied iSpot's API endpoints to build the "tv_ads" and "tv_ad_airings" tables in EDO's tv ad airings database. **Ex. QQQ, Zervas Report at 6, 39.** | Disputed. | Evidence cited only indicates that Dr. Zervas identified similarities between EDO's "tv_ads" and "tv_ad_airings" tables and iSpot's API endpoints and does not speak to whether EDO "copied iSpot's API endpoints." In fact, iSpot does not dispute that the data fields Dr. Zervas identified as similar reflect standard practice in the advertising industry and are also found in public advertising databases, such as those offered by Google, Spotify, and PBS. **SUF ¶ 83.**<br><br>No EDO employee has testified that EDO used any information received from iSpot during the term of the 2017 Licensing Agreement to develop products that compete or appear to compete with iSpot. **SUF ¶ 78.** |
| 130 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉ **Ex. QQQ, Zervas Report at 38.**▉▉▉ ▉▉▉▉▉▉▉▉▉ ▉▉▉▉ **Ex. OOOOO, EDO-00003431–32, Email from D. Cui to J. Lee, dated 1/18/2007.** | Disputed. | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉ iSpot does not dispute that the data fields Dr. Zervas identified as similar reflect standard practice in the advertising industry and are also found in public advertising databases, such as those offered by Google, Spotify, and PBS. **SUF ¶ 83.**<br><br>Ex. OOOOO does not support that "[b]efore copying it from iSpot, EDO was unsure what ▉▉▉ even meant." In the next email in the chain, engineer Josh Lee responds by defining what ▉▉▉ means. **Ex. XXXXXX,** |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | **EDO-00003428 at -28, Email from J. Lee dated 1/18/2007.** |
| 131 | EDO continued to use these same "tv_ads" and "tv_ad_airings" tables for its tv ad analytics and competitive intelligence database product called TV Ad Database, which was later renamed AdEngage. **Ex. LLL, Schorow Tr 127:1–3, 128:2–7; Ex. Q, Lee Tr. 45:10–22, 74:10–75:9; Ex. UUUUU, EDO-00003259–60, Email from T. Ho to J. Lee, dated 3/1/2017 [Lee Depo. Ex. 225].** | Partially Disputed. | EDO does not dispute that TV Ad Database was later renamed Ad EnGage Competitive Intelligence. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 7:11–12.**<br><br>Cited evidence does not say whether tables used in TV Ad Database or Ad EnGage were the same "tv_ads" and "tv_ad_airings" tables discussed in ¶ 129. |
| 132 | EDO's tv ad analytics services are all competitive to iSpot and its services. **Ex. DDDDD, Muller Decl. ¶ 23.** | Disputed. | The cited evidence does not substantiate that EDO offered "tv ad analytics services."<br><br>Mr. Muller has provided no basis for his "expert" testimony regarding all of EDO's products and services. For that reason, his declaration on this point should be ignored.<br><br>Mr. Muller's statement otherwise is ipse dixit and supported by no additional analysis or citations to other evidence in the record. For example, EDO sold products and services that were not substitutes for iSpot's products and services. **Ex. VV, Myers Tr. 189:23-190:7 (iSpot witness testifying that "EDO was focused on selling a search attribution product" and in December 2022 iSpot did not "offer a search attribution product").** Furthermore, iSpot does not dispute that during the Contracting Period, all |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | EDO movie-studio clients were iSpot clients. **SUF ¶ 38.** |
| 133 | In October 2016, Alex Andujar of Sony Pictures reported to iSpot's Jon Primrose that EDO had made a presentation to Sony wherein it appeared EDO had built a tv ad analytics dashboard using iSpot's data. **Ex. PPPPP, Primrose Tr. 50:12–52:3, 53:8–54:4, 55:13–57:6.** | Disputed and inadmissible as hearsay (Fed. R. Evid. 801-802) | Evidence cited does not say that Alex Andujar told Jon Primrose that "it appeared EDO had built a tv ad analytics dashboard using iSpot's data." <br><br> **Evidentiary Objection:** <br><br> Statements by Alex Andujar introduced in evidence to prove the truth of the matter asserted. **FRE 802.** |
| 134 | In an October 2016 email to his iSpot colleagues recapping his conversation with Mr. Andujar, Mr. Primrose wrote: "Sony is confused as to why we license our data to [EDO] who is creating a competitive offering." **Ex. UU, ISPOT_0008225, Oct. 2016 email chain between J. Primrose et al. [Jensen Depo. Ex. 55].** | Not Disputed. | |
| 135 | Mr. Jensen spoke with Mr. Krim on November 1, 2016 about Sony's report. Mr. Krim feigned surprise at Sony's claim and assured iSpot that EDO did not have any plans to compete with iSpot. **Ex. IIIII, ISPOT_0008229 at -30 [Jensen Depo. Ex. 59].** | Partially Disputed. | Ex. IIIII does not say that "Mr. Krim feigned surprise at Sony's claim and assured iSpot that EDO did not have any plans to compete with iSpot." In fact, it does not discuss anything about the November 1, 2016 call between Mr. Krim and Mr. Jensen. <br><br> There is no basis for Mr. Krim's state of mind in the evidence cited. |
| 136 | On November 18, 2016, during a follow-up call between Mr. Jensen, iSpot's Mark Myers, Mr. Primrose and Mr. Krim, Mr. Krim denied that EDO had | Partially disputed and partially inadmissible as hearsay | The Myers testimony does not purport to quote Mr. Krim. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | presented a dashboard product to Sony that was similar to anything that iSpot offered, and claimed that "Sony must have gotten it wrong." **Ex. VV, Myers Tr. at 105:9–106:5.** | (Fed. R. Evid. 802) | |
| 137 | On November 18, 2016, during a follow-up call between Mr. Jensen, iSpot's Mark Myers, Mr. Primrose and Mr. Krim, Mr. Krim assured iSpot that EDO was complying with the parties' 2016 Agreement. **Ex. VV, Myers Tr. 105:19–106:18.** | Not Disputed. | |
| 138 | On November 18, 2016, during a follow-up call between Mr. Jensen, iSpot's Mark Myers, Mr. Primrose and Mr. Krim, iSpot warned Mr. Krim that iSpot would terminate the 2016 Agreement if iSpot learned that EDO was violating its terms. **Ex. III, Jensen Tr. 133:3–17; Ex. VV, Myers Tr. 105:19–106:18.** | Not Disputed. | |
| 139 | Dr. Zervas also compared iSpot's dashboard with EDO's dashboard, and again concluded that EDO used iSpot's service to develop features and functionality of EDO's competing dashboard. **Ex. QQQ, Zervas Report at 6, 39.** | Disputed. | Evidence cited only indicates that Dr. Zervas identified similarities between iSpot's and EDO's dashboards and does not speak to whether EDO "used iSpot's service to develop features and functionality of EDO's competing dashboard[.]" In fact, iSpot does not dispute that the similarities Dr. Zervas identified between EDO's and iSpot's dashboards reflect standard practice in the advertising industry and are also found in other analytics dashboards, like those offered by Google, Facebook, and Adobe. SUF ¶ 84. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | No EDO employee has testified that EDO used any information received from iSpot during the term of the 2017 Licensing Agreement to develop products that compete or appear to compete with iSpot. **SUF ¶ 78.** |
| 140 | Mr. Krim confirmed in deposition that the Ava platform which EDO's clients could access through a user dashboard allowed EDO's client to perform Competitive Intelligence, *i.e.*, compare the effectiveness of the client's tv ads to the effectiveness of the competitor tv ads. **Ex. E, Krim Tr, 129:5–130:5.** | Not Disputed. | |
| 141 | Until March 2018, EDO's Ava service depended on iSpot's data, and EDO could not provide competitive intelligence at this time without iSpot. **Ex. E, Krim Tr, 130:6–13.** | Disputed. | EDO does not dispute that it used iSpot data for its predictive movie analytics, powered by Ava Data, from March 2016 – March 2018.<br><br>However, evidence cited does not say that "EDO could not provide competitive intelligence at this time without iSpot[.]" Mr. Krim testified that EDO could have obtained from clients "ad airings logs from a source like Nielsen or Kantar." **Ex. E, Krim Tr, 130:6–13.** |
| 142 | Until March 2018, iSpot was EDO's *only* source of syndicated, real-time ad airings data for Ava. **Ex. E, Krim Tr. 123:10–125:23; Ex. LL, Deshpande Tr. 155:22–156:3.** | Partially disputed. | EDO began to license syndicated, real-time ad airings data from Kantar in December 2017. **SUF ¶ 58; Ex. DDDDDD, EDO-00644889, ▮ Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** |
| 143 | In February 2017, EDO's subscription was up for renewal, and iSpot asked EDO for more information about how EDO was | Partially disputed. | The cited evidence does not purport to quote Mr. Krim. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
|  | using iSpot's data. Mr. Krim told Shamez Dharamsi and Keeley Sullivan at iSpot that EDO is in the business of "predicting box office sales based on various inputs including our data, digital, etc" and that EDO presents its analysis in "bespoke, customized reports in excel." **Ex. SSSSSS, Dharamsi Tr. 167:1–171:17); Ex. TTTTTT, ISPOT_0011073, Email from S. Dharamsi to S. Muller, dated 2/22/2017 [Dharamsi Depo. Ex. 235]; Ex. QQQQQ, EDO-00043262, Email from K. Krim to EDO Accounting, dated 12/26/2017.** | | Evidence cited does not say that "EDO is in the business of 'predicting box office sales[']". Mr. Dharamsi's notes from the conversation at issue do not mention "box office sales." **Ex. TTTTTT, ISPOT_0011073, Email from S. Dharamsi to S. Muller, dated 2/22/2017 [Dharamsi Depo. Ex. 235].** Rather, those notes indicate that Mr. Krim told Mr. Dharamsi that EDO's business included: "answer[ing] questions such as . . . . What did we do that impacted sales? Could we do more of that? Would we have a better return on ROI? What tactics drove the best ROI?" *Id.* |
| 144 | One EDO employee summarized a February 2017 call between iSpot and Kevin Krim as follows: "Kevin basically said f- off during the call, but he's going to think about how to respond and whether there's any work-product we can show them in a non-incriminating way." **Ex. RRRRR, EDO-00057829, Email with Slack message from D. Cui dated 2/22/2017 [Cui Depo. Ex. 139]; Ex. ZZ, Cui Tr. 170:13–172:14 (relaying Krim's summary of the phone call with iSpot to certain EDO engineers).** | Not Disputed. | |
| 145 | During call between Kevin Krim and Keeley Sullivan at iSpot, Mr. Krim again claimed that "Sony was a huge misunderstanding" and that "Everything is report | Partially disputed and partially inadmissible as hearsay | The cited evidence does not purport to quote Mr. Krim. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | based built in Excel." **Ex. SSSSS, Sullivan Brock Decl. ¶¶ 4–5, Ex. A (contemporaneous notes of Sullivan Brock's call with Krim).** | (Fed. R. Evid. 802). | |
| 146 | EDO developed a "strong concern" in early 2017 "that iSpot was either preparing to ask us to pay a lot more money, and it would therefore be prohibitive to renew our contract with them, and/or they simply would not offer to renew the contract at all and that we would therefore need to find a means of providing continuity to our clients so we didn't interrupt the services that we had already committed to perform on their behalf." **Ex. E, Krim Tr. 221:24–222:19.** | Not Disputed. | |
| 147 | Internally, EDO referred to its desperate need for tv ad airings data for its competing ad analytics offering as "Project Apocalypse Now." **Ex. Q, Lee Tr. 250:19-251:13; Ex. TTTTT, EDO-00637483 at -86, Email from K. Krim to E. Norton and D. Nadler, dated 2/24/2017 [Cui Depo. Ex. 125].** | Partially Disputed. | EDO does not dispute that it referred to its early 2017 efforts to scale up TV Ad Dataset as "Project Apocalypse Now." **SUF ¶ 56.** EDO otherwise disputes that it had a "desperate need for tv ad airings data for its competing ad analytics offering." The cited evidence merely shows that EDO considered "contingency plans" to find an alternative data source for its predictive movie analytics if iSpot failed to renew. **Ex. AAA, EDO-00636273 [Krim Ex. 252] at -276 (Weekly Update 2017-02-24 email, "Flagging iSpot risk").** |
| 148 | On March 1, 2017—with the March 31, 2017 expiration of the 2016 Agreement looming— EDO's Josh Lee obtained | Partially Disputed. | EDO disputes that it "knew" that ████████s iSpot credentials "provided access to all of iSpot's tv ad airings data. Ex. VVVVV merely shows that |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | ████ s iSpot credentials, which EDO knew provided access to *all* of iSpot's tv ad airings data and not just the movie-theatrical category to which EDO had a subscription. **Ex. UUUUU, EDO-00003259–60, Email from T. Ho to J. Lee, dated 3/1/2017 [Lee Depo. Ex. 225]; Ex. VVVVV, EDO-00003386–87, Email from S. Chiu to Ava Team, dated 1/27/2017.** | | ████████ of ████ y told EDO that ████ had "access to iSpot airings data across all verticals." **Ex. VVVVV, EDO-00003386 at -386, Email from S. Chiu to Ava Team, dated 1/27/2017.** |
| 149 | Mr. Lee's boss, EDO's Chief Technology Officer, Tony Ho, told Mr. Lee that "[w]e should access this [iSpot] API through some proxy to hide who we are" when using ████ 's iSpot credentials. **Ex. UUUUU, EDO-00003259–60, Email from T. Ho to J. Lee, dated 3/1/2017 [Lee Depo. Ex. 225].** | Not Disputed. | |
| 150 | In early March 2017, EDO used ████ s credentials to download from iSpot's database the data for 71,153,917 ads that aired between January 1, 2015 and March 6, 2017, most of which were outside EDO's limited subscription to the movie-theatrical category. **Ex. DDDDD, Muller Decl. ¶¶ 13–16; Ex. XXXXX, ISPOT_0043139–44, API Access Analysis Prepared by Sean Muller, dated October 2024.** | Not Disputed. | |
| 151 | iSpot revised the 2017–18 Subscription Agreement to reflect the limited way in which | Partially disputed. | EDO does not dispute the text of the 2017 Agreement. EDO disputes that iSpot revised the 2017 Agreement "to |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 151 | Mr. Krim claimed that EDO was using iSpot's service, including a new Subsection 1.3(i) under which EDO explicitly confirmed that it would not utilize iSpot's data to build a any service that competes with iSpot or appears to compete with iSpot. **Ex. XX, ISPOT_0011016 at -18, Mar. 14, 2017 email from K. Krim to K. Sullivan, with attachment [Sullivan Brock Depo. Ex. 31].** | | reflect the limited way in which Mr. Krim claimed that EDO was using iSpot's service." Exhibit XX—the contract itself— does not speak to iSpot's reasons for agreeing to contract revisions or how Mr. Krim described to iSpot EDO's use of its data. |
| 152 | The 2017 Agreement included a mutual termination for convenience provions that would allow iSpot to quickly cutoff EDO from iSpot's service on 30 days' notice. **Ex. XX, ISPOT_0011016 at-18, Mar. 14, 2017 email from K. Krim to K. Sullivan, with attachment [Sullivan Brock Depo. Ex. 31].** | Not disputed. | |
| 153 | EDO only made one change to the Restrictions in the 2017 Agreement, adding the underlined "predictive movie analytics services" language to the following restriction:<br><br>Company may not use the iSpot Service to build or contribute to any other third party TV monitoring or analytics service. For purposes of clarity, using the iSpot Service to support Company's own predictive movie analytics service in | Not disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | compliance with Section 1.2 above, shall not be a violation of this restriction.<br><br>**Ex. YYYYY, ISPOT_0011005 at-09, Email from K. Krim to K. Sullivan, dated 3/13/17 [Sullivan Brock Depo. Ex. 30].** | | |
| 154 | iSpot understood "predictive movie analytics" to be the movie box office sales predictions based upon how EDO had repeatedly described its use case for iSpot's data. **Ex. S, Muller Tr. 51:17–52:20, 57:13–58:23.** | Disputed. | EDO's descriptions of its use case for iSpot data was not limited to "box office sales predictions." **Ex. TTTTTT, ISPOT_0011073, Email from S. Dharamsi to S. Muller, dated 2/22/2017 [Dharamsi Depo. Ex. 235].** To the extent "iSpot understood 'predictive movie analytics' to be the movie box office sales predictions" that understanding was not "based upon how EDO had repeatedly described its use case for iSpot's data[.]"<br><br>In any event, this dispute is not material because iSpot's subjective understanding of "predictive movie analytics" is an unreasonable reading of the term in the 2017 Agreement. |
| 155 | Mr. Krim now claims that "predictive movie analytics service" always included tv ad analytics. **Ex. E, Krim Tr. 112:20–114:8, 114:23–117:22.** | Disputed | Mr. Krim testified that EDO's Studio Ad Analytics Group ("SAAG") that it offered to movie studio clients was a predictive movie analytics service because "[o]ne of its primary features or benefits was predictive analytics of the tactics that were most influential in increasing movie box office results." **Ex. E, Krim Tr. 112:21–113:13.** Mr. Krim further testified that SAAG evolved into TV Ad Analytics— another name for Ava Product— which it offered "as a way for those customers to start having an interface that they |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | themselves could log into and interact with those analytics and perform further analytics themselves." ***Id.* at 113:22–114:14; Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 19:25–28.** |
| 156 | Mr. Krim, however, admitted internally at EDO that he was purposely misleading iSpot, telling an EDO board member that using a more accurate term like "advertising efficacy analytics" would "risk tripping us up with iSpot" and "would create a potential clash that [Mr. Krim] did not want to have." **Ex. E, Krim Tr. at 243:3–9; Ex. ZZZZZ, EDO-00003744-45, Email from K. Krim to E. Norton, dated June 17, 2017 [Krim Depo. Ex. 249].** | Disputed. | The evidence cited does not say that Mr. Krim was "purposely misleading iSpot," or make any statement about the accuracy of the term "advertising efficacy analytics[.]" iSpot cites no evidence that the term "Predictive Analytics" is an inaccurate description of EDO's business, or otherwise less accurate than "advertising efficacy analytics[.]" Finally, Mr. Krim testified that this email reflects his concern that if EDO were to use the term "advertising efficacy analytics" it would spur iSpot to *introduce new products* that compete with EDO. **Ex. E, Krim Tr. at 241:10–243:15.** |
| 157 | The EDO-Kantar Agreement entered effective December 1, 2017 references "EDO's Base 'TV Advertising Analytics' Product." **Ex. FFF, KANTAR-0006, at -0010 (EDO-Kantar Agreement,).** | Not disputed. | |
| 158 | After the 2017 Agreement was signed, EDO began building TV Ad Dataset in earnest. **Ex. AAA, EDO-00636273, Feb. 24, 2017 email from K. Krim to E. Norton & D. Nadler [Krim Depo. Ex. 252.** | Partially disputed. | Evidence cited does not say anything about when EDO began building TV Ad Dataset. EDO does not dispute that it "ramped up its TAD efforts in mid-2017." **SUF ¶ 56.** |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 159 | EDO compared iSpot's data to data collected by TV Ad Dataset, and used iSpot's as a reference source for assessing the overal accuracy TV Ad Dataset's data. **Ex. ZZ, Cui Tr. 135:17–24; 154:5–21; Ex. UUUU, EDO-00639993, kantar_vs_tad_20170901_2017 0903.csv, last modified Oct. 17, 2017 [Cui Depo. Ex. 134]; Ex. AAAAAA, EDO-00644295–96, Proposed Changes to Cost Projection [Cui Depo. Ex. 133].** | Partially disputed. | EDO does not dispute that "[i]n a handful of instances, EDO compared samples of TAD and iSpot data to evaluate if EDO could transition its existing search engagement analytics from iSpot to TAD." SUF ¶ 55 (citing **Ex. UUUU**).<br><br>Evidence cited does not support that EDO "used iSpot[] as a reference source for assessing the overal[l] accuracy [of] TV Ad Dataset's data." Mr. Cui denied that any comparison between iSpot and TAD data would be "helpful . . . to see how accurate TV ad dataset['s] collection is." **Ex. ZZ, Cui Tr. 135:17–136:5.**<br><br>Ex. UUUU merely supports the uncontested fact that EDO compared samples of TAD and iSpot data.<br><br>Ex. AAAAAA is EDO notes from July 2018, after EDO had abandoned TV Ad Dataset. **SUF ¶ 56.** This document does not mention TV Ad Dataset, much less that EDO "used iSpot[] as a reference source for assessing the overal[l] accuracy [of] TV Ad Dataset's data." |
| 160 | EDO engineers testified that EDO's comparisons of ad airings data from different sources could be used to identify any discrepencies and investigate potential problems with the data sources. **Ex. LLL, Schorow Tr. 135:17–136:12; Ex. ZZ, Cui Tr. 137:20–23.** | Disputed. | EDO engineers testified that iSpot's data was inaccurate and thus not useful as a means to identify "discrepancies and investigate potential problems with the data sources[.]" **Ex. ZZ Cui Tr. 137:4–138:14; Ex. LL, Deshpande Tr. 138:15-18 ("I don't know if people believed iSpot to be a source [of] accurate . . . information.").** |

120

Parties' SUF & Genuine Disputes, Conclusions of Law re Defs.' MSJ
Case No. 2:21-cv-06815-MEMF-MAR

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | In any event, testimony on how comparisons *could* be used does not bear on how EDO actually used them. |
| 161 | EDO set benchmarks for the development of TV Ad Dataset *by measuring how it compared to iSpot's data*, using iSpot's data as a source of truth to calculate accuracy: "TAD % coverage against (holding Ispot as truth) – (50% on reviewed channels of all movie airings, 20% on all)." **Ex. SSSS, EDO-00641012, May 8, 2017, TAD Brainstorm [Cui Depo. Ex. 131]; Ex. LL, Deshpande Tr. 137:16–139:7.** | Disputed. | Evidence cited does not support that EDO used iSpot to "set benchmarks" for the development of TV Ad Dataset.  Ex. SSSS does not state that EDO compared TAD data to iSpot data "to calculate accuracy." Nor does the document itself raise a reasonable inference that EDO did so. Mr. Deshpande testified that the May 2017 TAD Brainstorm document only spoke to the fact that "there was a comparison" between iSpot and TAD data (an undisputed fact), not that the comparison was done for accuracy. He further testified, "I don't know if people believed iSpot to be a source [of] accurate . . . information." **Ex. LL, Deshpande Tr. 138:15-18; Ex. ZZ Cui Tr. 137:4–138:14.** And he testified that he had no knowledge of any data comparison.  He testified that "[o]ther people would have done the work" on any data comparison and that he "wasn't really involved in that," and that he "couldn't really tell" whether such comparisons were made "for accuracy purposes." **Exhibit LL, Deshpande Tr. at 137:9–14.**  EDO compared iSpot data to TV Ad Dataset data "to evaluate if EDO could transition its existing search engagement analytics from iSpot to TAD." **SUF ¶ 55.** |
| 162 | For most of 2017, EDO was still concerned that iSpot might not renew its subscription and | Not disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | discovered Kantar as a potential backup source of ad airings data. **Ex. ZZ, Cui Tr. 30:10–18.** | | |
| 163 | On September 19, 2017, Kevin Krim wrote: ███████ ████████ ████ █████████ █████████ ████████ ██████████ **Ex. BBBBBB, EDO-00044716, Email from K. Krim to E. Norton, dated 9/20/17 [Krim Depo. Ex. 250] (emphasis added); Ex. E, Krim Tr. 245:7–249:4.** | Not disputed. | |
| 164 | EDO was concerned that Kantar could not provide real-time data like iSpot, but EDO eventually worked out a special arrangment to receive a raw feed of real-time data from Kantar. **Ex. LL, Deshpande Tr. at 165:15–166:12; Ex. ZZ, Cui Tr. 161:21–162:8.** | Partially disputed. | The evidence cited does not support that "EDO was concerned that Kantar could not provide real-time data like iSpot." |
| 165 | Kantar data also had holes that EDO had to fill using data collected with TV Ad Dataset, which as discussed had been developed at least in part with the help of iSpot data. **Ex. LL, Deshpande Tr. 154:11–20; Ex. ZZ, Cui Tr. 161:8–20, 164:15-25.** | Disputed. | Mr. Deshpande did not testify that "Kantar data also had holes that EDO had to fill using data collected with TV Ad Dataset," but actually testified that he was not involved "in evaluating whether TV Ad Dataset could be used to supplement the data supplied by Kantar." **Ex. LL, Deshpande Tr. 154:2–8.** Mr. Cui speculates that "there were probably some problems that we needed to patch up, using TAD," but attests to no personal knowledge |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | and a lack of recollection regarding use of TV Ad Dataset data to supplement Kantar. **Ex. ZZ, Cui Tr. 161:8–24, 164:18-25.** |
| | | | The cited evidence does not support that TV Ad Dataset "had been developed at least in part with the help of iSpot data." |
| 166 | To decide whether EDO could replace iSpot with Kantar and TV Ad Dataset, effective December 1, 2017, EDO entered the Kantar Agreement that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ to assess Kantar's data. **Ex. FFF, KANTAR-0006, at -0008, ¶ 11, Dec. 1, 2017 Kantar-EDO License Agreement.** | Partially disputed. | EDO does not dispute that it entered into a licensing agreement for Kantar airings data on December 1, 2017 or the text of that agreement. **SUF ¶ 58.** |
| | | | The cited licensing agreement does not speak to whether EDO entered into it "[t]o decide whether EDO could replace iSpot with Kantar and TV Ad Dataset" or whether "EDO would have two months to assess Kantar's data." |
| 167 | With access to Kantar data in December 2017, EDO began comparing and analyzing data from iSpot, Kantar, and TV Ad Dataset. **Ex. ZZ, Cui Tr. 154:23–155:20, 177:4–18; Ex. Q, Lee Tr. 171:9–172:16.** | Partially disputed. | EDO does not dispute that after EDO signed the agreement with Kantar, it compared samples of Kantar and iSpot airings data to transition its existing search engagement analytics from iSpot to Kantar. **SUF ¶ 59.** |
| | | | The cited evidence does not support that EDO began—or continued— comparing and analyzing data from iSpot and TV Ad Dataset after December 1, 2017. **SUF ¶ 55; Ex. UUUU, EDO-00639993 [Cui Ex. 134] (ispot_vs_tad table) (dated Oct. 17, 2017).** |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 168 | EDO performed the comparisons using iSpot's data and Kantar's data to evaluate how a switch would impart EDO's tv ad analytics service that competed with iSpot. **Ex. GGG, EDO-00236714, Dec. 12, 2017 Slack notification to S. Deshpande [Cui Depo. Ex. 137]; Ex. HHH, EDO-00646924, Kantar Integration, last modified Dec. 13, 2017 [Cui Depo. Ex. 136]; Ex. III, EDO-00646947, Dec. 12, 2017 Ava Weekly Update; Ex. CCCCC, EDO-00058110, June 2016 email chain between K. Krim et al. [Schorow Depo. Ex. 79]; Ex. ZZ, Cui Tr. 162:24–163:17, 176:6–23; Ex. LLL, Schorow Tr. 131:16–133:3.** | Partially Disputed. | EDO does not dispute that after EDO signed the agreement with Kantar, it compared samples of Kantar and iSpot airings data to transition its existing search engagement analytics—generated for its movie-studio clients—from iSpot to Kantar. SUF ¶ 59.<br><br>The evidence cited does not support that EDO performed such comparisons "to evaluate how a switch would impart EDO's tv ad analytics service that competed with iSpot." |
| 169 | For a demonstration to ▮▮▮ after the 2017 Agreement expired, EDO was concerned about its continued reliance on iSpot data: "Is it a risk that we admit we have iSpot data from December to January?" **Ex. DDDDDD, EDO-00644889, ▮▮▮Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** | Disputed. | Ex. DDDDDD does not support that "EDO was concerned about its continued reliance on iSpot data." Exhibit DDDDDD is notes EDO prepared to pitch ▮▮▮ in March 2018 on TV Ad Database. The pitch touts Kantar as a "suitable replacement for iSpot," and an EDO engineer was concerned that if EDO admitted to having used iSpot to generate SEV and SER metrics from December 2017 to January 2018 (still under the 2017 Agreement)—despite having licensed Kantar in December 2017—that it might undermine its endorsement of Kantar.<br><br>EDO has proffered unrebutted evidence that before the 2017 Agreement terminated on March 28, 2018, EDO |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | deleted all iSpot data from its database by truncating the tables in EDO's database schema that EDO used to store iSpot data. **Ex. Q, Lee Tr. 45:23–47:18; Ex. TT, EDO-00644865 at -866 (March 2018 Standard Data Retention Policy tasklist, listing various "ispot_" database tables under the heading "[t]runcate these tables"); Ex. MMM, EDO Responses to First Set of RFAs, at 12:14–13:17; Ex. I, Lee Decl. ¶ 6.** |
| 170 | EDO's own documentation from September 2020 confirms that it continues to retain iSpot historical data: "Additionally, histrical data coming from iSpot (Standard Retention Airings and TAD (tv_ad_datase) for **movies are in the Common Set." Ex. EEEEEE, EDO-00058446, Confluence Email to S. Deshpande re: AVA Data Engineering, dated 9/28/2020 [Deshpande Depo. Ex. 157].** | Disputed. | Exhibit EEEEEE does not support that EDO "continues to retain iSpot historical data." Exhibit EEEEEE refers to "Standard Retention Airings," which is the name of the database table in which EDO stored the derived data it used to replace the iSpot airings data underlying historical SEV and SER metrics. *See* SUF ¶¶ **68–69; Ex. I, Lee Decl. ¶ 10.** "Standard Retention Airings" does not refer to iSpot data or any data generated from iSpot data. |
| 171 | The Common Set is airings data. **Ex. LL, Deshpande Tr. 170:22–171:1.** | Disputed. | Mr. Deshpande could not recall the purpose of Exhibit EEEEEE, and merely speculated regarding the contents of the "Common Set." **Ex. LL, Deshpande Tr. at 170:5–171:9.** |
| 172 | Upon Ms. Teyfukova's departure from Horizon, Ms. Teyfukova received a copy of a Protective Covenants Agreement that she had previously signed with Horizon. **Ex. NNNN, Teyfukova Tr. 79:15–80:20; Ex. GGGGGG, EDO-00638313, Horizon Media Letter to N.** | Not disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | **Teyfukova about Horizon Media Handbook and Agreements, dated 8/27/2019 [Teyfukova Depo. Ex. 6].** | | |
| 173 | Ms. Teyfukova agreed in the Horizon Protective Covenants Agreement to keep secret the confidential business information and trade secrets of Horizon, Horizon's clients, and Horizon's vendors. **Ex. HHHHHH, EDO-00638389, Horizon Media Protective Covenants Agreement [Teyfukova Depo. Ex. 7].** | Not disputed. | |
| 174 | When accessing iSpot's services while employed by EDO, Ms. Teyfukova knew that she would not have been given access to iSpot except by virtue of a subscription agreement that provided her access. **Ex. NNNN, Teyfukova Tr. 64:14–64:23.** | Disputed. | Ms. Teyfukova testified that she understands "now" that she would not have been given access to iSpot except by virtue of a subscription agreement that provided her access, but not that she understood so "[w]hen accessing iSpot's services while employed by EDO." She also testified that she didn't know if she "thought of it" while she was working at Horizon. **Ex. NNNN, Teyfukova Tr. 64:14–64:23.** |
| 175 | At EDO, Ms. Teyfukova used the login credentials (username and password) she had obtained while at Horizon under STX's subscription to access iSpot's dashboard and download iSpot's trade secret information, including airings logs and spend data. **Ex. NNNN, Teyfukova Tr. 12:21–13:8, 29:9–22, 85:25–86:13, 89:7–90:4; Ex. IIIII, Teyfukova's Responses to iSpot's Requests for** | Partially disputed. | The evidence cited does not support that any of the information Ms. Teyfukova accessed or downloaded was a trade secret. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | **Admissions at 11:5–15, 13:1–26 (RFA Nos. 13, 16, 17); Ex. DDDDD, Muller Decl. ¶ 19.** | | |
| 176 | Ms. Teyfukova accessed the iSpot service and collected information for the iSpot service in the course of her work for EDO at the direction of her supervisor, Ed Rugoff, an EDO Executive Vice President. **Ex. IIIIII, Teyfukova's Responses to iSpot's Requests for Admissions at 6:1–26, 8:1–14, 8:24–9:17, 10:14–25, 15:6–16:5 (RFA Nos. 2, 3, 6, 8, 9, 12, 20, 21); Ex. DDDDD, Muller Decl. ¶¶ 20-23 & Exs. D–F.** | Not disputed. | |
| 177 | Ms. Teyfukova never paid any subscription fees to iSpot. **Ex. IIIIII, Teyfukova's Responses to iSpot's Requests for Admissions at 23:1–22 (RFA Nos. 38, 39).** | Not disputed. | |
| 178 | EDO used the data obtained from iSpot to conduct comparisons with EDO's data and quality check the accuracy of EDO's data, including whether an ad aired on tv and comparisons of estimated spend, *i.e.*, the costs of an ad time slot. **Ex. NNN, Teyfukova Tr. 23:4–23, 24:11–13, 24:23–25:20, 30:19–32:19, 33:11–24; Ex. JJJJJJ, N. Teyfukova's Responses to iSpot's First Set of Interrogatories at 15:15–16:10; Ex. DDDDDD, EDO-00644889,** | Disputed. | Ms. Teyfukova testified that "she logged into iSpot's dashboard and/or obtained iSpot Information only either to (1) compare discrete spend data EDO has received from Kantar with the spend data reflected in iSpot's database; or (2) cross check if iSpot had logged a TV ad airing that EDO's data had not captured." **Ex. KKKK, Teyfukova Responses to First Set of Interrogatories, at 16:23–26.** The cited evidence does not support that Ms. Teyfukova or anyone at EDO conducted comparisons between EDO and iSpot data to "quality check the accuracy of EDO's data." In fact, Ms. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | ▮▮▮ **Demo Plan, dated 5/4/2018 [Deshpande Depo. Ex. 156].** | | Teyfukova testified that "double-checking" with iSpot would "[n]ot necessarily" help "make sure that [EDO] had the most accurate information." **Ex. NNN, Teyfukova Tr. 25:3–8.** |
| 179 | Ms. Teyfukova was also involved in product development at EDO, and provided feedback on improving how EDO structured its database and EDO's data accuracy. **Ex. NNNN, Teyfukova Tr. 125:8–126:22.** | Disputed. | Ms. Teyfukova did not testify that she was "involved in product development at EDO." Rather, she testified that she was sometimes asked for feedback on dashboard workflow and data quality. **Ex. NNNN, Teyfukova Tr. 125:8–126:22.** In fact, Ms. Teyfukova testified that she never "g[ave] any feedback to anyone at EDO that it needed to add or modify features to match iSpot." Nor did she "provide any comparisons between EDO and iSpot to the EDO engineering team." *Id.* at 128:24–129:6.<br><br>Ms. Teyfukova was an analyst with no technical expertise and no role in product development. **SUF ¶ 97.** |
| 180 | After iSpot sued Ms. Teyfukova for improperly accessing iSpot's service ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ , **Ex. OOOO, Rugoff Tr. 24:2–26:1, 42:22–43:21, 49:2–14, 50:21–51:17, 167:14–168:14; Ex. MMMMMM, Rugoff00089, Redacted Version of E. Rugoff Notes of ▮▮▮▮ ▮▮▮▮ [Rugoff Depo. Ex.** | Disputed. | ▮▮▮▮▮▮▮▮▮▮▮▮ |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | 259]; **Ex. LLLLLL, Rugoff Tr. 193:24–194:2.** | | ███████ ████████ ████ |
| 181 | ███████████ ███████████ ████ **Ex. OOOO, Rugoff Tr. 43:12–21.** | Disputed. | ████████ █████████ ████████ ███████ ████████ ████████ █████████ ████████ █ |
| 182 | ████████ ████████ █████████ ██████ ██████ ███████ ████ **Ex. OOOO, Rugoff Tr. 37:19–40:2.** | Disputed. | █████████ ████████ ████████ ████████ ████████ █████████ ████████ █████████ ████████ ████████ █ ████████ ████████ █████████ ████████ █ |
| 183 | Ms. Teyfukova testified that Mr. Rugoff directed her to delete any files on her EDO laptop with iSpot information, and she did. **Ex. NNNN, Teyfukova Tr. 19:18–20:1, 20:19–20:23, 21:22–23:23, 121:2–123:24; Ex. OOOO, Rugoff Tr. 81:11–16.** | Not disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 184 | Ms. Teyfukova testified the relevant documents she deleted after the lawsuit was filed included downloads from iSpot's service, documents comparing iSpot's data to EDO's data, and communications related to iSpot. **Ex. NNNN, Teyfukova Tr. 18:23–19:17.** | Partially disputed. | Ms. Teyfukova testified that in addition to "spreadsheets of TV ad airings or spend data related to movie campaigns that she downloaded from iSpot's database" and "screenshots of the same," she deleted "*a single spreadsheet comprised of one tab comparing a small set of EDO spend data with corresponding iSpot spend data*" and "*a single text message between Ms. Teyfukova and Edward Rugoff that included one piece of iSpot spend data.*" **Ex. KKKK, Teyfukova's Responses to First Set of Interrogatories, at 15:21–16:10.** |
| 185 | Ms. Teyfukova further testified that she was instructed to lie about why she was accessing iSpot, and say that she would sometimes access iSpot out of personal curiosity. **Ex. NNNN, Teyfukova Tr. 114:12–21.** | Not disputed. | |
| 186 | The parties then conducted discovery relevant to this allegation with iSpot identifying all of the ways in which EDO misappropriated iSpot's trade secrets even before EDO hired Ms. Teyfukova. **Ex. NNNNNN, iSpot's First Supplemental Response to EDO's First Set of Interrogatories at 3:1–10; Ex. OOOOOO, iSpot's Responses to N. Teyfukova's Third Set of Interrogatories at 7:23–8:5; Ex. YYYY, iSpot's Amended and Supplemented Response to N. Teyfukova's Interrogatories 1,** | Disputed. | EDO does not dispute that iSpot served nearly identical interrogatory responses when asked to identify the alleged trade secrets Defendants misused and the alleged confidential information EDO allegedly misused in breach of contract.<br><br>EDO disputes that the parties conducted discovery on the assumption that iSpot's trade secrets claims covered conduct by EDO alone before it hired Ms. Teyfukova. Defendants understood from iSpot's counsel's April 2022 representation, and iSpot's filings with the Court, that iSpot was not pursuing trade secrets claims for conduct by EDO alone before it hired Ms. Teyfukova. **Ex. XXXX, Email** |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | 2, 5, and 10 at 6:19–24, 8:4–8, 13:21–24, 14:3–8. | | dated Apr. 11, 2022, from Gavin Skok to Demian Ordway; ECF 56 at 11 (iSpot opposition to Defendants' motion to dismiss FAC stating "iSpot does not assert separate contract and trade secrets claims against EDO for the same conduct or same time period. iSpot's breach of contract claims arise from the parties' contractual relationship in 2017-2018 . . . [while] iSpot's misappropriation of trade secrets claims against EDO and Ms. Teyfukova are separate, and relate to actions in 2019-2021 after the iSpot Contract was terminated."). EDO conducted discovery on this assumption. **Ex. FF, Pflaum Report ¶¶ 12, 174 –91 (providing expert testimony on trade secrets only as to Defendants' alleged use of iSpot through Ms. Teyfukova's login credentials).** |
| 187 | In discovery, EDO produced access to its tv analytics dashboard that was in use between 2016 and 2020. **Ex. FF, Pflaum Report at 77 n.242.** | Partially disputed. | EDO produced a version of its dashboard as it appeared from 2016-2020 with data going to 2024 but limited to the Theatrical Movies category. The dashboard also excluded EDO's proprietary search engagement data—including SER and SEV scores—and real-time EKG for TV ads. **Ex. FF, Pflaum Report ¶ 110, p. 77 n.242.** |
| 188 | ███████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ | Disputed. | The Ava Product dashboard only displayed the following iSpot data fields: ████████████████ ███████████████ **Ex. I, Lee Decl. ¶ 3.** Dr. Zervas does not opine—and |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ | | did no analysis to show—that the fields ▮▮▮▮▮▮▮▮▮▮ in EDO's dashboard came from iSpot, or that these fields constitute "iSpot raw data." iSpot cannot assume based just on the fact that iSpot offered certain data points that EDO used that data in its Ava Product dashboard. |
| 189 | In its presentation to ▮▮▮▮ in August 2016, EDO presented its prediction for opening box office ticket sales for the movie ▮▮▮▮▮▮ **Ex. PPPPPP, EDO-00004735–48, EDO's ▮▮▮▮▮▮ Analysis dated Aug. 16, 2016.** | Not disputed. | |
| 190 | In its presentation to ▮▮▮ in August 2016, EDO told ▮▮▮ that "Advertising analytics via Ava can provide additional context on the impact of TV spend to-date." **Ex. PPPPPP, EDO-00004735–48, EDO's ▮▮▮▮▮ Analysis dated Aug. 16, 2016.** | Not disputed. | |
| 191 | In August 2016, EDO made a presentation to ▮▮▮ that included a screenshot of EDO's dashboard that identified iSpot as the source of "est. spend" data and "est. impressions" data. **Ex. PPPPPP, EDO-00004735–48, EDO's ▮▮▮▮▮ Analysis dated Aug. 16, 2016.** | Partially Disputed. | EDO does not dispute that the screenshot at Ex. PPPPPP -747 states "Est. Spend and Est. Impressions are based on iSpot data." But EDO did not offer the Ava Product dashboard to clients until October 2016, so the screenshot in Ex. PPPPPP is not a screenshot of EDO's Ava Product dashboard. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 10:4–18.** |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 192 | "Traction" is the initial term that EDO used for its search engagement tv ad analytics metric. **Ex. E, Krim Tr. 157:22–158:16.** | Not disputed. | |
| 193 | If EDO needed iSpot's airings data to generate EDO's SEV and SER metrics, it makes no sense for EDO to claim that it could preserve the SEV and SER metrics without also preserving iSpot's airings data. **Ex. DDDDD, Muller Decl. ¶ 11.** | Disputed. | Mr. Muller has no personal knowledge of EDO's process for generating or preserving SEV and SER metrics, and his declaration does nothing to cast doubt on EDO's evidence explaining that process.<br><br>During the Contracting Period, EDO generated SEV and SER metrics for movie-studio clients by combining iSpot airings data with EDO's proprietary search engagement data that it has always created independently. **Ex. ZZ, Cui Tr. 111:1–112:22; Ex. I, Lee Decl. ¶¶ 8–9.** Before the 2017 Agreement expired, EDO deleted all iSpot airings data from its database but retained its historical SEV and SER metrics. **SUF ¶¶ 63–64.** In other words, EDO deleted the input data, but kept the output data.<br><br>To preserve the context for its SEV and SER metrics produced using iSpot airings data, in most instances EDO replaced the underlying iSpot airings data associated with those SEV and SER metrics with Kantar airings data. **Ex. I, Lee Decl. ¶ 9.** EDO identified a limited subset of SEV and SER metrics whose corresponding iSpot airings data did not match any Kantar airings data. To preserve the context for those SEV and SER metrics, EDO replaced iSpot airings data with data that EDO derived from other sources, such as EDO's |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | proprietary search engagement data. For example, EDO replaced iSpot brand names with EDO's search engagement entity names, and EDO replaced iSpot timestamps with EDO's search engagement spike start times. *Id.* ¶ 10. |
| 194 | The Nielsen terms and conditions attached as Exhibit A to the Declaration of Sean Muller provide in part: "You shall not and shall not permit any third party to (e) combine, integrate, match, connect, fuse, validate or in any way use the Services or Nielsen Information with any other data or with software programs provided from any other source. **Ex. DDDDD, Muller Decl. ¶¶ 7–10 & Ex. A.** | Not disputed. | |
| 195 | The Standard Terms and Conditions for Use of Kantar Marketplace Services attached as Exhibit B to the Declaration of Sean Muller provides in part: "Client shall not: … (b) access all or any part of the Services in order to build a product or service which competes with the Services." **Ex. DDDDD, Muller Decl. Ex. B.** | Not disputed. | |
| 196 | After the 2017 Agreement ended, EDO used data from both Kantar and TV Ad Dataset for its tv ad analytics service. **Ex. LL, Deshpande Tr. 154:11–20; Ex. ZZ, Cui Tr. 161:8–20, 164:15-25; Ex. Q, Lee Tr. 197:4–198:15.** | Partially Disputed. | EDO does not dispute that after the 2017 Agreement ended, EDO used Kantar to supply airings data to its TV ad airings database.<br><br>EDO disputes that it used any more than a "de minimis" amount of data from TV Ad Dataset in its TV ad airings database after the 2017 |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | | | Agreement ended. Mr. Lee testified that by May 2018, "EDO's airings data was comprised mostly of data from Kantar, and there was a de minimis amount of data from the ad dataset that we included for team morale purposes." **Ex. Q, Lee Tr. 231:21– 232:8;** *Id.* **at 197:4–198:21, 201:20– 202:23.**<br><br>Further, the cited evidence does not substantiate that EDO offered a "tv ad analytics service." |
| 197 | When iSpot was building its technology for computers to programmatically collect ad airings data from linear television, it was extremely challenging, because iSpot had no reference source to check whether our technology was accurately capturing the thousands of ads that air on tv. **Ex. DDDDD, Muller Decl. ¶ 4.** | Not Disputed. | |
| 198 | A reliable source of television ads, metadata, and airings data would have dramatically accelerated iSpot's development of our technology for programmatically collecting television ad airings data from linear television in real-time, because marketplace discovery, product development, product research, and software output errors would have been quickly identified without expensive and time-consuming manual review of television recordings by | Disputed. | Mr. Muller's statements that "a reliable source of television ads, metadata, and airings data would have dramatically accelerated iSpot's development" and "errors would have been quickly identified without expensive and time-consuming manual review" are purely speculative.<br><br>Mr. Muller provides no basis for his "expert" testimony regarding what could have benefitted iSpot in its development process. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | people or customers vetting iSpot's data over a lengthy period of time. **Ex. DDDDD, Muller Decl. ¶ 4; Ex. QQQ, Zervas Report at 7–11.** | | Mr. Zervas's report does not speak to what would have been true for iSpot. |
| 199 | EDO's claimed concerns about iSpot's data was related to iSpot's "spend" estimates, which were estimates of how much the advertiser paid to air the ad. **Ex. PPPPPP, Primrose Tr. 40:5–24; Ex. IIII, Jensen Tr. 45:21–46:9.** | Disputed. | EDO's concerns about iSpot's data included accuracy of airings data as well as spend. **Ex. ZZ, Cui Tr. 34:7–25; Ex. LL, Deshpande Tr. 138:15-18.** |
| 200 | EDO's tv ad analytics were operating off TV Ad Dataset and Kantar as of February 2, 2018, and that EDO "ended up requiring a lot more of [TV Ad Datase] than we expected and was delivered!" **Ex. DDD, EDO-00644354, EDO Objectives & Key Results: 2018 Q1 (10/21/17–3/30/18) [Deshpande Depo. Ex. 155].** | Disputed. | EDO does not dispute that Ex. DDD states that "By 2/2/18, Ava for movies is running off DAT+Kantar," and "[t]his ended up requiring a lot more of DAT than we expected and was delivered!" But this document does not support that "EDO's tv ad analytics were operating off TV Ad Dataset" as of February 2, 2018. Rather, Joshua Lee testified, in response to this document, that in February 2018 only 0.00001% of EDO's movie airings data had been generated by TV Ad Dataset. **Ex. Q, Lee Tr. 201:20–202:23.**<br><br>Further, the cited evidence does not substantiate that EDO offered a "tv ad analytics" service. |
| 201 | EDO created "tv_ads" and "tv_ad_airings" tables within EDO's database schema to store ad airings data and develop EDO's Ava tv ad analytics | Disputed. | EDO does not dispute that it created "tv_ads" and "tv_ad_airings" tables within EDO's database schema to store ad airings data. |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | product. **Ex. ZZ, Cui Tr. 157:21–159:5.** | | EDO disputes that it created these tables "to develop" Ava. Further, the evidence cited does not substantiate that Ava was a tv ad analytics product. Ava Data was "a generalized data platform" that "ingests airings data (from any source) and combines them with Search Engagement data to produce analysis." **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 8:1–3.** Ava Product "was a dashboard user interface that internal analysts initially used to perform analysis for SAAG and later Ad Analytics using Ava Data," then offered to clients in October 2016. *Id.* at 9:4–5. |
| 202 | EDO continued to use these same "tv_ads" and "tv_ad_airings" tables for its tv ad analytics and competitive intelligence database product called TV Ad Database, which was later renamed AdEngage. **Ex. LLL, Schorow Tr. 127:1–3, 128:2–7; Ex. Q, Lee Tr. 45:10–22, 74:10–75:9; Ex. UUUUU, EDO-00003259–60, Email from T. Ho to J. Lee, dated 3/1/2017 [Lee Depo. Ex. 225].** | Disputed. | EDO does not dispute that TV Ad Database was later renamed Ad EnGage Competitive Intelligence. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 7:11–12.** EDO also does not dispute that it continued to use database tables called "tv_ads" and "tv_ad_airings" in Ad EnGage. **Ex. LLL, Schorow Tr. 127:1–3, 128:2–7.** The cited evidence does not say whether tables used in TV Ad Database or Ad EnGage were the same "tv_ads" and "tv_ad_airings" tables discussed in Material Fact No. 201. Further, the cited evidence does not substantiate that EDO offered a "tv ad analytics" service. |
| 203 | The source of data for "tv_ads" and "tv_ad_airings" included TV | Disputed. | Neither Mr. Deshpande nor Mr. Lee testified that TV Ad Dataset was a |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | Ad Dataset. **Ex. LL, Deshpande Tr. 158:12–20; Ex. Q, Lee Tr. 195:6–13.** | | source for EDO's "tv_ads" and "tv_ad_airings" tables. EDO used only a "de minimis" amount of data generated by TV Ad Dataset in EDO's TV ad airings database. **Ex. Q, Lee Tr. 197:4–198:21, 201:20–202:23, 231:21–232:8.** |
| 204 | One of EDO's purposes for the TV Ad Dataset projected was to "remove dependency on iSpot." **Ex. DDD, EDO-00644354, EDO Objectives & Key Results: 2018 Q1 (10/21/17–3/30/18) [Deshpande Depo. Ex. 155].** | Not disputed. | |
| 205 | EDO's initial disclosures did not identify Bobby Shen as a possible witness. **Ex. RRRRRR, Defendants' Rule 26 Initial Disclosures at 2:12–4.** | Partially disputed. | EDO does not dispute that it did not identify Mr. Shen in its initial disclosures.<br><br>But EDO does not intend to rely on Mr. Shen as a trial witness.  In any event, EDO identified Mr. Shen as a primary developer of Atlas in its June 2023 interrogatory responses, putting iSpot on notice of his identity at the outset of discovery. **Ex. J, EDO's Responses to iSpot's First Set of Interrogatories at 15:24–28;** *Davis v. Davison Hotel Co.,* **LLC, 2013 WL 3337669, at \*2–3 (C.D. Cal. July 1, 2013) (no prejudice when witness not identified in initial disclosures if opposing party was "on notice" of that witness through interrogatory responses).** |
| 206 | Bobby Shen began working at EDO in October 2017 while EDO still had an iSpot subscription. **Ex. OOO, LinkedIn, "Bobby Shen," available at https://www.linkedin.com/in/bo** | Not disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | bby-c-shen; Ex. XX, ISPOT_0011016 [Sullivan Brock Ex. 31] (email attachment: 2017 Agreement). | | |
| 207 | EDO's commit log showing changes made to EDO's source code does not prove that EDO never used the iSpot service to build or contribute to EDO's products. **Ex. FFFFFF, Pflaum Tr. 217:23-219:13.** | Disputed. | The purported factual statement in paragraph 207 is an argument, not a fact.<br><br>In any event, EDO does not have the burden to "prove that EDO never used the iSpot service to build or contribute to EDO's products." In any event, iSpot misstates Mr. Pflaum's testimony. Mr. Pflaum testified that EDO's commit log reflects "consistent indicia of independent development activities," and Dr. Zervas could not "conclude that there was derivation without dealing with it at all." **Ex. FFFFFF, Pflaum Tr. 217:23-219:5.** Mr. Pflaum further testified that the commit log "makes it much less likely" that "EDO derived aspects of the iSpot service for EDO's own competing products." *Id.* **at 219:6–13.** |
| 208 | The iSpot credentials issued to Nayda Teyfukova were used after August 27, 2019 to log into iSpot more than a hundred times and perform hundreds of downloads of iSpot data. **Ex. DDDDD, Muller Decl. ¶ 19 & Exs. D–E.** | Not Disputed. | |
| 209 | The iSpot credentials issued to Nayda Teyfukova were used after August 27, 2019 to perform hundreds of downloads of iSpot data. **Ex. DDDDD (Muller Decl. ¶ 19–22 & Exs. D–F.** | Not Disputed. | |

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| 210 | Edward Rugoff was the Executive Vice President of EDO, reporting directly to Mr. Krim the CEO, and his responsibilities included managing EDO's entertainment client relationships, soliciting new business, participating in the day-to-day analyses and sending of EDO reports to clients, and responding to questions from clients. **Ex. OOOO, Rugoff Tr. 58:3–8, 60:22–24.** | Not disputed. | |
| 211 | The report from FTI only relates to Ms. Teyfukova's laptop. **Ex. NNNN, Teyfukova Tr. 19:3–9; Ex. KKKK, Teyfukova Responses to First Set of Interrogatories at 15:28–16:10; Ex. E, Krim Tr. 16:8–17:2.** | Not Disputed. | |
| 212 | EDO maintains that there is nothing wrong with using its client's iSpot credentials to access iSpot's system through a proxy to hide EDO's identity. **Ex. Q, Lee Tr. 134:15–138:24.** | Not disputed. | |
| 213 | iSpot lost customers to EDO. **Ex. RRRR, Cook Report ¶ 25.** ██████████ ██████████ ██████████ ██████████ ██████████ **Ex. ZZZZ, iSpot's Responses to EDO's Fourth Set of Interrogatories at 23:13–26:25 (Response to Interrogatory No.** | Disputed. | The evidence cited does not support that "iSpot lost customers to EDO" but merely identifies the fact that some clients of iSpot contracted with EDO at some point after ceasing to work with iSpot. The evidence does not say that any client ceased contracting with iSpot because of EDO, or whether EDO provided the customers with the same or similar services as iSpot. |

PARTIES' SUF & GENUINE DISPUTES, CONCLUSIONS OF LAW
RE DEFS.' MSJ
CASE NO. 2:21-CV-06815-MEMF-MAR

| ¶ No. | Material Fact | Status | Opposition |
|---|---|---|---|
| | 22); Ex. VV, Myers Tr. 166:22–183:15. | | |
| 214 | EDO did no diligence beyond asking to determine whether EDO's clients actually had iSpot subscriptions before giving those clients access to iSpot's data. **Ex. E, Krim Tr. 179:25–180:25.** | Not disputed. | |
| 215 | Section 4.6 of the 2017 Agreement ("Remedies") states: "To the extent permitted by appliable law, the rights and remedies of the parties provided under this Agreement are cumulative and in addition to any other rights and remedies of the parties at law or equity." **Ex. XX, ISPOT_0011016 at -19 [Sullivan Brock Ex. 31] (email attachment: 2017 Agreement).** | Not disputed. | |
| 216 | Subscribing to Kantar's data allowed EDO to expand its TV Ad Analytics services to industries other than movies, including the auto industry. **Ex. QQQQQQ, EDO-00043262, Email from K. Krim to EDO Accounting, dated 12/26/2017.** | Not disputed. | |

**PLAINTIFF'S CONCLUSIONS OF LAW**

| Conclusion | Relevant Facts |
|---|---|
| Section 1.3(b) of the 2017 Agreement provided that EDO "may not share any data retrieved via the iSpot Service outside of Company's organization, other than as permitted in Section 1.2." Nothing in Section 1.2 permitted EDO to provide EDO's own customers with access to data retrieved via the iSpot Service, including iSpot's estimated spend and estimated impressions data. | ¶ 102 |
| Section 1.3(c) of the 2017 Agreement provided that EDO "may not resell, redistribute, sublicense, copy, transfer, lease, or authorize the resale or redistribution, sublicensing, copying, transferring or leasing of the iSpot service or any element thereof to any third party." | ¶ 102 |
| Section 1.3(d) of the 2017 Agreement provided that EDO "may not modify, create derivative works of, reverse engineer, disassemble, decompile, or otherwise attempt to derive the source code or underlying trade secrets of the iSpot Service." | ¶ 102 |
| Section 1.3(e) of the 2017 Agreement provided that EDO could not use the iSpot Service to build or contribute to any other TV monitoring or analytics service, except could be used for EDO's "own predictive movie analytics service" in compliance with Section 1.2 above. | ¶ 102 |
| A reasonable jury could find that, based on the circumstances surrounding the making of the 2017 Agreement, that EDO's "own predictive movie analytics service" meant EDO's model that predicting movie box office ticket sales and not a tv ad analytics service. | ¶¶ 102, 112–123, 133–157 |
| Section 1.3(g) of the 2017 Agreement provided that EDO "may not …make use of any iSpot Materials other than in accordance with the terms this Agreement." | ¶ 102 |
| Section 1.3(i) of the 2017 Agreement provided that EDO "may not utilize data to build any services that comp[]ete with iSpot.tv, Inc. or gives the impression that they compete with iSpot.tv, Inc." | ¶ 102 |
| A reasonable jury could find that EDO breached Section 1.3(b), Section 1.3(c) and/or Section 1.3(g) of the 2017 Agreement by retrieving data via the iSpot Service (including iSpot's estimated spend and estimated impressions data), and then sharing this data | ¶¶ 102, 133–134, 142, 186–195 |

| Conclusion | Relevant Facts |
|---|---|
| with EDO's customers through reports and EDO's tv ad analytics dashboard. | |
| A reasonable jury could find that EDO breached Section 1.3(d), Section 1.3(e), Section 1.3(g), and/or Section 1.3(i) of the 2017 Agreement by using the iSpot Service to build or contribute to the database for EDO's tv ad analytics service, including its tables, structure and schema, and then using the database for EDO's tv ad analytics service. | ¶¶ 102, 126–132, 201–202 |
| A reasonable jury could find that EDO breached Section 1.3(d), Section 1.3(e), Section 1.3(g), and/or Section 1.3(i) of the 2017 Agreement by using the iSpot Service to build or contribute to the dashboard for EDO's tv ad analytics service, including the features and functionality of iSpot's dashboard. | ¶¶ 102, 133–134, 142, 186–195 |
| A reasonable jury EDO also violated Sections 1.3(d), 1.3(e), and/or 1.3(f) of the by using data retrieved via the iSpot Service as a reference source for checking the accuracy and efficacy of EDO's TV Ad Dataset technology for collecting tv ads and tv ad metadata, which EDO needed to supplement data from Kantar and to compete with iSpot. | ¶¶ 102, 157–168, 169–171, 196–204 |
| A reasonable jury could find that EDO violated Sections 1.3(d), 1.3(e), 1.3(g) and 1.3(i) of the 2017 Agreement by retaining iSpot data and using it for EDO's TV Ad Database after the 2017 Agreement expired. | ¶¶ 102, 169–171 |
| Genuine issues of material fact preclude summary judgment on Plaintiff's breach of contract claim. | ¶¶ 1–36, 41–84, 102, 107–171, 212–223, 133–157 |
| Under Washington law, Plaintiff may seek restitution or restoration damages for Defendant EDO's breach of contract. | ¶ 215 |
| A reasonable jury could find that Defendants misappropriated iSpot's trade secrets by logging into iSpot's service without a subscription, using credentials from Ms. Teyfukova's former employer and then accessing iSpot's data to determine whether it differed from EDO's data. | ¶¶ 172–186, 208–211 |
| A reasonable jury could find that Defendants damaged iSpot by logging into iSpot's service without a subscription, using | ¶¶ 172–186, 208–211 |

| Conclusion | Relevant Facts |
|---|---|
| credentials from Ms. Teyfukova's former employer and then accessing iSpot's data to determine whether it differed from EDO's data. | |
| A reasonable jury could find that EDO misappropriated iSpot's trade secrets by using iSpot's data to create and/or support a competitive tv ad analytics service. | **¶¶ 124, 126-134, 139-142, 148-150, 169-161, 166-171, 172–195, 197-198, 200–204, 208–211** |
| Genuine issues of material fact preclude summary judgment on Plaintiff's trade secrets claim. | **¶¶ 124, 126-134, 139-142, 148-150, 169-161, 166-171, 172–195, 197-198, 200-204, 208–211** |

144

Parties' SUF & Genuine Disputes, Conclusions of Law
re Defs.' MSJ
Case No. 2:21-cv-06815-MEMF-MAR